**No. 26-1930**

---

**UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT**

---

AFRICAN COMMUNITIES TOGETHER; PARTNERSHIP FOR THE ADVANCEMENT OF NEW AMERICANS; ALEXANDER DOE; MOHAMED DOE; TYSON DOE; AND NINA DOE,

*Plaintiffs-Appellants*,

v.

MARKWAYNE MULLIN, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; AND UNITED STATES OF AMERICA,

*Defendants-Appellees*,

---

On Appeal from an Order of the United States District Court for the District of Massachusetts (Burroughs, J.) in No. 1:26-cv-11201-ADB

---

# BRIEF OF APPELLANTS

---

Nargis Aslami
Sadaf Hasan
MUSLIM ADVOCATES
1763 Columbia Rd. N.W.
#14324
Washington, DC 20009
(202) 897-2622
Nargis@muslimadvocates.org
Sadaf@muslimadvocates.org

Kacey Mordecai
Mide Odunsi
NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
(202) 682-1300
kmordecai@naacpldf.org
modunsi@naacpldf.org

*Additional counsel on inside cover*

*Counsel continued from front page*

Melissa Keaney
Abbey Rutherford
MUSLIM ADVOCATES
1763 Columbia Rd. N.W. #14324
Washington, DC 20009
(202) 897-2622
Melissa@muslimadvocates.org
Abbey@muslimadvocates.org

Erik Crew
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
(949) 603-7411
ECrew@haitianbridge.org

Deuel Ross
Amia Trigg
Warrington E. Sebree
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
(202) 682-1300
dross@naacpldf.org
atrigg@naacpldf.org
wsebree@naacpldf.org

Matthew Callahan
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(202) 965-2200
mcallahan@naacpldf.org

*Counsel for Appellants*

## STATEMENT REQUESTING ORAL ARGUMENT

Plaintiffs respectfully request oral argument because this appeal concerns important questions about the statutory and constitutional limits on the federal government's ability to deprive immigrants in the United States of vital, Congressionally-authorized protections and benefits.

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellants African Communities Together ("ACT") and Partnership for the Advancement of New Americans ("PANA") state that they are nonprofit corporations with no parent corporation, and that no publicly held corporation owns 10% or more of stock or an ownership interest in ACT or PANA.

*/s/ Kacey Mordecai*
Kacey Mordecai

*Counsel for Appellants*

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ vi

INTRODUCTION ........ 1

JURISDICTIONAL STATEMENT ........ 4

STATEMENT OF THE ISSUES ........ 5

STATEMENT OF THE CASE ........ 6

I. The TPS program ........ 6

II. TPS grants eligible individuals non-discretionary benefits and protections ........ 7

III. Required procedures for termination of TPS designations ........ 8

IV. Discriminatory targeting of Somalis surrounding the Termination ........ 8

V. Procedural deficiencies in the Termination ........ 9

VI. Procedural Background ........ 11

SUMMARY OF THE ARGUMENT ........ 13

STANDARD OF REVIEW ........ 16

ARGUMENT ........ 16

I. The District Court Has Jurisdiction to Review All of Plaintiffs' Claims. ........ 16

II. Plaintiffs Are Likely to Succeed on the Merits of Their Equal Protection Claims. ........ 19

A. Plaintiffs' Evidence Satisfies *Mullin*'s Criteria for Discriminatory Intent. ........ 20

B. The District Court Erred by Failing to Consider the Merits of Plaintiffs' National Origin-Based Discrimination Claim. ................27

III. Plaintiffs Are Likely to Succeed on the Merits of Their Procedural Due Process Claims. ....................................................................30

A. Plaintiffs Have Protected Property and Liberty Interests in the Continued Receipt of Existing TPS Benefits. .................................31

B. Plaintiffs Have a Legitimate Claim of Entitlement to These Interests. ..........................................................................................34

C. The Conditional Nature of TPS Benefits Does Not Foreclose Plaintiffs' Interests. ................................................................................35

D. Defendants' Discretion in Terminating TPS Is Limited and Does Not Preclude Constitutional Protection. ................................37

E. Plaintiffs Were Deprived of Constitutionally Adequate Process. ..........................................................................................39

IV. Plaintiffs Are Likely to Succeed on the Merits of Their *Ultra Vires* Claim. .........................................................................................45

A. The District Court Erred in Adopting Defendants' EOIR-Only Theory. ..........................................................................................46

B. TPS Termination Authority Is Exclusively Vested in the Attorney General and That Authority Was Not Transferred. ...........54

V. The Remaining Preliminary Injunction Factors Favor Plaintiffs. ..............55

CONCLUSION .........................................................................................57

CERTIFICATE OF COMPLIANCE ...............................................................59

CERTIFICATE OF SERVICE .......................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.A.R.P. v. Trump*,
605 U.S. 91 (2025) .... 40

*Acosta de Mata v. Sullivan*,
832 F. Supp. 3d 1338 (N.D. Ga. 2026) .... 33, 36

*Adame v. Holder*,
762 F.3d 667 (7th Cir. 2014) .... 42

*Afr. Cmtys. Together v. Mullin*,
No. 1:25-cv-13939, 2026 WL 2274504 (D. Mass. Aug. 7, 2026) .... 48–50, 52

*Anderson ex rel. Dowd v. City of Boston*,
375 F.3d 71 (1st Cir. 2004) .... 20

*Aponte-Rosario v. Acevedo-Vila*,
617 F.3d 1 (1st Cir. 2010) .... 40

*Ariz. Dream Act Coal. v. Brewer*,
757 F.3d 1053 (9th Cir. 2014) .... 56

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*,
515 U.S. 687 (1995) .... 49

*Bd. of Regents of State Colls. v. Roth*,
408 U.S. 564 (1972) .... 34–35, 38

*Beitzell v. Jeffrey*,
643 F.2d 870 (1st Cir. 1981) .... 34

*Bell v. Burson*,
402 U.S. 535 (1971) .... 32

*Bolling v. Sharpe*,
347 U.S. 497 (1954) .... 20

*Boniface v. Viliena*,
145 F.4th 98 (1st Cir. 2025) .......... 27, 30

*Bos. All. of Gay, Lesbian, Bisexual & Transgender Youth v. U.S. Dep't of Health & Hum. Servs.*,
557 F. Supp. 3d 224 (D. Mass. 2021) .......... 19

*Bridges v. Wixon*,
326 U.S. 135 (1945) .......... 34

*Buck v. Davis*,
580 U.S. 100 (2017) .......... 24

*Bufkin v. Collins*,
604 U.S. 369 (2025) .......... 49

*Cal. Wilderness Coal. v. U.S. Dep't of Energy*,
631 F.3d 1072 (9th Cir. 2011) .......... 43

*Calvary Chapel Belfast v. Univ. of Me. Sys.*,
180 F.4th 13 (1st Cir. 2026) .......... 21

*Campanale & Sons, Inc. v. Evans*,
311 F.3d 109 (1st Cir. 2002) .......... 43

*Carey v. Piphus*,
435 U.S. 247 (1978) .......... 44

*Castaneda v. Partida*,
430 U.S. 482 (1977) .......... 27

*Ching v. Mayorkas*,
725 F.3d 1149 (9th Cir. 2013) .......... 34

*City of Arlington v. FCC*,
569 U.S. 290 (2013) .......... 45

*Cleveland Bd. of Educ. v. Loudermill*,
470 U.S. 532 (1985) .......... 35, 39

*Clukey v. Town of Camden*,
717 F.3d 52(1st Cir. 2013) .....37

*Coal. for Indep. Tech. Rsch. v. Rubio*,
836 F. Supp. 3d 215 (D.D.C. 2026) .....18

*Dart Cherokee Basin Operating Co. v. Owens*,
574 U.S. 81 (2014) .....3

*Davis v. District of Columbia*,
158 F.3d 1342 (D.C. Cir. 1998) .....56

*Davis v. Mich. Dep't of Treasury*,
489 U.S. 803 (1989) ..... 52, 54

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) .....28

*Doe v. Trump*,
157 F.4th 36 (1st Cir. 2025) .....56

*Enyart v. Nat'l Conf. of Bar Examiners, Inc.*,
630 F.3d 1153 (9th Cir. 2011) .....56

*Facebook, Inc. v. Duguid*,
592 U.S. 395 (2021) .....50

*Febus v. Gallant*,
866 F. Supp. 45 (D. Mass. 1994) .....43

*Gibson Found., Inc. v. Norris*,
159 F.4th 147 (1st Cir. 2025) .....14

*Goldberg v. Kelly*,
397 U.S. 254 (1970) .....36

*Gustafson v. Alloyd Co.*,
513 U.S. 561 (1995) .....52

*Immigr. & Naturalization Serv. v. Cardoza-Fonseca*,
480 U.S. 421 (1987) .....51

*In re Coughlin*,
33 F. 4th 600 (1st Cir. 2022)....................50

*Ky. Dep't of Corr. v. Thompson*,
490 U.S. 454 (1989).................... 37, 39

*Lamie v. U.S. Tr.*,
540 U.S. 526 (2004)....................48

*Leiva-Perez v. Holder*,
640 F.3d 962 (9th Cir. 2011) ....................56

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024).................... 45, 51

*Make the Rd. N.Y. v. Mullin*,
179 F.4th 16 (D.C. Cir. 2026)....................18

*Mallette v. Arlington Cnty. Emps.' Supplemental Ret. Sys. II*,
91 F.3d 630 (4th Cir. 1996) ....................37

*Mansor v. U.S. Citizenship & Immigr. Servs.*,
685 F. Supp. 3d 1000 (W.D. Wash. 2023) .................... 31–32, 38–39

*Marx v. Gen. Revenue Corp.*,
568 U.S. 371 (2013)....................49

*Massachusetts v. U.S. Dep't of Health & Hum. Servs.*,
682 F.3d 1 (1st Cir. 2012)....................26

*Mathews v. Eldridge*,
424 U.S. 319 (1976).................... 30, 40–41

*Medina v. DHS*,
313 F. Supp. 3d 1237 (W.D. Wash. 2018) .................... 33, 36

*Mhany Mgmt., Inc. v. Cnty. of Nassau*,
819 F.3d 581 (2d Cir. 2016) ....................24

*Morrissey v. Brewer*,
408 U.S. 471 (1972)....................33

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
339 U.S. 306 (1950)....................42

*Mullin v. Al Otro Lado*,
609 U.S. 258 (2026)....................50

*Mullin v. Doe*,
609 U.S. 324 (2026).................... *passim*

*Nat'l Ass'n of Broads. v. FCC*,
39 F.4th 817 (D.C. Cir. 2022)....................45

*Nat'l TPS All. v. Noem*,
150 F.4th 1000 (9th Cir. 2025)....................37

*New York v. Trump*,
171 F.4th 1 (1st Cir. 2026)....................16

*Ocean State Tactical, LLC v. Rhode Island*,
95 F.4th 38 (1st Cir. 2024)....................16

*Parada v. Anoka Cnty.*,
54 F.4th 1016 (8th Cir. 2022)....................27

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979)....................49

*Rice v. Cayetano*,
528 U.S. 495 (2005)....................29

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan*,
397 F.3d 56 (1st Cir. 2005)....................55

*Romer v. Evans*,
517 U.S. 620 (1996)....................26

*Ross v. Meese*,
818 F.2d 1132 (4th Cir. 1987)....................56

*Saget v. Trump*,
375 F. Supp. 3d 280 (E.D.N.Y. 2019)....................38

*Saint Francis Coll. v. Al-Khazraji*,
481 U.S. 604 (1987).....29

*Santiago v. Mun. of Utuado*,
114 F.4th 25 (1st Cir. 2024).....16

*Sinai v. New England Tel. & Tel. Co.*,
3 F.3d 471 (1st Cir. 1993).....28

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944).....51

*Smith v. Goodnow*,
No. C83-120-L, 1983 WL 2229 (D.N.H. Sep. 26, 1983).....39

*Somerville Pub. Schs. v. McMahon*,
139 F.4th 63 (1st Cir. 2025).....57

*St. Luke's Hosp. v. Sec'y of Health & Hum. Servs.*,
810 F.2d 325 (1st Cir. 1987).....51

*Swarthout v. Cooke*,
562 U.S. 216 (2011).....31

*Sylvia Dev. Corp. v. Calvert Cnty.*,
48 F.3d 810 (4th Cir. 1995).....28

*Truax v. Raich*,
239 U.S. 33 (1915).....32

*Truswal Sys. Corp. v. Hydro-Air Eng'g, Inc.*,
813 F.2d 1207 (Fed. Cir. 1987).....27

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001).....48

*Turner v. Fouche*,
396 U.S. 346 (1970).....24

*United States v. Rubalcava Gonzales*,
179 F. Supp. 3d 917 (E.D. Mo. 2016).....53

*United Steelworkers of Am., AFL-CIO v. Textron, Inc.*,
836 F.2d 6 (1st Cir. 1987) .......... 56

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) .......... 20–21, 25

*Washington v. Trump*,
847 F.3d 1151 (9th Cir. 2017) .......... 40

*Webster v. Doe*,
486 U.S. 592 (1988) .......... 18

*Wilkinson v. Austin*,
545 U.S. 209 (2005) .......... 42

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,
186 F.4th 25 (1st Cir. 2026) .......... 16

*Zadvydas v. Davis*,
533 U.S. 678 (2001) .......... 30

**Statutes**

28 U.S.C. § 1292(a)(1) .......... 4

28 U.S.C. § 1331 .......... 4

5 U.S.C. § 706(2) .......... 45

6 U.S.C. § 251 .......... 7, 55

6 U.S.C. § 271 .......... 7, 55

6 U.S.C. § 557 .......... 55

8 U.S.C. § 1103 .......... *passim*

8 U.S.C. § 1105(b) .......... 53

8 U.S.C. § 1189(d)(4) .......... 53

8 U.S.C. § 1231(i) .......... 53

8 U.S.C. § 1254a ........................................ *passim*

8 U.S.C. § 1532 ........................................ 52

8 U.S.C. § 1533 ........................................ 53

**Other Authorities**

135 Cong. Rec. H7501 (daily ed. Oct. 25, 1989) ........................................ 38

68 Fed. Reg. 52407 (Sep. 3, 2003) ........................................ 7

68 Fed. Reg. 9824 (Feb. 28, 2003) ........................................ 50

8 C.F.R. § 244.10(e) ........................................ 8

8 C.F.R. § 244.2 ........................................ 7

8 C.F.R. § 244.4 ........................................ 7

8 C.F.R. § 244.5 ........................................ 8

8 C.F.R. § 244.9 ........................................ 7

89 Fed. Reg. 21182 (Mar. 29, 2024) ........................................ 28

90 Fed. Reg. 34067 (July 18, 2025) ........................................ 53

90 Fed. Reg. 45969 (Sep. 24, 2025) ........................................ 53

91 Fed. Reg. 10402 (Mar. 3, 2026) ........................................ 7

91 Fed. Reg. 1547 (Jan. 14, 2026) ........................................ 1

Press Release, DOJ, Off. of Pub. Affs., *Department of Justice Files First Case in U.S. Alien Terrorist Removal Court to Deport Afghan Alien Who Supported Her Family's Plans for Election-Day Shooting* (July 30, 2026), https://perma.cc/2CXR-BXFN ........................................ 53

Stephen R. Viña, Cong. Rsch. Serv., RL31997, *Authority to Enforce the Immigration and Nationality Act (INA) in the Wake of the Homeland Security Act: Legal Issues* (July 16, 2003) ........................................ 47

Tr. of Oral Arg., *Mullin v. Doe*, No. 25-1083 (U.S. Apr. 29, 2026), https://www.supremecourt.gov/oral_arguments/argument_transcripts/2025/25-1083_0pl1.pdf........................................................................................17

## INTRODUCTION

On January 14, 2026, Defendants published a Federal Register Notice terminating Somalia's designation for Temporary Protected Status ("TPS") (the "Termination"), which aimed to end TPS and its attendant benefits for Somali nationals for the first time in thirty-five years. 91 Fed. Reg. 1547 (Jan. 14, 2026), Add.44–50.[1] The Termination left approximately 2,500 Somalis in the United States—including Plaintiffs—at immediate risk of detention, deportation, separation from their family members, and of being forced to return to verifiably unsafe conditions. Add.49. Immediately upon the Termination's effective date, beneficiaries were stripped of their work authorization,[2] and were at risk of losing eligibility for drivers' licenses, health insurance, and other basic necessities.

The Termination did not comport with the Fifth Amendment's constitutional mandates or the TPS statute. The district court properly found that it had jurisdiction to review Plaintiffs' *ultra vires* claim under the Administrative Procedure Act ("APA") and their equal protection and procedural due process claims under the Fifth Amendment. Add.12, Add.34. However, the district court erred in not

[1] References to the Addendum are cited as "Add. ___", to the Appendix as "App. ___", and to district court filings as "Dkt. ___."

[2] E-Verify, Termination of Temporary Protected Status for Somalia (Release: Aug. 14, 2026), https://www.e-verify.gov/about-e-verify/whats-new/termination-of-temporary-protected-status-for-somalia-release-aug-14-2026.

extending its jurisdictional analysis to review Plaintiffs' constitutional claims under the APA, Add.34, which are constitutional in nature despite being brought via the APA. Furthermore, the district court's ruling that Plaintiffs are unlikely to succeed on the merits of their equal protection, procedural due process, and *ultra vires* claims, Add.27, Add.30, Add.34–35, cannot be reconciled with constitutional jurisprudence, the plain text of the TPS statute, nor the robust evidence in the record. This Court should reverse the district court's denial of Plaintiffs' motion for emergency relief.

Plaintiffs are likely to succeed on their equal protection claims even considering the Supreme Court's reasoning in *Mullin v. Doe* that the evidence in that case failed to prove that the termination of Haiti's TPS was motivated by race. 609 U.S. 324, 350 (2026). President Trump and Defendants targeted Somalis specifically with overtly racist and xenophobic rhetoric that relied on racist stereotypes of criminality and low intelligence and made fun of their Muslim faith, evidence that was not considered in *Mullin*. *Compare id.* at 349 *with*, *e.g.*, App.180, App.234, App.237, App.290, App.600. The administrative record is replete with unsubstantiated fraud allegations and selective examples of crimes allegedly committed by Somalis, who were not beneficiaries of TPS status, to justify the Termination. App.428–35, App.476–77. Simultaneously, the Administration was pursuing aggressive immigration policies and targeted enforcement operations

against Somalis, App.225–29, App.331–36, App.578, App.601, to promote their expulsion from the country. Given the wealth of evidence demonstrating that Defendants' discriminatory intent motivated, at least in part, the Termination, the district court's conclusion that Plaintiffs are unlikely to succeed on their equal protection claims because these "racist" statements are factually insufficient or lack precedent to sustain them, Add.30, Add.33–34, was grounded in an "erroneous view of the law" that constitutes an abuse of discretion. *See Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 91 (2014) (citation omitted).

The district court likewise erred in holding that Defendants need not comply with due process obligations prior to the Termination. Add.27–28. Plaintiffs have constitutionally-protected property and liberty interests in the work authorization benefit and protection from detention and removal TPS status confers, which the district court dismissed as merely "[i]nterests in procedure." Add.27. However, the deprivation of Plaintiffs' TPS benefits is subject to due process even though these benefits and protections are conditional on Somalia's TPS designation, a decision that is itself constrained by statute. And Defendants failed to provide the minimally adequate process the Constitution requires. Plaintiffs are therefore likely to succeed in establishing a due process violation.

Finally, although the Secretary of the Department of Homeland Security ("DHS") (hereinafter "Secretary") purported to effectuate the Termination for

Somalia, the plain text of the TPS statute is clear that it is the Attorney General who holds such authority. 8 U.S.C. § 1254a, Add.37–41. No statutory provision transferring this authority to the DHS Secretary exists, rendering the Secretary's action *ultra vires* and the Termination unlawful under the APA.

Plaintiffs are thus likely to succeed on the merits of each of their claims, and the district court abused its discretion in holding otherwise. Without this Court's intervention, thousands of Somalis in the United States, including Plaintiffs, will continue to be at risk of immediate and irreparable harm from the unlawful and unconstitutional Termination. Because Plaintiffs have established a likelihood of success on the merits, and the substantial risk of irreparable harm and other equities favor Plaintiffs, Plaintiffs are entitled to emergency relief postponing or enjoining the Termination.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over all of Plaintiffs' claims under 28 U.S.C. § 1331. It entered its order denying Plaintiffs' motion for postponement and preliminary injunction on August 14, 2026, Add.36, and Plaintiffs timely filed the notice of appeal that same day, App.623. This Court has jurisdiction over the district court's interlocutory order under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

Whether the district court's order denying Plaintiffs' motion for postponement and for preliminary injunction should be reversed because:

1. The district court has jurisdiction over all of Plaintiffs' claims because they are reviewable under the TPS statute, 8 U.S.C. § 1254a(b)(5)(A), Add.38;
2. Plaintiffs are likely to succeed on the merits of their equal protection claims where Defendants and President Trump used racially overt language against Somalis and intentionally targeted Somalis for immigration, detention, and enforcement, indicating that Defendants acted with discriminatory intent based on Somalis' race and national origin in the Termination;
3. Plaintiffs are likely to succeed on the merits of their procedural due process claim because they have constitutionally-protected property and liberty interests in the non-discretionary employment authorization and protection from removal and detention that TPS status confers, which they were deprived of without due process of law; and
4. Plaintiffs are likely to succeed on the merits of their claim that Defendant Secretary of DHS acted in excess of statutory authority under the APA in issuing the Termination because TPS termination authority resides solely in the Attorney General.

## STATEMENT OF THE CASE

On January 14, 2026, the Secretary announced the termination of Somalia's designation for TPS in the Federal Register. Add.44–50. Congress created the TPS program in 1990 to offer categorical humanitarian protection to nationals of countries experiencing dire conditions that render return for their nationals unsafe. Dkt. 5-1 at 28. Somalia was first designated for TPS a year later, in 1991, Add.44, and for the thirty-five years prior to the Termination, the country's TPS status was continuously redesignated or extended because either or both the ongoing armed conflict and extraordinary circumstances statutory grounds made return for Somalis unsafe, Add.44–45, App.504 n.30.

### I. The TPS program

In creating the TPS program, Congress sought to replace the prior practice of ad hoc presidential grants of country-based humanitarian protection.[3] Congress vested the Attorney General with TPS decision making authority to be exercised in accordance with the TPS statute's clear parameters and timelines for designation, extension and termination of TPS designations. 8 U.S.C. § 1254a(b), Add.37–38. From 1990 through 2002, the Attorney General exercised this authority by issuing TPS designations and terminations. Dkt. 5-4 at 8. In 2002, Congress enacted the

[3] 101 Cong. Rec. 25811, 25838 (Oct. 25, 1989), Dkt. 5-1 at 29 (statement of Rep. Sander Levine debating the immediate precursor to the TPS statute).

Homeland Security Act ("HSA"), creating DHS to absorb many of the functions of the Immigration and Naturalization Service ("INS"), which had been overseen by the Attorney General.[4] Although the HSA transferred some immigration-related powers from the Attorney General to DHS, *see, e.g.*, 6 U.S.C. §§ 251, 271, no such provision transferred the Attorney General's TPS termination authority. Although the DHS Secretary has asserted that such transfer of authority occurred with the HSA and has issued TPS terminations since 2003, that assertion of authority has not previously been challenged.[5]

## II. TPS grants eligible individuals non-discretionary benefits and protections

Once a country is designated for TPS, its nationals may apply for TPS if they satisfy stringent and ongoing eligibility and vetting requirements. *See* 8 U.S.C. § 1254a(c), Add.39–40. Applicants undergo rigorous screening for potential grounds of ineligibility including a disqualifying criminal history, *see id.* § 1254a(c)(1), Add.39; *see also* 8 C.F.R. §§ 244.2, 244.4, 244.9. TPS applicants with *prima facie* eligibility must receive employment authorization and protection from removal

---

[4] Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135.

[5] *See, e.g.*, 68 Fed. Reg. 52407 (Sep. 3, 2003); 91 Fed. Reg. 10402 (Mar. 3, 2026) (announcing the DHS Secretary's terminations of TPS designations for Sierra Leone and Yemen, respectively, pursuant to the Attorney General's authority).

while their application is pending. 8 U.S.C. § 1254a(a)(1), (a)(4), (d)(4), Add.37, Add.40; 8 C.F.R. §§ 244.5, 244.10(e).

## III. Required procedures for termination of TPS designations

The TPS statute establishes guidelines to determine whether to extend or terminate TPS designations. The Attorney General must first "consult[] with appropriate agencies of the Government" and then "review the conditions in the foreign state" to determine whether the conditions for the TPS designation "continue to be met." 8 U.S.C. § 1254a(b)(3)(A), Add.38. The Attorney General may terminate a TPS designation only if she determines that a country "no longer continues to meet the conditions for designation," *id.* § 1254a(b)(3)(B), Add.38, and must publish "the basis for the determination" in the Federal Register, *id.* If the Attorney General fails to timely publish a decision, the statute requires that the TPS designation "is extended" automatically for "6 months" at least. *Id.* § 1254a(b)(3)(C), Add.38.

## IV. Discriminatory targeting of Somalis surrounding the Termination

Leading up to, and contemporaneous with, the Termination, President Trump, Defendants, and other Administration officials repeatedly made derogatory statements about Somalis calling them "scammers," "crooked," "stupid," "low IQ" "criminals," members of "Somali gangs," "pirates," and animals who "prey" on others, invoking pernicious and false stereotypes about Black people, criminality and low intelligence. *See, e.g.*, App.175, App.180, App.234, App.237, App.290,

App.515 ¶ 111, App.520 ¶123, App.521 ¶125. Defendants also mocked Somalis for displays of their Muslim faith, including wearing hijabs. App.180, App.600. Defendants employed this discriminatory rhetoric exclusively against Somalis. Defendants also selectively referenced articles that accused Somalis who are not TPS holders of crimes to validate the Termination. App.428–35, App.476–77.

Concurrently, Defendants pursued a series of actions that encouraged expulsion of Somalis from the country. *See* App.516–19 ¶¶ 115–120, App.175–319, App.602–605. Defendant DHS launched its "largest immigration enforcement operation ever," to target Somalis in Minnesota. *See* App.225–29, App.577–81. DHS also commenced "a sweeping initiative" to reexamine Somali refugee cases that had already passed security screening and background checks and been admitted to the United States, App.601, while fast-tracking asylum hearings for Somali immigrants to the month the Termination was to take effect, App.331–36.

**V. Procedural deficiencies in the Termination**

Departing from the TPS statute's requirements, the Secretary undertook no consultation with appropriate agencies regarding country conditions in Somalia prior to the Termination. The certified administrative record ("CAR") contains only a single-line email exchange between DHS and the State Department that records the State Department's lack of "foreign policy objections to a change in TPS for Somalia." App.441. Evidence that was routinely considered in prior reviews of

Somalia's TPS designation, including the State Department's Level 4 Travel Advisory that indicated extremely unsafe conditions in Somalia, App.337–41, was not considered, and Defendants cherry-picked evidence of supposed improvements in country conditions to justify their conclusion that conditions permitted safe return. *Compare, e.g.*, Add.46 (stating Somalia "has transitioned from a failed state to a fragile state") (citation modified), *with* App.364 (the same report stating "security remains fragile" in Somalia). A DHS memorandum identifies November 5, 2025, as the "estimated start date" for the Termination, App.421, but the agency's reporting on relevant country conditions was not completed until November 17, 2025, almost two weeks later, *see* App.364, App.386, indicating that the Termination was decided prior to the required assessment of country conditions and that the published "basis for the determination" did not reflect this assessment. *See* 8 U.S.C § 1254a(b)(3)(A), Add.38.

The Termination immediately stripped Somali TPS holders and applicants—including the four individual Plaintiffs— of work authorization and protections from immigration enforcement and detention, which puts them at risk of deportation and forced separation from their loved ones. App.149, App.151–52, App.155, App.159–60. They also face forced removal to Somalia and the risks of harm there, including armed conflict, humanitarian crises, and other extraordinarily dangerous

circumstances, or forced removal to unsafe third countries. App.149, App.152, App.156, App.160.

## VI. Procedural Background

After Defendants published the Termination on January 14, 2026, Plaintiffs filed this suit on March 9, 2026, challenging the Termination as a violation of the APA and the Fifth Amendment and seeking an emergency stay of the agency action as well as postponement of the Termination under 5 U.S.C. § 705. App.21–116; Dkt. 3. On March 13, 2026, the district court administratively stayed the effective date of the Termination to allow the parties to fully brief Plaintiffs' request for preliminary relief. Add.1–4.

After briefing was complete but before arguments were heard, the district court entered an unopposed administrative stay of this case pending the Supreme Court's decision in *Mullin v. Doe*, which concerned the termination of TPS for Haiti and Syria, and ordered the parties to file a joint status report within 14 days of the issuance of an opinion, Add.6, which was ultimately issued on June 25, 2026. 609 U.S. 324. Before the date set for filing the joint status report, Defendants filed a motion to lift the district court's administrative stay of both the case and the Termination. Dkt. 77. The district court lifted the administrative stay of the case but left the stay of the Termination in place until the parties completed briefing on *Mullin*'s impact. Add.7.

Defendants responded by appealing to this Court to seek summary reversal and vacatur of the district court's order, or, in the alternative, mandamus to dissolve the district court's stay. Dkt. 84. While that request was pending, on July 30, 2026, Plaintiffs filed an amended complaint, App.481–571, and a renewed emergency motion for a stay, postponement, and preliminary injunction, Dkt. 91. The next day, the district court dissolved its previous stay of the Termination and entered a new stay to allow for briefing on Plaintiffs' renewed motion. Add.8. Accordingly, this Court dismissed the pending appeal. Add.9–11. On August 3, 2026, Defendants filed a motion asking the district court to lift the new stay. Dkt. 97. The next day, the district court issued an order directing Plaintiffs to respond to Defendants' stay motion and an expedited briefing schedule that had briefing on Plaintiffs' emergency motion complete within 48 hours. App.619–22. One week after briefing was completed, on August 13, 2026, Defendants filed yet another motion to lift the stay. Dkt. 108.

On August 14, 2026, the district court granted Defendants' motions to lift the stay of the Termination and denied Plaintiffs' motion for preliminary relief. Add.12–36. That same day, pursuant to 28 U.S.C. § 1292(a)(1), Plaintiffs timely noticed this interlocutory appeal of the district court's decision denying their motion. App.623.

## SUMMARY OF THE ARGUMENT

The district court abused its discretion in denying Plaintiffs' motion for emergency relief based on their equal protection, procedural due process, and *ultra vires* claims. Contrary to the district court's order, for each claim, Plaintiffs have demonstrated that jurisdiction exists and that they are likely to succeed on the merits. And, as the district court correctly found, the remaining factors favor granting Plaintiffs' preliminary relief to prevent imminent and irreparable harm to their lives, families, and livelihoods.

*First*, nothing prevents the district court from reviewing Plaintiffs' claims. The district court rightfully found that it has jurisdiction over Plaintiffs' *ultra vires* and pure constitutional claims. Add.21, Add.34. Regarding the latter, the district court correctly relied on the Supreme Court's conclusion in *Mullin* that Congress expressed no intent to foreclose review of constitutional claims. Add.21. However, the court erred in its jurisdictional analysis by failing to extend this reasoning to Plaintiffs' constitutional claims under the APA, which are constitutional in nature despite their statutory vehicle. *Contra* Add.34. As a result, the TPS statute permits review of each of Plaintiffs' claims.

*Second*, Plaintiffs are likely to succeed on the merits of each claim. Regarding their equal protection claims, Plaintiffs' robust and unique Somali-specific evidence, including statements the district court recognized to be "racist," Add.30, cannot be

disregarded based on the *Mullin* Court's characterization of a wholly distinct record, about *Haiti*'s TPS termination, as representative of "race-neutral" policy views against Somalis. 609 U.S. at 348. The district court "based its ruling on an erroneous view of the law" that constitutes an abuse of discretion. *Gibson Found., Inc. v. Norris*, 159 F.4th 147, 152 (1st Cir. 2025) (citation omitted). Likewise, the district court abused its discretion in ignoring Plaintiffs' strong showing that, in the district court's own words, "Somalia and its people are being targeted," due to insufficient precedent on national origin discrimination. Add.32; *see Gibson Found.*, 159 F.4th at 152. Plaintiffs' direct and circumstantial evidence weigh conclusively in favor of finding that Plaintiffs are likely to succeed in showing that Defendants acted with discriminatory intent based on Somalis' race and national origin when they issued the Termination.

Plaintiffs have also shown that they are likely to succeed on their procedural due process claims because they have protected property and liberty interests in the continuation of existing, mandatory, TPS benefits conferred by their TPS status—including work authorization and protection from removal and detention. The district court erroneously concluded that no liberty or property interest exists because the benefits are conditional on Somalia's TPS designation, and Defendants have some discretion over that decision. *See* Add.27. However, Plaintiffs' interests in these benefits are constitutionally protected even though they are conditional on

Somalia's TPS designation, a determination that is itself constrained by statute, and Defendants have some discretion in the Termination. Finally, Defendants failed to provide the minimum process the Constitution requires before Plaintiffs' interests were deprived.

The district court also abused its discretion in holding that the Secretary had statutory authority for the Termination based on Defendants' untenable theory—that the only immigration-related powers retained by the Attorney General under the HSA are those related to the Executive Office for Immigration Review ("EOIR"). *See* Add.35. Defendants' theory violates multiple canons of statutory interpretation and is refuted by numerous statutory examples authorizing the Attorney General to conduct non-EOIR related immigration duties and functions, which the Attorney General exercises to this day. Setting aside this demonstrably erroneous theory, Defendants have not provided any statutory basis to support the Secretary's authority to issue the Termination. Therefore, Plaintiffs are likely to succeed on the merits of their *ultra vires* claim.

*Lastly*, and as the district court correctly found, the irreparable harm and other equitable factors overwhelmingly favor granting Plaintiffs' motion for emergency relief. Add.35–36.

Accordingly, Plaintiffs are entitled to preliminary injunctive relief, and this Court should reverse the district court's contrary decision below.

## STANDARD OF REVIEW

This Court reviews the denial of a preliminary injunction for abuse of discretion. *See Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 42 (1st Cir. 2024), *cert denied*, 145 S. Ct. 2771 (2025). In conducting that review, this Court "review[s] the legal issues de novo and the factual findings for clear error." *New York v. Trump*, 171 F.4th 1, 15 (1st Cir. 2026) (citation omitted). This Court "must conclude an abuse of discretion occurred when a district court bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Santiago v. Mun. of Utuado*, 114 F.4th 25, 34 (1st Cir. 2024) (citation modified). The same abuse of discretion standard applies to decisions to postpone agency actions under the APA. *See Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 186 F.4th 25, 39 (1st Cir. 2026).

## ARGUMENT

### I. The District Court Has Jurisdiction to Review All of Plaintiffs' Claims.

The district court correctly held that neither the TPS statute's judicial review bar, 8 U.S.C. § 1254a(b)(5)(A),[6] nor the U.S. Supreme Court's interpretation of it in *Mullin*, which foreclosed review of non-constitutional challenges to the Secretary's

[6] "There is no judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." 8 U.S.C. § 1254a(b)(5)(A), Add.38.

determinations, bars review of Plaintiffs' *ultra vires* and pure constitutional claims.[7] Add.21, Add.34.[8] However, the Court erred in declining to extend its analysis on the constitutional claims to Plaintiffs' contrary to constitutional right claims under the APA. Add.34. These claims are equally constitutional in nature even if the APA is the vehicle for relief, and the district court's findings on reviewability of constitutional claims apply equally to them.

In holding it can exercise jurisdiction over Plaintiffs' constitutional claims, the district court properly adopted the Supreme Court's reasoning in *Mullin* that where "Congress intends to preclude judicial review of constitutional claims[,] its intent to do so must be clear." 609 U.S. at 345 (quoting *Webster v. Doe*, 486 U.S. 592, 603 (1988));[9] Add.22. The court also correctly determined that there was no

---

[7] Defendants also rely on Section 1252(f)(1), which is non-jurisdictional and operates only to limit certain remedies. As Plaintiffs explain, Dkt. 125 at 4–5, § 1252(f)(1) does not prohibit the district court's jurisdiction because it does not apply to the TPS statute, and, moreover, would not bar Plaintiffs' APA-based or declaratory relief.

[8] The district court correctly concluded that it would have jurisdiction "because the judicial-review bar only applies to decisions by the statutorily-authorized decision-maker," Add.34, and for all the reasons in Section IV, *see infra*, the authority for the Termination was never transferred to the Secretary.

[9] The Government itself conceded at oral argument in *Mullin* that it would "have to be fighting with [Supreme Court precedent] . . . to argue that there's no judicial review of [] constitutional claims" under § 1254a(b)(5)(A). Tr. of Oral Arg. 26:22–27:8, *Mullin*, No. 25-1083 (U.S. Apr. 29, 2026), https://www.supremecourt.gov/oral_arguments/argument_transcripts/2025/25-1083_0pl1.pdf.

reason to "conclude that Congress departed from over two hundred years of history by denying all remedies for constitutional claims when it passed 8 U.S.C. § 1254a." Add.22–23.

Plaintiffs' contrary to constitutional right claims under the APA, (Counts II and IV), are reviewable for the same reasons. *See* Add.34. The fact that Plaintiffs bring their claims under the APA does not convert them into mere statutory claims subject to the TPS statute's jurisdictional bar. *Contra* Add.34. The case the *Mullin* Court relied on for its jurisdictional analysis of Plaintiffs' constitutional claims, *Webster v. Doe*, itself held that a statutory bar on judicial review of agency action did not apply to a plaintiff's constitutional challenge under the APA. 486 U.S. at 603. Citing *Webster*, the Court of Appeals for the District of Columbia Circuit recently held that a challenge that sought vacatur of agency action as unconstitutional "was properly reviewed" for unlawful agency action under 5 U.S.C. § 706(2)(B). *Make the Rd. N.Y. v. Mullin*, 179 F.4th 16, 30 (D.C. Cir. 2026) ("Constitutional challenges to agency action are . . . resolved within the APA's judicial review framework."). And at least one district court has applied this logic to review a contrary to constitutional right claim under the APA post-*Mullin*. *See Coal. for Indep. Tech. Rsch. v. Rubio*, 836 F. Supp. 3d 215, 244–45 (D.D.C. 2026), *appeal docketed*, No. 26-5324 (D.C. Cir. Sep. 16, 2026) (calling the APA "the vehicle rather than the destination" for constitutional claims). That aligns with a prior district court

ruling in this circuit that contrary to constitutional right claims are "constitutional in substance" although they "arise[] under" the APA. *See Bos. All. of Gay, Lesbian, Bisexual & Transgender Youth v. U.S. Dep't of Health & Hum. Servs.*, 557 F. Supp. 3d 224, 245 (D. Mass. 2021).

In sum, the district court properly decided it could consider Plaintiffs' *ultra vires* and pure constitutional claims. However, this Court should correct the district court's failure to extend its reasoning on reviewability of constitutional challenges to Plaintiffs' constitutional claims brought under the APA, which was an abuse of discretion.

## II. Plaintiffs Are Likely to Succeed on the Merits of Their Equal Protection Claims.

The district court's holding that Plaintiffs were unlikely to succeed on their race and national origin-based equal protection claims was grounded in an erroneous view of the law that constituted an abuse of discretion. The district court found that Plaintiffs had "strong" evidence of Defendants' "racist" statements against Somalis. Add.30. Yet the district court also determined that evidence was indistinguishable from the evidence in *Mullin*, which, according to the *Mullin* Court, did not reflect statements by decisionmakers that were "overtly racial," and instead expressed "policy views that could rest on race-neutral justifications." 609 U.S. at 348; *see also* Add.31. The district court's analysis is grounded in a misinterpretation of *Mullin* and therefore an erroneous view of the law, because the record here includes statements

and other actions that reflect clear racial, national origin, and religious bias even under the *Mullin* Court's reasoning. Premised on this error of law, the district court made factual findings that were contradictory and clearly erroneous. Likewise, the district court also erred in holding that the limited body of law addressing national origin discrimination undermined Plaintiffs' national origin-based claim when it found that Plaintiffs' evidence "clearly show[ed] that Somalia and its people are being targeted" by Defendants. Add.32.

### A. Plaintiffs' Evidence Satisfies *Mullin*'s Criteria for Discriminatory Intent.

The district court correctly applied the *Arlington Heights* framework to consider Plaintiffs' challenge under the Fifth Amendment's implicit equal protection guarantee, which prohibits any government action that is motivated by discrimination based on race or national origin. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ("*Arlington Heights*"); *Bolling v. Sharpe*, 347 U.S. 497, 498–500 (1954); *Oyama v. California*, 332 U.S. 633, 640 (1948). The *Arlington Heights* analysis "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available" to "[d]etermin[e] whether invidious discriminatory purpose was a motivating factor" in the government action. *Anderson ex rel. Dowd v. City of Boston*, 375 F.3d 71, 83 (1st Cir. 2004) (quoting *Arlington Heights*, 429 U.S. at 266). Plaintiffs need only show that the discriminatory purpose or intent was "one of the 'motivating factor[s]' . . . not the only motivating factor"

for Defendants' actions. *See Calvary Chapel Belfast v. Univ. of Me. Sys.*, 180 F.4th 13, 26 (1st Cir. 2026) (quoting *Arlington Heights*, 429 U.S. at 265–66).

However, the district court erred in determining that *Mullin*, which found insufficient evidence that race motivated the termination of Haitian TPS, required finding that Plaintiffs were unlikely to succeed on their Somali-specific equal protection claims. Defendants' derogatory statements about Somalis prior to, during, and after the Termination are overtly racial and single out Somalis in a manner that is wholly distinct from statements reflecting the "administration's general stance on immigration," which the Supreme Court referred to in *Mullin*. 609 U.S. at 349. Additionally, circumstantial evidence the *Mullin* Court did not consider, including Defendants' policies uniquely targeting Somalis for expulsion, further demonstrate Defendants' discriminatory intent. Accordingly, Plaintiffs have shown that discriminatory intent was a motivating factor in the Termination and are likely to succeed on their equal protection claims.

#### 1. The Statements by Termination Decisionmakers Are Distinct from Those Considered in *Mullin.*

"Contemporary statements by members of the decisionmaking body" are "highly relevant" direct evidence of racially discriminatory intent. *Arlington Heights*, 429 U.S. at 268. During the period leading up to and contemporaneous with

the Termination, Defendants and President Trump[10] frequently invoked racial epithets and tropes when referring to Somalis. This language was directed only at Somalis and meets the "overtly racial" standard the *Mullin* Court established as overcoming "race-neutral justifications." *Mullin*, 609 U.S. at 348.

The district court acknowledged that "Plaintiffs lay out a strong case for why the at-issue statements were racist," Add.30, which is a noteworthy and legally-relevant distinction from *Mullin*. The *Mullin* Court considered President Trump's statements that Haitians are "eating" dogs, cats, and pets, "probably have AIDS," come from a "shithole country" and are "poisoning the blood" of the country, 609 U.S. at 366–67 (Kagan, J., dissenting).[11] The *Mullin* Court found that these statements about Haitians were not "overtly racial" and only 1) "express[ed] strong objections" to immigration and immigrants or generally "associate[d] these immigrants with crime and other social ills"; 2) "express[ed] great displeasure with

---

[10] In *Mullin*, the Supreme Court considered President Trump's statements in its *Arlington Heights* analysis. *See* 609 U.S. at 346–47; *see also* Add.30 ("The *Mullin* majority, too, appeared to assume, though it did not explicitly state, that the President's statements could factor into the equal-protection analysis.").

[11] Plaintiffs respectfully disagree that the statements about Haitians in the *Mullin* record are not racial and thus agree with Justice Kagan that they reflect "racial stereotypes and tropes" about Black people. *Mullin*, 609 U.S. at 367 (Kagan, J., dissenting). Nevertheless, Plaintiffs assert that President Trump and Defendants' statements about Somalis here explicitly and overtly link all Somalis to criminality and low intelligence, invoking well-known racial stereotypes about people of African descent that the Supreme Court itself has recognized as evidence of unconstitutional intentional discrimination. *See generally* Sec. II.

TPS"; 3) "broadly denigrate[d]" TPS-designated countries; or 4) "malign[ed]" Haitians in the United States. 609 U.S. at 347. Similarly, the Secretary's statements demonstrated only general "antipathy" towards immigration and immigrants or criticized "past implementation" of TPS. *Id.* at 347–48. The *Mullin* Court concluded that the statements at issue "expressed policy views that could rest on race-neutral justifications." *Id.* at 348.

Here, however, Defendants' and President Trump's statements about Somalis employed racial stereotypes that cannot be viewed as race neutral. *See generally* App.611–18. President Trump overtly equated all Somalis with criminality and low intelligence solely because of their race and national origin. He called all Somalis "scammers," App.515 ¶ 111, "stupid, crooked people," App.521 ¶ 125, and referred to Somalis as "convicted murderers, drug dealers and addicts, rapists, violent released and escaped prisoners, . . . and other deadly criminals," App.237. Defendants, President Trump, and other Administration officials have regularly used the word "pirate" and pirate imagery to demean all Somalis. *See, e.g.*, App.234, App.290, App.512 ¶ 102 ("[W]hen you import a population whose primary occupation is pirate, that they are going to come here and steal everything we have.") For example, in multiple social media posts referencing the Termination, President Trump referred to Somalis as gang members, stating "Somalian gangs are roving the streets looking for 'prey.'" App.180, App.509–10 ¶¶ 95, 97. Furthermore,

Defendants, President Trump, and other Administration officials repeatedly amplified misleading allegations that Somalis in Minnesota are committing fraud. App.235, App.512–15 ¶¶ 103–105, 108, 111. These statements rely on "powerful racial stereotype[s]" of people of African descent as innately criminal and "violence prone," *Buck v. Davis*, 580 U.S. 100, 121 (2017) (discussing prejudicial testimony that a Black person's race indicated an "increased probability" of future violence), or unintelligent and not morally "upright," *Turner v. Fouche*, 396 U.S. 346, 361 (1970) (finding that dismissal of African American jurors as "not 'upright' or 'intelligent'" established a *prima facie* case of racial discrimination). The Supreme Court itself has recognized both as evidence of unconstitutional intentional discrimination. *Buck*, 580 U.S. at 124; *Turner*, 396 U.S. at 361; *see also Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 609, 611 (2d Cir. 2016) (describing "[r]acially-charged code words" as indicative of discriminatory intent). These targeted racial stereotypes about Somalis' criminality and intelligence were not considered in *Mullin*.

Thus, the "*Mullin* prism" the district court invoked cannot foreclose Plaintiffs' equal protection claims because of the overtly racial, Somali-specific statements here. *See* Add.31. Each of the terms Defendants and President Trump used to denigrate Somalis has racist origins. *See, e.g.*, App.175, App.180, App.234, App.237, App.290–91; Dkt. 92 at 11–16 (describing racist history of use of animal

imagery, pirate imagery, and criminal terminology). These attacks were directed only at Somalis and are therefore distinct from comments that "associate" immigrants generally "with crime and other social ills." *Mullin*, 609 U.S. at 347. These statements present a compelling record that discrimination based on Somalis' race and national origin motivated, at least in part, the Termination. The district court's holding that these "racist" statements are not "more illustrative of racial antipathy than were those in *Mullin*," Add.31, is incorrect and should be reversed.

**2. Plaintiffs' Circumstantial Evidence Further Supports Discriminatory Intent and Was Not at Issue in *Mullin*.**

Plaintiffs also present Somali-specific circumstantial evidence that was not considered in *Mullin*. In addition to statements by decisionmakers, the procedural departures from the norm, the "specific sequence of events," and "historical background" surrounding the Termination are relevant to the *Arlington Heights* analysis. *See* 429 U.S. at 267. These factors all weigh in favor of finding Defendants' discriminatory intent. While Defendants and President Trump repeatedly amplified unsubstantiated racist claims of Somalis' criminality, App.235, App.269–70, Defendants selectively included articles spotlighting allegations of fraud in Minnesota and criminal activity by non-TPS holders in the administrative record, weaponizing the same stereotypes underlying their racist rhetoric to justify the

Termination. *See* App.428–435.[12] Moreover, Defendants enacted several policies that uniquely targeted Somalis for detention and deportation, including fast-tracked asylum hearings, asylum case referrals to immigration judges with lower application acceptance rates, and the "largest immigration enforcement operation ever carried out by [Defendant DHS]" against Somalis in Minnesota. *See* App.225–29, App.331–36. These policies continued the Administration's history of barring Somalis from entering the country. *See, e.g.*, Dkt. 6-17; Dkt. 8-4; Dkt. 9-1; App.602. The procedural departures from the TPS statute's consultation and assessment of country conditions requirements also demonstrate that Defendants acted with discriminatory intent. *See infra* Sec. III.

The district court recognized that even without the racist statements, the weight of "[t]his circumstantial evidence clearly shows that Somalia and its people are being targeted." Add.32.[13] This is sufficient to show that race was at least one

---

[12] Notably, none of these articles allege any criminal wrongdoing by Somali TPS holders, each of whom underwent a rigorous vetting process and would be ineligible for TPS in the event of a disqualifying criminal history. 8 U.S.C. § 1254a(c)(1)(A), (2)(B).

[13] This singular targeting of Somali nationals also reflects a "bare desire to harm a politically unpopular group" that violates equal protection. *Romer v. Evans*, 517 U.S. 620, 634 (1996) (quoting *Dep't of Agr. v. Moreno*, 413 U.S. 528, 534 (1973)); *Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 682 F.3d 1, 8–13 (1st Cir. 2012) (reasoning that the government's bare desire to harm a historically disadvantaged group cannot withstand constitutional scrutiny).

motivating factor in the Termination, and the district court abused its discretion by holding that Plaintiffs were unlikely to succeed on their equal protection claims.

### B. The District Court Erred by Failing to Consider the Merits of Plaintiffs' National Origin-Based Discrimination Claim.

For similar reasons, the district court abused its discretion in finding that Plaintiffs were unlikely to succeed on their national origin-based discrimination claim based solely on the lack of controlling precedent. National origin discrimination, including in the immigration context, constitutes unlawful discrimination. *See, e.g.*, *Parada v. Anoka Cnty.*, 54 F.4th 1016, 1020 (8th Cir. 2022) (holding nationality-based municipal policy violated the Equal Protection Clause); *cf. Castaneda v. Partida*, 430 U.S. 482, 500–01 (1977) (holding that discrimination against Mexican-Americans violated the Equal Protection Clause). The absence of controlling precedent indicates a question of first impression, not a dispositive ground for denying Plaintiffs' requested relief. *See Truswal Sys. Corp. v. Hydro-Air Eng'g, Inc.*, 813 F.2d 1207, 1210–11 (Fed. Cir. 1987) (finding district court abused its discretion by granting motion to quash based on lack of controlling precedent); *see also Boniface v. Viliena*, 145 F.4th 98, 112 (1st Cir. 2025) (vacating in part and remanding for district court to consider argument that it previously failed to address because "[w]hile we are not aware of other courts that have grappled with these precise questions, we are confident that the district court can do so"). The district court acknowledged that "national origin is a characteristic that merits the greatest

degree of protection under our constitutional equal protection jurisprudence," Add.33, but improperly relied on the "absence of more settled law on national-origin discrimination" and the lack of "examples of successful challenges to federal agency action based on national origin" to conclude that Plaintiffs were unlikely to succeed, Add.33–34.

Had the district court assessed the merits of Plaintiffs' claim under the proper constitutional standard, it should have concluded that Plaintiffs are equally likely to succeed on their race and national origin claims.[14] As this Court has recognized, race and national origin discrimination are often "identical as a factual matter: one was born in the nation whose primary stock is one's own ethnic group." *Sinai v. New England Tel. & Tel. Co.*, 3 F.3d 471, 474 (1st Cir. 1993) (quoting *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 614 (1987) (Brennan, J., concurring)).[15]

---

[14] The *Arlington Heights* framework also applies to equal protection claims based on national origin, *see, e.g.*, *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 821–825 (4th Cir. 1995) (applying *Arlington Heights* to a national origin discrimination claim), and in the immigration context, *see, e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 34 (2020).

[15] Plaintiffs ask the Court to take judicial notice of federal standards for data on race and ethnicity that define "Black or African American" to include people of Somali national origin. 89 Fed. Reg. 21182, 22191(Mar. 29, 2024) (defining "Black or African American" as "[i]ndividuals with origins in any of the Black racial groups of Africa, including, for example, African American, Jamaican, Haitian, Nigerian, Ethiopian, and Somali").

Several of Defendants' and President Trump's overtly racist statements are intertwined with negative stereotypes about Somalis indicating intersectional discrimination based on race and Somalis' national origin and ancestry. *Rice v. Cayetano*, 528 U.S. 495, 496 (2005) ("Ancestry can be a proxy for race."); *Saint Francis Coll.*, 481 U.S. at 613 (noting intentional racial discrimination includes "discrimination solely because of . . . ancestry or ethnic characteristics"). Defendants' repeated use of the term "pirate" and pirate imagery to disparage Somalis represents both a racial trope associating people of African descent with criminality and a stereotype about the Somali identity. App.234, App.280, App.290, App.512 ¶ 102. Additionally, President Trump's repeated criticism of Somalis, including Representative Ilhan Omar, for wearing hijabs that signify their Muslim faith also indicates national origin discrimination. App.180, App.600, App.510 ¶ 97, App.522 ¶ 129. He has not made similarly debasing remarks about nationals from other predominantly-Muslim countries. The singling out of Somalis based on their prevailing racial and religious characteristics demonstrate Defendants and President Trump targeted Somalis based on their national origin. However, the district court failed to consider this evidence.

The district court's reliance on the absence of authority and resulting failure to address the merits of Plaintiffs' national origin discrimination claim is reversible

error. *See Boniface*, 145 F.4th at 111–12 (reversing and remanding for district court to consider legal question it failed to address).

## III. Plaintiffs Are Likely to Succeed on the Merits of Their Procedural Due Process Claims.

The Due Process Clause reaches "all 'persons' within the United States, including [noncitizens]," *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (citations omitted), and "imposes constraints on governmental decisions which deprive individuals" of protected interests, *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).

The district court erred in concluding that Plaintiffs lack constitutionally-protected liberty and property interests in the continuation of their existing TPS benefits. Plaintiffs do not claim an unconditional right to perpetual TPS. They claim a right to a fair process before benefits already conferred are withdrawn under a statute that makes extension of both the TPS designation and the accompanying benefits the default unless a specified substantive ground for Termination is established. *See* 8 U.S.C. § 1254a(b)(3)(B)–(C), Add.38. The possibility of the Termination therefore defines the limits of Plaintiffs' interests; it does not eliminate the need for constitutionally adequate procedures when Defendants make the determination that extinguishes those interests.

The due process inquiry asks whether government action deprives a person of a protected liberty or property interest and, if so, whether the procedures accompanying that deprivation are constitutionally sufficient. *See Swarthout v.*

*Cooke*, 562 U.S. 216, 219–20 (2011). Here, the district court treated Plaintiffs' claim to continued substantive benefits as merely an interest in statutory procedures. Add.27. That characterization overlooks the mandatory benefits TPS confers, and the substantive limits Congress placed on their termination. Applying the correct framework, Plaintiffs have demonstrated a likelihood of success on their procedural due process claim.

### A. Plaintiffs Have Protected Property and Liberty Interests in the Continued Receipt of Existing TPS Benefits.

Somalia's TPS designation confers upon Plaintiffs constitutionally-protected property and liberty interests in the form of non-discretionary employment authorization and protection from removal and detention. The statutory default to extension and substantive limits on termination of TPS designations support Plaintiffs' legitimate claim to TPS benefits. *See* 8 U.S.C. § 1254a(b)(3)(B)–(C), Add.38. Accordingly, Defendants must satisfy due process prior to their deprivation.

#### 1. Plaintiffs' Property Interests

Plaintiffs seek to protect their mandatory work authorization conferred by Somalia's TPS designation as a property interest. They do not assert a freestanding constitutional entitlement to perpetual country designation.[16] However, because the

[16] The district court erroneously distinguished *Mansor v. United States Citizenship & Immigration Services*, 685 F. Supp. 3d 1000 (W.D. Wash. 2023), from the instant case because of its flawed characterization of Plaintiffs' asserted property interest as a future entitlement to TPS. Rather, the *Mansor* court's recognition of an

Termination automatically withdraws Plaintiffs' work authorization, their due process claim necessarily reaches the procedures accompanying the Termination and supports preserving the designation necessary to sustain their benefits pending constitutionally adequate procedures. *Contra* Add.26. Once an individual has TPS, the government *must* authorize employment during that status, 8 U.S.C. § 1254a(a)(1)(B),[17] Add.37, and TPS beneficiaries continue to benefit from work authorization as long as the designation remains active, *id.* Plaintiffs thus possess a protected property interest in continued employment authorization, which secures their livelihood and financial stability. The right to earn a living has long been recognized as "of the very essence of the personal freedom and opportunity" the Constitution protects, including for noncitizens. *Truax v. Raich*, 239 U.S. 33, 41 (1915); *see Bell v. Burson*, 402 U.S. 535, 539 (1971) (due process protects against withdrawal of an issued legal authorization essential to earning a livelihood).

---

individual's property interest in mandatory TPS benefits once a country has been designated further supports Plaintiffs' property interest. The *Mansor* Court held that TPS eligibility criteria is not discretionary and prohibited withholding benefits from *prima facie* eligible applicants. *See* 685 F. Supp. 3d at 1013–14.

[17] *Prima facie* eligible applicants have a related, but distinct, statutory basis for interim benefits pending a final eligibility determination. 8 U.S.C. § 1254a(a)(4)(B), Add.37. As *Mansor* also recognized, this benefit is non-discretionary. 685 F. Supp. 3d, 1013.

**2. Plaintiffs' Liberty Interests**

Similarly, the district court misconstrued Plaintiffs' liberty interests as "a protected liberty interest in being free from the prospect of immigration enforcement." Add.28. But Plaintiffs do not assert immunity from detention on every possible ground. Termination withdraws *existing* protections from removal and detention that derive from Plaintiffs' TPS status. Like their property interests, Plaintiffs' liberty interests concern the TPS statute's mandatory grant of protection against removal and detention. *See* 8 U.S.C. § 1254a(a)(1)(A), (d)(4), Add.37, Add.40. Contrary to the district court's order, courts have recognized that similar protection from detention or removal arising from a conditional grant of immigration status is a constitutionally-protected liberty interest, even absent detention or other enforcement. *See, e.g.*, *Acosta de Mata v. Sullivan*, 832 F. Supp. 3d 1338, 1357 (N.D. Ga. 2026) (recognizing liberty interest in freedom from detention under temporary U-Visa-related deferred action because it promised freedom from immigration enforcement for four years); *Medina v. DHS*, 313 F. Supp. 3d 1237 (W.D. Wash. 2018) (similar regarding DACA-related protection); *cf. Morrissey v. Brewer*, 408 U.S. 471, 480–82 (1972) (recognizing liberty interest for a parolee even though the status is conditional). TPS confers precisely the kind of liberty interest at issue in *Acosta* and *Medina*: the statute affirmatively restricts the government's authority to detain and remove Plaintiffs, providing a concrete protection that is subject to due

process when Termination withdraws it.[18] *See* 8 U.S.C. § 1254a(a)(1)(A), (a)(4), (d)(4), Add.37, Add.40.

### B. Plaintiffs Have a Legitimate Claim of Entitlement to These Interests.

The district court's erroneous assumptions about the source of Plaintiffs' constitutionally-protected interests resulted in its flawed conclusion that Plaintiffs lack a protected interest in their TPS benefits. However, the TPS statute explicitly makes TPS benefits *mandatory* once eligibility is established and they continue as long as a country is designated. 8 U.S.C. § 1254a(a)(1)(A)–(B), (4)(B), Add.37 ("*shall* not remove"; "*shall* authorize . . . employment" (emphasis added)), *see* Add.25. The mandatory nature of TPS benefits demonstrates they are far from an "abstract need or desire" and instead create "a legitimate claim of entitlement" for Plaintiffs. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Plaintiffs have a reasonable expectation of continuing to enjoy their TPS benefits and in "making decisions in reliance upon that expectation." *See Beitzell v. Jeffrey*, 643 F.2d 870, 874 (1st Cir. 1981). Plaintiffs "rely in their daily lives," on both work

[18] The protections from removal and detention attendant to TPS status constitute independently valid liberty interests. Additionally, as the district court recognized, "immigration detention and removal from the country implicate core due process liberty interests," Add.28. *See, e.g.*, *Ching v. Mayorkas*, 725 F.3d 1149, 1157 (9th Cir. 2013) ("The right to live with and not be separated from one's immediate family … cannot be taken away without procedural due process."); *Bridges v. Wixon*, 326 U.S. 135, 154 (1945) (deportation "visits a great hardship on the individual and deprives him of the right to stay and live in this land of freedom").

authorization and protection from detention and removal and their reliance "must not be arbitrarily undermined." *Roth*, 408 U.S. at 577.

### C. The Conditional Nature of TPS Benefits Does Not Foreclose Plaintiffs' Interests.

Although Plaintiffs' property and liberty interests are conditioned on Somalia's TPS designation, an interest need not be unconditional or permanent to warrant protection. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 535, 539 (1985) (finding property rights in continued employment because employees could be "discharged only for cause"); *contra* Add.25. Plaintiffs do not claim an unconditional right to perpetual TPS; they claim a right to continued benefits subject to adequate procedures to terminate them. TPS's temporary nature does not foreclose finding that Plaintiffs' interests are subject to due process.

The district court mistakenly relied on *Roth*, which denied a professor's property interest in contract renewal when there was no rehiring assurance, to dismiss Plaintiffs' interests in TPS benefits as "'a unilateral expectation' . . . in their future TPS eligibility." Add.25 (citing 408 U.S. at 577). *Roth* is inapposite. "[T]he important fact" in that case is that the decisionmaker "made no provision for renewal [of the terminated benefit] whatsoever." 408 U.S. at 578. *Roth* supports Plaintiffs because the TPS statute makes continuation the default absent a specified termination determination process. *Id.* at 576 ("[A] person receiving . . . benefits under statutory and administrative standards defining eligibility for them has an

interest in continued receipt of those benefits that is safeguarded by procedural due process."). Similarly, the Supreme Court held that existing welfare benefits were a protected property interest because "[s]uch benefits are a matter of statutory entitlement for persons qualified to receive them" even if recipients had not yet proven their eligibility for future benefits. *Goldberg v. Kelly*, 397 U.S. 254, 262 & n.8 (1970) ("The constitutional challenge cannot be answered by arguing benefits are a privilege and not a right" (citation modified)).

Courts have found protected interests in work authorization and protection from detention and removal conferred by an individual's conditional immigration status, as Plaintiffs claim here. *See, e.g.*, *Acosta de Mata*, 832 F. Supp. 3d at 1356–57 (finding both a property and liberty interest in the "solid promise and representation" of four years of employment authorization and freedom from detention for U-Visa applicant); *Medina*, 313 F. Supp. 3d at 1251 (finding individual with temporary DACA status had "significant liberty and property interests" in "employment authorization and the right to be considered lawfully present in the United States").

Thus, the district court's conclusion that Plaintiffs' "only cognizable interest is in the Secretary following the review and termination procedures prescribed by the statute" is incorrect. *Contra* Add.27. Instead, Plaintiffs have constitutionally-protected interests in their existing benefits that attach to TPS status and the

deprivation of these already-conferred benefits require constitutionally adequate process.

### D. Defendants' Discretion in Terminating TPS Is Limited and Does Not Preclude Constitutional Protection.

Defendants' discretion to terminate TPS is limited and, regardless, does not deprive Plaintiffs of their constitutionally-protected interests, as the district court mistakenly concluded. Add.25. Instead, the TPS statute's multiple constraints on agency discretion support Plaintiffs' constitutionally-protected interests in their TPS benefits. *See, e.g.*, *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 462 (1989) (explaining that states create liberty interests by "placing substantive limitations on official discretion"); *Clukey v. Town of Camden*, 717 F.3d 52, 56 (1st Cir. 2013) ("[T]he more circumscribed is the government's discretion (under substantive state or federal law) to withhold a benefit, the more likely that benefit constitutes 'property'"); *see also Mallette v. Arlington Cnty. Emps.' Supplemental Ret. Sys. II*, 91 F.3d 630, 635 (4th Cir. 1996) (recognizing property interest where statute constrained officials' discretion via particularized eligibility criteria and provided that qualifying employees "shall receive" benefits).

The TPS statute reflects Congress' intent to constrain Defendants' decisions at multiple stages. *See, e.g.*, *Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1022–23 (9th Cir. 2025), *mot. to vacate denied*, 169 F.4th 1170 (9th Cir. 2026) (mem.) (noting Congress designed the TPS statute to "constrain Executive authority and to provide

stability for those with temporary status by insulating them from shifting political winds"); *see also* 135 Cong. Rec. H7501 (daily ed. Oct. 25, 1989). First, whether to continue an existing TPS designation—what the district court labels the first step in the TPS structure—is not a wholly discretionary decision. *Contra* Add.25. The TPS statute makes extension of TPS the default. Absent a determination that the foreign state "no longer continues to meet the conditions for designation," the designation is automatically extended by operation of law. 8 U.S.C. § 1254a(a)(1)–(2), (b)(3)(C), Add.37–38. Because Plaintiffs' protection from removal and work authorization are tied to the designation, they are automatically extended too. *Id.*; *see Saget v. Trump*, 375 F. Supp. 3d 280, 333 (E.D.N.Y. 2019); *Mansor*, 685 F. Supp. 3d at 1013; *Roth*, 408 U.S. at 576. Further, although there is latitude in the initial TPS designation decision, Congress made termination contingent on a prior specified substantive determination, rather than leave it to the executive's unrestricted discretion. *Compare* 8 U.S.C. § 1254a(b)(1) (*may* designate) *with id.* § 1254a(b)(3) (*shall* comply with a set of conditions prior to terminating), Add.37–38.

Once eligibility for TPS benefits is established, there is no such discretion. Eligible individuals *must* be granted employment authorization and protection from removal and detention. 8 U.S.C. § 1254a(a), Add.37. Thus, the automatic-extension default and limitations on termination in the TPS statute and the non-discretionary

conferral of benefits to TPS holders impose "specified substantive predicates" on the Termination. *See Ky. Dep't of Corr.*, 490 U.S. at 454, 463.

Furthermore, discretion in the decision to confer a benefit initially, as in an individual grant of TPS status, does not give unrestricted discretion to withdraw it once conferred. *See Loudermill*, 470 U.S. at 538–41. *Mansor* illustrates this point: identifying discretion at one stage of the TPS scheme does not preclude conferring a protected interest at another. 685 F. Supp. 3d at 1014 (holding that temporary employment authorization under TPS was a constitutionally-protected benefit despite the government's discretion regarding when to issue it). Here, Plaintiffs likewise challenge the deprivation of non-discretionary benefits from satisfying the same TPS statutory criteria; their interests are similarly protected by the Due Process Clause.

### E. Plaintiffs Were Deprived of Constitutionally Adequate Process.

The district court did not reach the issue of what process was due, Add.23–28, but the relevant factors clearly favor Plaintiffs. Due process requires that, once conferred, Plaintiffs' constitutionally-protected TPS benefits may not be arbitrarily terminated.[19] To determine the process due, the Court weighs: (1) the private and

---

[19] Discretion in the decision to terminate TPS does not permit Defendants to circumvent their procedural due process obligations. *Smith v. Goodnow*, No. C83-120-L, 1983 WL 2229, at *6 (D.N.H. Sep. 26, 1983) (noting that even if a decision

government interests, (2) the risk of error from the government's procedures, and (3) the value of additional safeguards. *Aponte-Rosario v. Acevedo-Vila*, 617 F.3d 1, 9 (1st Cir. 2010) (citing *Mathews*, 424 U.S. at 335). Due process is "flexible and calls for such procedural protections as the particular situation demands."[20] *Mathews*, 424 U.S. at 334. The situation here demands more than the process Plaintiffs received.

Here, the *Mathews* factors all demonstrate that Defendants failed to provide constitutionally sufficient procedures.

*First*, Plaintiffs have substantial private interests. *See id.* at 341. The Termination deprives Plaintiffs of work authorization and protection against immigration enforcement and removal from the country—threatening their livelihoods, security, and family life. App.148–49, App.152–53, App.155–57, App.160, App.165–66, App.172–73. Those consequences matter regardless of whether TPS status is temporary. Loss of work authorization affects Plaintiffs'

---

is discretionary, "[t]he decision to comply with the constraints of due process was not").

[20] Courts have routinely analyzed what procedural due process protections are afforded to groups impacted by broader immigration policies. *See, e.g.*, *A.A.R.P. v. Trump*, 605 U.S. 91, 94–96 (2025) (holding government violated due process by failing to provide adequate notice to class of detained individuals); *Washington v. Trump*, 847 F.3d 1151, 1164–65 (9th Cir. 2017) (affirming plaintiffs' likelihood of success on procedural due process challenge to first travel ban Executive Order, which applied categorically to broad classes of noncitizens through a generally applicable policy).

ability to support themselves while any challenge proceeds, and a later detention or removal proceeding would fail to provide the process required prior to deprivation.[21] Plaintiffs must be able to address the grounds of Termination while the agency can still reconsider them.

*Second*, Plaintiffs have been subjected to meaningful risk of error because Defendants predetermined the outcome of the Termination before completing their factual review. To mitigate the risk of erroneous deprivation of core constitutional interests, Congress embedded specific procedures for terminating TPS benefits in the statute—including reliable information gathering, and reasoned decision-making, operationalized through the statute's requirements of consultation, and notice of the actual basis for the deprivation—which closely track the requirements of constitutional due process. 8 U.S.C. § 1254a(b)(3), Add.38. These safeguards inform the independent constitutional inquiry under *Mathews*. 424 U.S. at 344 (disability termination process deemed constitutionally adequate where it required expert consultation through "unbiased medical reports").

[21] Immigration Judges in individual removal hearings lack the authority to rule on broad constitutional challenges and remain bound by existing immigration laws and regulations. 8 U.S.C. § 1252(a)(2)(D). Plaintiffs therefore are deprived of their liberty interest in protection from removal and detention because of the constitutionally inadequate process the Termination affords them.

While statutory noncompliance does not alone establish a due process violation, it can inform that analysis. *See, e.g.*, *Adame v. Holder*, 762 F.3d 667, 672 (7th Cir. 2014) ("[S]tatutorily required procedures [can] assure compliance with constitutional due process requirements."). Here, the fundamental due process requirements are expressed via the TPS statute. First, adequate notice is a bedrock due process requirement. *See Mullane v. Cent. Hanover Bank & Tr. C*o., 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."). So, too, is the TPS statute's requirement of consultation with appropriate advisers on country conditions, which ensures adequate fact-finding procedures to guard against erroneous deprivations. *See, e.g.*, *Wilkinson v. Austin*, 545 U.S. 209, 210 (2005) (procedures for determining Supermax prison placement satisfied due process because tiered review system involving recommendations and review from multiple advisers ensured accuracy).

Here, the evidence refutes Defendants' assertions that they complied with the statute's procedural protections. The Termination required complex, country-specific factual assessments as to whether Somalia "continues to meet the conditions for designation," *See* 8 U.S.C. § 1254a(b)(3)(A), Add.38. Those assessments were

not completed. The notice contains a boilerplate assertion that the Secretary "consult[ed] with appropriate U.S. Government agencies," Add.45, however, the CAR contains only a single-line email exchange between DHS and the State Department about "foreign policy objections to a change in TPS for Somalia" that is insufficient to constitute consultation.[22] App.441. The email did not address specific country conditions, as the TPS statute requires, which fall squarely within the expertise of agencies like the State Department. Moreover, the CAR supports Plaintiffs' contention that the Termination decision was made weeks before Defendants completed their cursory factual review of country conditions. App.364, App.386, App.42. Consultation responsive to the country-condition questions, conducted while the outcome remained open to reconsideration, would reduce the risk of an erroneous loss of Plaintiffs' interests. This failure deprived Plaintiffs of adequate notice to identify the operative grounds for the Termination sufficient to permit a meaningful response *before* benefits were withdrawn. *See, e.g.*, *Febus v. Gallant*, 866 F. Supp. 45, 46 (D. Mass. 1994) (holding that the minimal requirements of due process were not met where notices of termination provided inaccurate

---

[22] "[C]onsultation" involves "asking the advice or opinion of someone," *Campanale & Sons, Inc. v. Evans*, 311 F.3d 109, 117 (1st Cir. 2002) (quoting *Black's Law Dictionary* (7th ed. 1999)), and "a meaningful exchange of information." *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1086 (9th Cir. 2011).

information and failed to provide recipient "with an adequate basis to contest the termination of benefits").

*Third*, the procedures Plaintiffs propose impose a limited administrative burden on Defendants and require no new administrative machinery: Congress already prescribed adequate consultation and notice mechanisms in the TPS statute more than three decades ago. *See* 8 U.S.C. § 1254a(b)(3), Add.38. The government's interest in efficient administration is thus not burdened here, and, in any event, must be weighed against the value of obtaining relevant expertise and providing meaningful notice before benefits are withdrawn. Plaintiffs seek only the process due under the TPS statute and demanded by the Fifth Amendment, irrespective of the outcome, to safeguard against an arbitrary deprivation of their rights. *See Carey v. Piphus*, 435 U.S. 247, 259 (1978) ("Procedural due process rules are meant to protect persons . . . from the mistaken or unjustified deprivation of life, liberty, or property.").

Thus, all three *Mathews* factors weigh in favor of providing Plaintiffs with the process required *prior* to Termination. The statutory departures described above inform the due process analysis and show that the Termination failed to meet the constitutional minimum required. Because Plaintiffs were deprived of their property and liberty interests without constitutionally adequate process, they are likely to succeed on the merits of their due process claim.

## IV. Plaintiffs Are Likely to Succeed on the Merits of Their *Ultra Vires* Claim.

Because agencies are creatures of statute, "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress," such that "when they act beyond their jurisdiction, what they do is ultra vires." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). Accordingly, an agency bears the burden to "identify statutory authority for any action it takes," *Nat'l Ass'n of Broads. v. FCC*, 39 F.4th 817, 819 (D.C. Cir. 2022), and courts "must exercise their independent judgment in deciding whether an agency has acted within its statutory authority," *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). When an agency acts "in excess of statutory . . . authority," a reviewing court must "hold unlawful and set aside agency action." 5 U.S.C. § 706(2).

The district court erred in finding Plaintiffs unlikely to succeed on the merits of their *ultra vires* claim by adopting Defendants' untenable theory that the Homeland Security Act of 2002 ("HSA") transferred *all* immigration-related authority (including TPS termination authority) from the Attorney General to the Secretary, except for those powers related to the Executive Office for Immigration Review ("EOIR"). That theory is unsupported by the text and overall statutory scheme and violates multiple canons of statutory interpretation. Furthermore, the TPS statute clearly vests TPS termination authority in the Attorney General, and neither the HSA, nor any other law, transferred it to DHS. Defendants cannot point

to any authority that supports the Secretary's purported power to terminate Somalia's TPS designation. Plaintiffs have shown that they are likely to succeed on the merits of their *ultra vires* claim, and the district court's contrary holding should be reversed.

### A. The District Court Erred in Adopting Defendants' EOIR-Only Theory.

The district court rejected Plaintiffs' *ultra vires* argument in a single perfunctory paragraph, which adopted the erroneous reasoning of another district court without any further analysis or elaboration. That court accepted Defendants' theory that, under 8 U.S.C. § 1103 as amended by the HSA, the only immigration-related powers the Attorney General retained are those related to the EOIR. Accordingly, Defendants argue that the HSA transferred all other immigration authority, including TPS termination authority, to the Secretary. Add.35 (citing *Afr. Cmtys. Together v. Mullin*, No. 1:25-cv-13939, 2026 WL 2274504, at *2–4 (D. Mass. Aug. 7, 2026) ("*ACT I*"), *appeal docketed*, No. 26-1898 (1st Cir. Aug. 10, 2026)). But that "EOIR-only" theory is at odds with the text of 8 U.S.C. § 1103 and other provisions of the Immigration and Nationality Act ("INA"), which expressly retained immigration-related authorities in the Attorney General beyond just those related to the operation of EOIR. To this day, the Attorney General continues to exercise those authorities.

### 1. The EOIR-Only Theory Violates Principles of Statutory Interpretation.

Defendants' EOIR-only theory cannot be squared with a plain reading of the statute and violates the rule against surplusage. The district court erred in adopting this reading.

Prior to the enactment of the HSA in 2002, the Attorney General administered immigration laws, largely through oversight of the INS.[23] In creating DHS to replace the INS, the HSA transferred many immigration-related authorities to the Secretary.[24] The HSA thus amended 8 U.S.C. § 1103(a)(1) by adding "Attorney General," expressly reserving for the Attorney General certain functions and duties not conferred to DHS: "The [Secretary] shall be charged with the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens, *except* insofar as [the INA] or such laws relate to the powers, functions, and duties conferred upon the . . . *Attorney General* . . . ." (emphases added). Add.42. The HSA also added § 1103(g), which reserves the Attorney General's authority regarding the EOIR, stating: "The Attorney General shall have such authorities and functions under [the INA] and all other laws relating to the

[23] *See generally* Stephen R. Viña, Cong. Rsch. Serv., RL31997, *Authority to Enforce the Immigration and Nationality Act (INA) in the Wake of the Homeland Security Act: Legal Issues*, at CRS-1–2 (July 16, 2003).

[24] *Id.* at CRS-2–3.

immigration and naturalization of aliens as were exercised by the [EOIR], or by the Attorney General with respect to the [EOIR] . . . .” Add.43.

Under Defendants’ theory, adopted by the district court, § 1103(g) defines the *only* immigration-related powers the Attorney General retained under the HSA: those related to the EOIR. But the statutory text does not contain the word “only” or any other limiting language. Nor does § 1103(g) contain a cross-reference to § 1103(a)(1) such that it would define the scope of § 1103(a)(1)’s “except” clause and establish the full scope of authority reserved to the Attorney General. Courts are not to “read an absent word into the statute.” *See Lamie v. U.S. Tr.*, 540 U.S. 526, 538 (2004); Add.43. Thus, the plain text of 8 U.S.C. § 1103 does not support the statutory construction the district court adopted.

Defendants’ EOIR-only theory also violates the canon against surplusage—the principle that courts should avoid constructions that render statutory language “superfluous, void, or insignificant.” *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). Defendants’ interpretation renders § 1103(a)(1)’s broad exception “unnecessary,” *ACT I*, 2026 WL 2274504, at *3, because if § 1103(g) describes the *only* immigration-related powers the Attorney General retained, § 1103(a)(1) would not need to exempt *any* of the Attorney General’s immigration-related powers from transfer. Because Defendants’ interpretation would deprive Congress’s addition of the Attorney General to § 1103(a)(1) of operative effect, “the canon against

surplusage is [at its] strongest." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013); *see also Bufkin v. Collins*, 604 U.S. 369, 387 (2025) ("Our reluctance [to treat statutory terms as surplusage] increases when Congress amends a statute.").

Indeed, Defendants' theory entirely fails to account for Congress's decision to amend § 1103(a)(1) to include the Attorney General in the list of officials whose powers were exempted from transfer to the Secretary. "When Congress acts to amend a statute, [courts] presume it intends its amendment to have real and substantial effect." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 701 (1995). That presumption is best respected by reading § 1103(a)(1) and § 1103(g) to perform complementary functions. Under Defendants' reading, Congress's addition of authorities "conferred upon" the Attorney General does nothing beyond what § 1103(g) independently accomplishes. Courts are, however, "obliged to give effect, if possible, to every word Congress used." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979).

By incorporating *ACT I*'s reasoning without further analysis, the district court erred in treating the parties' competing interpretations as producing equivalent surplusage. *See* 2026 WL 2274504, at *3. Plaintiffs' interpretation gives independent meaning to both provisions: § 1103(a)(1) preserves powers vested in the Attorney General unless otherwise transferred, while § 1103(g) ensures EOIR

functions remain within the Department of Justice ("DOJ") following the HSA.[25] While this reading may lead to modest redundancy, it does not render unnecessary any part of the statutory scheme. Instead, Plaintiffs' interpretation is aligned with the "belt-and-suspenders" approach Congress may take when drafting, whereby overlapping provisions reinforce a point or provide clarity. *See In re Coughlin*, 33 F. 4th 600, 608–09 (1st Cir. 2022); *Facebook, Inc. v. Duguid*, 592 U.S. 395, 407 n.7 (2021); *see also Mullin v. Al Otro Lado*, 609 U.S. 258, 273 (2026) (recognizing that "[s]ome statutes, for instance, pick out a 'general' category alongside a 'specific' subcategory that 'might in other circumstances be deemed surplusage'" (quoting *Lorenzo v. SEC*, 587 U.S. 71, 80 (2019))).

The district court also gave undue deference to DHS's practice of issuing TPS terminations since the HSA's passage.[26] *See ACT I*, 2026 WL 2274504, at *3. Such practice has no bearing on a court's independent analysis of whether DHS has the

---

[25] *See* Viña, *supra* note 23, at CRS-7 (explaining that § 1103(g) was added "[t]o address the authority retained by the DOJ").

[26] A 2003 DOJ reorganization rule noted the need to "further refine[]. . . the authority of the Secretary of Homeland Security to designate countries for temporary protected status" and indicated that the duplication of certain rules "should not be viewed as any indication that the Department of Justice is involved in those future decisions." 68 Fed. Reg. 9824, 9827 (Feb. 28, 2003). The DOJ went on to state, however, that the rules "will be subject to further adjustment by the Department of Homeland Security and the Department of Justice," *id.*, making clear that TPS designation and termination authority was not a settled matter at the time of the HSA's enactment.

authority to issue TPS terminations because only an agency's *interpretation* of a statute may be afforded "respect" depending, in part, on "its consistency with earlier and later pronouncements." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). Defendants cannot claim such consistency because they have offered differing interpretive theories throughout this litigation. *Compare* Dkt.102 at 20–21 (arguing that "§ 1103(a)'s proviso is properly understood to explain that the transfer covered functions except otherwise provided elsewhere," and that § 1103(g) is one such example) *with* Dkt.118 at 22–23 (arguing that § 1103(g) sets forth the only immigration-related powers the Attorney General retained). This inconsistency in Defendants' differing theories "detracts considerably from the force of the" agency's statutory interpretation. *See, e.g.*, *St. Luke's Hosp. v. Sec'y of Health & Hum. Servs.*, 810 F.2d 325, 331 (1st Cir. 1987); *see also Loper Bright Enters.*, 603 U.S. at 386 (noting agency interpretations are given more respect when they "remained consistent over time"); *Immigr. & Naturalization Serv. v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987) (noting an agency's conflicting interpretation of a relevant provision "is 'entitled to considerably less deference' than a consistently held agency view") (quoting *Watt v. Alaska*, 451 U.S. 259, 273 (1981)).

### 1. It Was Error Not to Consider the Non-EOIR Immigration Powers Exercised by the Attorney General in Interpreting the Statute.

Defendants' EOIR-only theory is squarely at odds with the rest of the INA, which vests non-EOIR authorities in the Attorney General that the Attorney General exercises to this day. The *ACT I* Court declined to consider the INA's broader statutory scheme when interpreting 8 U.S.C. § 1103, as did the district court below by wholesale adopting *ACT I*'s reasoning. *See ACT I*, 2026 WL 2274504, at *4 n.3. This was error. Courts have a "duty to construe statutes, not isolated provisions," *Gustafson v. Alloyd Co.*, 513 U.S. 561, 568 (1995), and "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme," *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989). The overall statutory scheme the district court should have considered includes Chapter 12 of Title 8 (the INA), which houses the TPS statute and is cross-referenced in § 1103(a)(1). Add.42. A comprehensive review reveals fundamental problems with Defendants' proposed interpretation of the statute.

The EOIR-only theory is refuted by several examples of statutes in Chapter 12 of Title 8 expressly vesting non-EOIR immigration authorities in the Attorney General that have not been interpreted or enforced as having been transferred to the Secretary. First, in 1996, Congress established an alien terrorist removal court comprised of Article III judges, which bypasses the EOIR. 8 U.S.C. § 1532. Section

1533 provides that the "Attorney General may seek removal of the [alien terrorist] . . . by filing an application with the removal court." *Id.* § 1533. Pursuant to that express authority under that statute, the Attorney General recently filed such an application to commence these proceedings.[27] Second, 8 U.S.C. § 1189(d)(4) provides that the Secretary of State shall make Foreign Terrorist Organization ("FTO") designations "in consultation with . . . the Attorney General." The Secretary of State has consistently consulted with the Attorney General in compliance with that provision.[28] Third, under 8 U.S.C. § 1105(b), "the Attorney General and the Director of the Federal Bureau of Investigation" oversee the National Crime Information Center Database and share criminal history record information of visa applicants or applicants for admission with the Department of State. Fourth, 8 U.S.C. § 1231(i) authorizes the "Attorney General" to provide federal payments to states and localities that incur correctional costs for incarcerating undocumented noncitizens. The Attorney General, not DHS, administers the program through the DOJ's Bureau of Justice Assistance. *See, e.g.*, *United States v. Rubalcava Gonzales*, 179 F. Supp. 3d 917, 929 (E.D. Mo. 2016) (directing denaturalization certification

---

[27] *See* Press Release, DOJ, Off. of Pub. Affs., *Department of Justice Files First Case in U.S. Alien Terrorist Removal Court to Deport Afghan Alien Who Supported Her Family's Plans for Election-Day Shooting* (July 30, 2026), https://perma.cc/2CXR-BXFN.

[28] *See, e.g.*, 90 Fed. Reg. 34067 (July 18, 2025); 90 Fed. Reg. 45969 (Sep. 24, 2025).

to the Attorney General pursuant to 8 U.S.C. § 1451(f)). Under the theory the district court adopted, these statutes' references to the "Attorney General" must be read as referring to the Secretary such that *only* the Secretary is authorized to exercise *all* these functions because they are not related to the EOIR. Plaintiffs' theory, on the other hand, takes "context" and the "overall statutory scheme" into account, *see Davis*, 489 U.S. at 809—both of which show that § 1103(g) did not set forth the only immigration-related powers the Attorney General retained after the HSA's enactment.

Accordingly, not only is the EOIR-only theory at odds with the plain text of 8 U.S.C. § 1103, it is also contradicted by the overall relevant statutory scheme.

**B. TPS Termination Authority Is Exclusively Vested in the Attorney General and That Authority Was Not Transferred.**

Because the EOIR-only theory is meritless, Defendants ultimately fail to provide a source of statutory authority for the Secretary's purported Termination. Congress expressly vested TPS termination authority in the Attorney General: "If the [Attorney General] determines . . . that a foreign state . . . no longer continues to meet the conditions for [TPS] designation . . . the [Attorney General] shall terminate the designation." 8 U.S.C. § 1254a(b)(3)(B), Add.38.

DHS has asserted TPS termination authority pursuant to the HSA, but the HSA did not transfer that authority from the Attorney General to DHS. As discussed above, *see supra* Sec. IV(A)(1), the provision DHS counts on, 8 U.S.C. § 1103(a)(1),

Add.42, preserved the Attorney General's TPS termination authority, and the government does not point to any other provision that performs the transfer of authority Defendants claim.[29] In contrast, other HSA provisions clearly transfer other immigration-related authorities from the Attorney General to the Secretary. *See, e.g.*, 6 U.S.C. § 251 (transferring border-related functions); *id.* § 271(b) (transferring immigration benefits adjudication functions). Thus, if Congress wanted to clearly transfer TPS Termination authority from the Attorney General to the Secretary, it would have. Section 1103(a)(1)'s "except" clause, which is not limited by § 1103(g), *see supra* Sec. IV(A)(1); Add.42–43, therefore retained the Attorney General's TPS termination authority because the TPS statute—housed in the INA—"conferred" that "power[]" "upon the . . . Attorney General," 8 U.S.C. § 1103(a)(1), Add.42.

## V. The Remaining Preliminary Injunction Factors Favor Plaintiffs.

The district court correctly held that "Plaintiffs have made a convincing showing that they will suffer irreparable harm if the injunction is withheld." Add.35. Harm is irreparable when it "cannot adequately be compensated for" by future proceedings or "a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005).

---

[29] 6 U.S.C. § 557 similarly did not effectuate such a transfer and is instead, as Defendants acknowledge, just a housekeeping provision. Dkt. 118 at 23.

Plaintiffs faced multiple risks of irreparable harm. Once the Termination took effect, they faced deprivation of work authorization which renders them unable to pursue their careers as educators, provide for their families, and receive other critical government benefits like drivers' licenses and health insurance. App.147, App.149, App.152–53, App.155–57, App.160, App.166, App.172. These are all independent sources of irreparable harm. *Enyart v. Nat'l Conf. of Bar Examiners, Inc.*, 630 F.3d 1153, 1165 (9th Cir. 2011) (losing the ability to work is irreparable harm); *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (same for driver's license); *United Steelworkers of Am., AFL-CIO v. Textron, Inc.*, 836 F.2d 6, 8 (1st Cir. 1987) (same for access to health insurance). The loss of their protection from removal and detention and subsequent risk of deportation to Somalia where they face physical danger and widespread insecurity, *see* App.148–49, App.152–53, App.156–57, App.160, App.166, App.172, App.337–341, is another source of irreparable harm. *See, e.g.*, *Leiva-Perez v. Holder*, 640 F.3d 962, 969 (9th Cir. 2011). The risk of separation from their family and loved ones in the United States, *see, e.g.*, App.151–62, also constitutes irreparable harm, *see Doe v. Trump*, 157 F.4th 36, 78 (1st Cir. 2025), *cert. denied*, 146 S. Ct. 2810 (2026); *Leiva–Perez*, 640 F.3d at 969–70. Finally, the loss of Plaintiffs' Fifth Amendment rights, *supra* Secs. II and III, is also irreparable harm. *See Ross v. Meese*, 818 F.2d 1132, 1134–35 (4th Cir. 1987); *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998).

Any of these harms alone sufficiently demonstrate irreparable harm; together, this factor overwhelmingly favors Plaintiffs as the district court recognized. Add.35. The ongoing injuries to Plaintiffs outweigh any hypothetical damage an injunction would cause the government because there is "no public interest in the perpetuation of unlawful agency action." *Somerville Pub. Schs. v. McMahon*, 139 F.4th 63, 76 (1st Cir. 2025). Moreover, as the district court aptly concluded, "the government has made no showing that maintaining TPS status for the duration of this litigation would impose an undue burden apart from any injury inherent in delayed enforcement of the executive's priorities." Add.36. These factors thus weigh in favor of issuing Plaintiffs preliminary injunctive relief.

## CONCLUSION

For the foregoing reasons, the district court's denial of Plaintiffs' motion for emergency relief should be reversed.

Respectfully submitted,

*/s/ Kacey Mordecai*
Deuel Ross
Amia Trigg
Kacey Mordecai
Mide Odunsi
Warrington E. Sebree
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
(202) 682-1300
dross@naacpldf.org
atrigg@naacpldf.org
kmordecai@naacpldf.org
modunsi@naacpldf.org
wsebree@naacpldf.org

Matthew Callahan
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(202) 965-2200
mcallahan@naacpldf.org

Nargis Aslami
Sadaf Hasan
Melissa Keaney
Abbey Rutherford
MUSLIM ADVOCATES
1763 Columbia Rd. N.W. #14324
Washington, DC 20009
(202) 897-2622
Nargis@muslimadvocates.org
Sadaf@muslimadvocates.org
Melissa@muslimadvocates.org
Abbey@muslimadvocates.org

Erik Crew
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
(949) 603-7411
ECrew@haitianbridge.org

*Counsel for Appellants*

Dated: October 19, 2026

## CERTIFICATE OF COMPLIANCE

This Brief complies with the type-volume limitation of Rule 32(a)(7)(A) of the Federal Rules of Appellate Procedure because it contains 12,974 words, excluding the parts of the Response exempted by Federal Rule of Appellate Procedure 32(f).

This Brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because it was prepared using 14-point Times New Roman font in Microsoft Word.

*/s/ Kacey Mordecai*
Kacey Mordecai

*Counsel for Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that, on October 19, 2026, I caused the foregoing Brief to be filed with the Clerk of the Court of the United States Court of Appeals for the First Circuit using the Court's CM/ECF system. Service will be accomplished by the Court's CM/ECF system.

*/s/ Kacey Mordecai*
Kacey Mordecai

*Counsel for Appellants*

# ADDENDUM

# INDEX

## Addendum

**Orders and Judgments** **Page**

Order Granting Plaintiffs' Emergency Motion for Administrative Stay (Dkt. No. 33) .......... Add.1

Order for Parties to Advise Court of Opposition to Stay Litigation Pending *Mullin* (Dkt. No. 70) .......... Add.5

Order Staying Proceedings Pending *Mullin* (Dkt. No. 73) .......... Add.6

Order Lifting Litigation Stay and Continuing Administrative Stay (Dkt. No. 78) .......... Add.7

Order Dissolving Previous Administrative Stay and Staying Effective Date of Somalia's TPS Termination (Dkt. No. 94) .......... Add.8

First Circuit Judgment Remanding for Further Proceedings (Dkt. No. 95) .......... Add.9

Order Granting Defendants' Motion to Lift Administrative Stay and Denying Plaintiffs' Emergency Motion (Dkt. No. 109) .......... Add.12

**Statutes**

8 U.S.C. § 1254a .......... Add.37

8 U.S.C. § 1103 .......... Add.42

**Termination Notice**

91 Fed. Reg. 1547 (Jan. 14, 2026) (Termination of the Designation of Somalia for Temporary Protected Status) .......... Add.44

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AFRICAN COMMUNITIES TOGETHER, PARTNERSHIP FOR THE ADVANCEMENT OF NEW AMERICANS, ALEXANDER DOE, MOHAMED DOE, TYSON DOE, and NINA DOE, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

KRISTI NOEM, in her official capacity as Secretary of the U.S. Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA,

Defendants.

Civil Action No. 26-cv-11201-ADB

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

On January 14, 2026, the Department of Homeland Security published notice that Secretary Noem had concluded that "Somalia no longer continues to meet the conditions for designation for Temporary Protected Status" ("TPS") pursuant to 8 U.S.C. § 1254a, and that the nation's designation for Temporary Protected Status would be terminated following its expiration on March 17, 2026. Termination of the Designation of Somalia for Temporary Protected Status, 91 Fed. Reg. 1547 (Jan. 14, 2026). On March 9, 2026, Plaintiffs filed the

instant action, challenging the termination of Somalia's designation for TPS pursuant to the Administrative Procedure Act, [ECF No. 1 ("Compl.") ¶¶ 262–313], and the Constitution, [id. ¶¶ 314–20]. Presently before the Court is Plaintiffs' emergency motion, [ECF No. 3], seeking an administrative stay of the termination of Somalia's TPS designation, production of the certified administrative record, and postponement of the March 17, 2026, effective date of the termination. [Id. at 1–2].

## I. DISCUSSION

This action was filed fewer than ten days before the termination of Somalia's TPS designation is scheduled to take effect. As of the entry of this Order, Defendants have not appeared in the action, produced the certified administrative record on which the Court must rely in deciding the merits, see Atieh v. Riordan, 727 F.3d 73, 77 (1st Cir. 2013), or filed a brief setting forth their position on Plaintiffs' emergency motion. The Court notes that the consequences of either granting or denying Plaintiffs' motion to postpone the effective date of the termination would be weighty: Plaintiffs aver that if Somalia's TPS designation is allowed to terminate, over one thousand people will face "a myriad of grave risks," including detention and deportation, physical violence if removed to Somalia, and forced separation from family members. [Compl. ¶¶ 9–10]. On the other hand, if the Court postpones the effective date of a decision committed to the executive branch by Congress, see 8 U.S.C. § 1254a(b)(3)(B), it risks harmful interference with its coordinate branches of government. See Trump v. CASA, Inc., 606 U.S. 831, 861 (2025).

In similar situations, other district courts have used administrative stays "to permit time for briefing and deliberation," United States v. Texas, 144 S. Ct. 797, 798 (2024) (Barrett, J., concurring) (discussing purpose of appellate-court administrative stays of lower-court decisions).

See, e.g., Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget, 763 F. Supp. 3d 13, 17 (D.D.C. 2025) (collecting cases). Such stays reflect a "first-blush judgment about the relative consequences of staying the [agency action] versus allowing it to go into effect." United States v. Texas, 144 S. Ct. at 798 (Barrett, J., concurring). On the record now before it, the Court concludes that those relative consequences favor an administrative stay to permit Defendants to produce the certified administrative record and the parties to brief the issues presented by Plaintiffs' emergency motion.

In light of the serious interests on both sides, the Court will require the parties to establish and comply with a prompt briefing schedule with the goal of resolving Plaintiffs' emergency motion for preliminary relief as quickly as possible.

## II. CONCLUSION

For the foregoing reasons, Plaintiffs' emergency motion, [ECF No. 3], is **GRANTED IN PART**. The Court will implement an administrative stay and defer ruling on postponement until the administrative record has been produced and the parties have fully briefed the issues presented. The March 17, 2026, effective date of the termination of Somalia's TPS designation, published at 91 Fed. Reg. 1547, is hereby **STAYED** subject to further order of the Court. While the stay is in effect, the termination shall be null, void, and of no legal effect. Individuals with TPS status based on Somalia's designation shall retain all rights and protections afforded by TPS status, including eligibility for work authorization and protection against deportation and detention based on TPS status, and individuals with pending TPS applications based on Somalia's designation shall retain all rights and protections afforded to persons with pending TPS applications, including eligibility for work authorization and protection against deportation based on a pending TPS application.

Plaintiffs are **ORDERED** to serve a copy of this Order, along with the summons and complaint, on Defendants by **5:00 p.m. EDT** on **March 16, 2026**, if they have not already done so. The parties are instructed to confer to establish a schedule for briefing and production of the administrative record and file such schedule with the Court by no later than **5:00 p.m. EDT** on **March 18, 2026**.

**SO ORDERED.**

March 13, 2026

*/s/ Allison D. Burroughs*
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE

Judge Allison D. Burroughs: ELECTRONIC ORDER entered. The parties shall advise the Court by 12:00 p.m. on Friday, May 1, if they oppose a stay of this litigation pending a decision of the Supreme Court in Mullin v. Doe, No. 25-1083, and Trump v. Miot, No. 25-1084. (CAM)

Judge Allison D. Burroughs: ELECTRONIC ORDER entered. Both parties have indicated that they do not oppose staying this action until the Supreme Court has issued an opinion in Mullin v. Doe, No. 25-1083, and Trump v. Miot, No. 25-1084. See [ECF Nos. [71], [72]]. Pursuant to the Court's "inherent power to stay pending litigation when the efficacious management of court dockets reasonably requires such intervention," Marquis v. F.D.I.C., 965 F.2d 1148, 1154 (1st Cir. 1992) (collecting cases), and in light of the fact that the question at issue in this case "will, in all likelihood, turn upon [the Supreme Court's decision in a recently argued case]," Marshel v. AFW Fabric Corp., 552 F.2d 471, 472 (2d Cir. 1977) (per curiam), this action is STAYED until the Supreme Court has issued a decision in Doe and Miot.

The Court further accepts Plaintiffs' proposal, see [ECF No. [71] at 1], and ORDERS the parties to file a joint status report within fourteen days of the Supreme Court's decision in those cases. The status report should set forth the parties' positions on appropriate next steps in the litigation, including a proposed briefing schedule with a new hearing date on Plaintiffs' motion for postponement.

Until the Court orders otherwise, the administrative stay, [ECF No. [33]], will remain in place.(CAM)

Judge Allison D. Burroughs: ELECTRONIC ORDER entered. On March 13, 2026, the Court entered an administrative stay of the termination of Somalia's TPS designation to provide time for the government to produce the administrative record and the parties to brief the issues presented in this action. [ECF No. [33]]. On May 1, 2026, with the agreement of the parties, the Court stayed this litigation until the Supreme Court decided Mullin v. Doe, No. 25-1083, and Trump v. Miot, No. 25-1084. [ECF No. [73]]. Those cases were decided last week. Mullin v. Doe, Nos. 25-1083, 25-1084, 2026 WL 1825840 (U.S. June 25, 2026). The Court previously ordered the parties to file a joint status report within 14 days of that decision, [ECF No. [73]], but rather than a joint filing, the government has now moved to lift both the stay of this action and the administrative stay of the underlying TPS termination, [ECF No. [77]], which Plaintiffs have indicated they will oppose, [id. at 6]. The motion is GRANTED IN PART and DENIED IN PART. The stay of this action is lifted, but the administrative stay will remain in place until further notice to permit the Court to resolve the issues presented by Plaintiffs' emergency motion, [ECF No. [3]].

As originally ordered, by July 9, the parties shall submit a joint status report stating their respective positions on which counts of the complaint, if any, remain viable in light of the Supreme Court's decision in Mullin v. Doe, Nos. 25-1083, 25-1084, 2026 WL 1825840 (U.S. June 25, 2026), and on appropriate next steps in this action.

Finally, Plaintiffs' motion to compel, [ECF No. [65]], remains unopposed by Defendants. By July 9, Defendants shall also (1) file, ex parte, unredacted copies of each of the disputed documents for the Court to review, and (2) file any opposition to the motion to compel. (CAM)

Judge Allison D. Burroughs: ELECTRONIC ORDER entered. Plaintiffs filed an amended complaint, [ECF No. [90]], and an emergency motion to stay, [ECF No. [91]]. As two other sessions of this Court have concluded, see Afr. Cmtys. Together v. Noem, No. 25-cv-13939-PBS, Dkt. No. 106 (D. Mass. July 23, 2026); Afr. Cmtys. Together v. Noem, No. 26-cv-10278-BEM, Dkt. No. [82] (D. Mass. July 24, 2026), and for reasons the Court has previously explained, see [ECF No. 33 at 2–3], an administrative stay is appropriate to permit time for briefing and deliberation concerning the new issues presented by Plaintiffs' amended complaint and accompanying emergency motion.

The effective date of the termination of Somalia's TPS designation, published at 91 Fed. Reg. 1547, is hereby STAYED subject to further order of the Court. This order supersedes the Court's previous administrative stay order, [ECF No. [33]], which is hereby DISSOLVED. While the new administrative stay is in effect, the termination shall be null, void, and of no legal effect, as previously elaborated by the Court, see [ECF No. [33] at 3]. This order is effective immediately upon receipt of the First Circuit's mandate in African Communities Together v. Mullin, No. 26-1832.

The parties shall comply with the briefing schedule previously adopted by the Court, [ECF No. [82]]. The parties' briefs should incorporate argument on Plaintiffs' emergency motion, [ECF No. [91]], and the parties are given leave to file briefs of up to 25 pages for all remaining briefs due under that schedule to accommodate that requirement. (MBM)

# United States Court of Appeals
## For the First Circuit

---

No. 26-1832

AFRICAN COMMUNITIES TOGETHER, on behalf of themselves and all others similarly situated; PARTNERSHIP FOR THE ADVANCEMENT OF NEW AMERICANS, on behalf of themselves and all others similarly situated; ALEXANDER DOE, on behalf of themselves and all others similarly situated; MOHAMED DOE, on behalf of themselves and all others similarly situated; TYSON DOE, on behalf of themselves and all others similarly situated; NINA DOE, on behalf of themselves and all others similarly situated,

Plaintiffs - Appellees,

v.

MARKWAYNE MULLIN, in the official capacity as Secretary of the U.S. Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; UNITED STATES OF AMERICA,

Defendants - Appellants.

---

Before

Aframe, Lynch, and Dunlap,
Circuit Judges.

---

**JUDGMENT**

Entered: August 3, 2026

The government has filed an appeal from the district court's July 2, 2026, order in part continuing its administrative stay of the temporary protected status termination that is at issue in the underlying district court proceedings. On July 21, 2026, the government moved for summary reversal and in the alternative for mandamus relief, seeking an order from this court "summarily vacat[ing] the district court's administrative stay and direct[ing] it to promptly adjudicate [p]laintiffs' underlying [5 U.S.C.] § 705 motion." Plaintiffs responded on July 24, 2026, and the government replied on July 27, 2026.

Complicating matters, we note that on July 31, 2026, with this appeal pending, the district court issued an order in which it stated that, upon receipt of mandate from this court, (1) the challenged administrative stay would be dissolved, and (2) a new administrative stay would enter. The district court thus appeared to assume that it did not have jurisdiction to enter an order that

would be effective immediately, likely because of the pendency of this appeal. We are therefore inclined to treat the July 31, 2026, order as an indicative ruling that the court would grant relief the government seeks here -- dissolution of the existing administrative stay -- if jurisdiction were returned to that court. See Fed. R. Civ. P. 62.1; see also United States v. Rodriguez-Milian, 820 F.3d 26 (1st Cir. 2016) (treating district court order granting compassionate release while sentencing appeal was pending as an indicative ruling). In light of the district court's July 31, 2026, order, we remand for further proceedings and decline to retain jurisdiction. See Fed. R. App. P. 12.1(b). Furthermore, it is the view of this court that the district court must rule promptly on the motion before it and nothing in this judgment should be read to approve the briefing deadlines set by that court. The appeal is dismissed. Mandate shall enter forthwith.

**DUNLAP, Circuit Judge, dissenting.** This proceeding concerns the Secretary of Homeland Security's revocation of Temporary Protected Status ("TPS") for Somalia. On July 2, 2026, the district court denied the government's request to lift the administrative stay that had been in place while the Supreme Court considered a challenge to the revocation of TPS for Syria and Haiti in Mullin v. Doe, 146 S. Ct. 2121 (2026) -- a case, decided by the Court on June 25, 2026, which bore directly on the claims asserted by the plaintiffs in this case. The administrative stay was temporally indefinite: According to the July 2 order, it was to "remain in place until further notice to permit the [c]ourt to resolve the issues" presented by the plaintiffs.[1] The stay has been in place for longer than a temporary restraining order ("TRO") may lawfully be in force. See Fed. R. Civ. P. 65(b)(2). The government appealed the July 2 order. We have jurisdiction because, as explained below, the stay has the practical effect of granting an injunction. 28 U.S.C. § 1292(a)(1); see Abbott v. Perez, 585 U.S. 579, 594 (2018). The stay ought to be vacated.

I see no basis to issue an open-ended administrative stay here. An "administrative stay is supposed to be a short-lived prelude to the main event: a ruling on the motion" for preliminary relief. United States v. Texas, 144 S. Ct. 797, 799 (2024) (Barrett, J., concurring). There is no doubt that an administrative stay can be a valid tool when rightly employed; it may be used, for instance, to allow a court "time to deliberate." Id. at 798. But administrative stays also create a risk of misuse by allowing a court to avoid the necessity of assessing whether a movant has carried its burden to obtain injunctive relief -- including by demonstrating likelihood of success on the merits -- even while effectively granting such relief. Id. at 799; see Nken v. Holder, 556 U.S. 418, 425-26 (2009) (describing movant's burden to obtain a stay pending appeal); Esso Standard Oil Co. (P.R.) v. Monroig-Zayas, 445 F.3d 13, 17-18 (1st Cir. 2006) (describing movant's burden to obtain preliminary injunctive relief). The stay in this case went too far because it effectively granted injunctive relief for an indeterminate period without any assessment of plaintiffs' entitlement to an injunction. Indeed, after denying the government's request to lift the administrative stay, the district court set a schedule contemplating that briefing as to the propriety of preliminary injunctive relief would not be completed for over a month -- longer than is typically allowed. See D. Mass. L.R. 7.1(b)(2). As a result, the administrative stay would necessarily last (and has in fact lasted) longer even than a TRO -- which itself requires that a movant demonstrate

---

[1] On July 31, 2026, the district court issued a further order which has the effect (upon issuance of our mandate in this appeal) of dissolving the stay that had been maintained by the July 2 order and entering a new indefinite administrative stay. My colleagues treat the July 31 order as an indicative ruling that grants the government's requested relief, but I doubt the usefulness of that step given the springing administrative stay that effectively continues the prior stay.

entitlement to relief -- without any justification. See Fed. R. Civ. P. 65(b). By issuing such relief, the district court has effectively obviated plaintiffs' ordinary burden to obtain injunctive relief, an outcome that is all the more remarkable given the Supreme Court's rejection in Mullin of the claims asserted in this proceeding. See 146 S. Ct. at 2127-28.

In my view, "the time" has "come" where the circumstances surrounding a court's issuance of an administrative stay compel the conclusion that the stay is effectively, and impermissibly, an injunction. Texas, 144 S. Ct. at 800 (Barrett, J., concurring). I respectfully dissent.

By the Court:

Anastasia Dubrovsky, Clerk

cc: Hon. Allison Dale Burroughs, Robert Farrell, Clerk, United States District Court for the District of Massachusetts, Ashley Michelle Burrell, Ayomide Odunsi, Morenike Fajana, Sadaf Hasan, Collin Poirot, Erik Matthew Crew, Nargis Aslami, Abbey Rose Koenning Rutherford, Melissa Shay Keaney, Kacey Ann Mordecai, Lauren Carbajal, Donald Campbell Lockhart, Robert Edward Richardson, Abraham R. George, Jeffrey Michael Hartman, Sarah Welch, Tasha J. Bahal, Matthew P. Horvitz, Nathaniel R. B. Koslof, Asti Gallina, Alyssa Melter, Devra Cohen, Cinda Fernald, Mikaela Louie, William Kenick, Graham Fulton, Lynne M. Cohee, Bob C. Sterbank, Malcolm Seymour, Annabelle Cathryn Wilmott, Michael Louis Newman, Jesse P. Basbaum, Vilma Palma-Solana, Joseph Robert Richie, Barbara D. Underwood, Zoe Levine, Judith N. Vale, Cleland B. Welton, Kathleen Jennings, Dana Nessel, Brian L. Schwalb, Aaron D. Ford, Anne E. Lopez, Jennifer Davenport, Kwame Raoul, Daniel A. Rayfield, Aaron M. Frey, Charity R. Clark, Anthony G. Brown, Nicholas W. Brown

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AFRICAN COMMUNITIES TOGETHER, PARTNERSHIP FOR THE ADVANCEMENT OF NEW AMERICANS, ALEXANDER DOE, MOHAMED DOE, TYSON DOE, and NINA DOE, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MARKWAYNE MULLIN, in his official capacity as Secretary of the U.S. Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA,<br><br>Defendants. | Civil Action No. 26-cv-11201-ADB |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

In this action, two organizations and four individual plaintiffs challenge the decision of the Secretary of Homeland Security to terminate Somalia's designation as a foreign state whose nationals may apply for Temporary Protected Status ("TPS") in the United States. TPS provides eligible people from certain countries with protection against detention or removal from the United States and work authorization when it is unsafe for them to return to their own country. Now before the Court are Plaintiffs' emergency motion seeking postponement of agency action

and a preliminary injunction, [ECF No. 91], and the government's motions to lift the administrative stay that this Court entered while briefing on Plaintiffs' emergency motion was pending, [ECF No. 97]; [ECF No. 108]. Because the Court is now prepared to rule on Plaintiffs' fully briefed emergency motion, the government's motions to lift the administrative stay are **GRANTED**. For the following reasons, Plaintiffs' emergency motion for postponement and a preliminary injunction is **DENIED**.[1]

# I. BACKGROUND

## A. Statutory and Administrative History

### 1. Origins of the TPS Program

The TPS program was created by the Immigration Act of 1990, Pub. L. No. 101-649, § 302, 104 Stat. 4978, 5030–36 (codified as amended at 8 U.S.C. § 1254a), to provide a framework for humanitarian relief to nationals of certain countries residing in the United States. See generally 8 U.S.C. § 1254a; Mullin v. Doe, 146 S. Ct. 2121, 2129–30 (2026).

### 2. Creation of DHS

The Homeland Security Act of 2002 (the "HSA"), Pub. L. No. 107-296, 116 Stat. 2135 (codified as amended in scattered sections of the U.S. Code), "abolished the former [Immigration and Naturalization Service ('INS')] and established the Department of Homeland Security ('DHS')." Flores v. Sessions, 862 F.3d 863, 870 (9th Cir. 2017) (citing 6 U.S.C. §§ 111, 251, 291); accord Khanal v. Blanche, 168 F.4th 1, 6 n.10 (1st Cir. 2026). "[T]he functions of the [INS] were transferred from [the United States Department of Justice ('DOJ')] to DHS." Sunday v. Att'y Gen. U.S., 832 F.3d 211, 216 n.5 (3d Cir. 2016). The reorganization charged "[t]he

---

[1] Plaintiffs' first emergency motion, [ECF No. 3], is **DENIED AS MOOT** in light of Plaintiffs' filing of an amended complaint.

Secretary of Homeland Security . . . with the administration and enforcement of . . . all . . . laws relating to the immigration and naturalization of aliens, except insofar as . . . such laws relate to the powers, functions, and duties conferred upon the . . . Attorney General." 8 U.S.C. § 1103(a)(1).

Pursuant to a provision of the HSA, 6 U.S.C. § 542, on November 25, 2002, the President submitted a reorganization plan to Congress that laid out, in general terms, the steps that the executive would take to "transfer . . . agencies, personnel, assets, and obligations to [DHS]" and then to "consolidat[e], reorganiz[e], or streamlin[e] . . . agencies transferred to [DHS]." 6 U.S.C. § 542(a)(1)–(2). Thereafter, DOJ issued a 2003 rule that divided regulations related to the former INS between itself and DHS. See Aliens and Nationality; Homeland Security; Reorganization of Regulations ("2003 Reorganization Rule"), 68 Fed. Reg. 9824, 9824 (Feb. 28, 2003). The rule noted the need for "further refinement to clarify the authority of [the] Secretary of Homeland Security to designate countries for [TPS]" and disclaimed "any indication that the Department of Justice is involved in those future decisions." Id. at 9827.

Since the creation of DHS, the Secretary of Homeland Security has issued TPS designations, see, e.g., Designation of Ukraine for Temporary Protected Status, 87 Fed. Reg. 23211 (Apr. 19, 2022); extensions, see, e.g., Extension of the Designation of Somalia Under Temporary Protected Status Program, 68 Fed. Reg. 43147 (July 21, 2003); redesignations, see, e.g., Extension and Redesignation of Somalia for Temporary Protected Status, 77 Fed. Reg. 25723 (May 1, 2012); and terminations, see [ECF No. 90 ¶ 67 (collecting examples)].

**3. Procedure**

TPS proceeds in two steps. First, the Secretary must designate a foreign state as eligible, 8 U.S.C. § 1254a(b)(1), which he or she may do on the basis of an "ongoing armed conflict," id. § 1254a(b)(1)(A); a natural disaster causing substantial, temporary disruption of living

conditions such that the state cannot "handle adequately the return" of its nationals and for which the state "officially has requested designation," id. § 1254a(b)(1)(B); or the existence of "extraordinary and temporary conditions" that prevent nationals of the state from safely returning to it, except where permitting them to remain in the United States "is contrary to the national interest," id. § 1254a(b)(1)(C).

Second, after a state has been so designated, qualified nationals residing in the United States, see 8 U.S.C. § 1254a(c) (specifying eligibility requirements), may register for TPS "in a manner which the [Secretary] establishes," id. § 1254a(c)(1)(A)(iv). Once a person has established his or her eligibility and registered for TPS, he or she "shall not [be] remove[d] . . . from the United States during the period in which such status is in effect," id. § 1254a(a)(1)(A), and "shall [be] authorize[d] . . . to engage in employment in the United States," id. § 1254a(a)(1)(B).

The Secretary may initially designate a state for six to eighteen months at a time. 8 U.S.C. § 1254a(b)(2)(B). "At least 60 days before [the] end of the initial period of designation, and any extended period of designation," the Secretary must "consult[] with appropriate agencies," then "review the conditions in the foreign state" and "determine whether the conditions for such designation . . . continue to be met." Id. § 1254a(b)(3)(A). If, "after consultation with appropriate agencies," id. § 1254a(b)(3)(A), and "review [of] the conditions in the foreign state," id., the Secretary concludes that the state "no longer continues to meet the conditions for designation," id. § 1254a(b)(3)(B), he or she "shall terminate the designation" after a sixty-day period of notice by publication in the Federal Register, id. Otherwise, the designation is extended for at least six months. See id. § 1254a(b)(3)(C).

#### 4. Somalia

Somalia was first designated for TPS in 1991 on the basis of extraordinary and temporary conditions. Designation of Nationals of Somalia for Temporary Protected Status, 56 Fed. Reg. 46804 (Sep. 16, 1991). Thereafter, its designation was extended and renewed—including, in 2002, the addition of ongoing armed conflict as a separate basis for the designation, see [ECF No. 90 ¶ 86 n.30 (collecting extensions and redesignations)]—until January 14, 2026, when then-Secretary Kristi Noem published notice of the termination of Somalia's TPS designation in the Federal Register, see Termination of the Designation of Somalia for Temporary Protected Status ("2026 Termination Notice"), 91 Fed. Reg. 1547 (Jan. 14, 2026).

### B. Procedural History

The termination of Somalia's TPS status was set to take effect on March 17, 2026. See 2026 Termination Notice, 91 Fed. Reg. at 1547. On March 9, 2026, Plaintiffs, two organizations[2] and four individuals,[3] initiated this action by filing a complaint against the Secretary, DHS, United States Citizenship and Immigration Services ("USCIS"), and the United States of America. [ECF No. 1]. The same day, before Defendants had been served, Plaintiffs filed an emergency motion seeking a stay pursuant to 5 U.S.C. § 705 and an interim administrative stay to enable Defendants to produce the administrative record and to allow time

---

[2] "Plaintiff African Communities Together ('ACT') is a non-profit, membership-based organization that fights for civil rights, opportunity, and a better life for African immigrants, their families, and their communities across the United States." [ECF No. 90 ("Am. Compl.") ¶ 14]. "Plaintiff Partnership for the Advancement of New Americans ("PANA") is a non-profit, membership-based organization of refugees and displaced people with a focus on African, Middle Eastern, Muslim, and South Asian communities." [Id. ¶ 21].
[3] The individual plaintiffs are Alexander, Mohamed, Tyson, and Nina Doe, all Somali nationals who have applied for or received TPS. Their motion to proceed by pseudonym, [ECF No. 2], remains pending. From their description in Plaintiffs' Amended Complaint, all individual plaintiffs appear to be leading exemplary lives in the United States. See [Am. Compl. ¶¶ 26–48].

for the parties to brief the issues. [ECF No. 3]. On March 13, 2026, the Court entered an administrative stay,[4] ordered Plaintiffs to promptly serve Defendants, and ordered the parties to file a joint schedule for briefing and production of the administrative record. See generally [ECF No. 33]. The parties agreed to have the case briefed and ready for hearing the week of May 4, 2026, see [ECF No. 35 at 2], then later agreed to stay the case pending the Supreme Court's decision in Mullin, see [ECF No. 71]; [ECF No. 72].[5]

On June 25, 2026, the Supreme Court issued its decision in Mullin, which rejected two similar challenges to TPS terminations. See 146 S. Ct. at 2121. On July 1, 2026, the government moved to reopen this case and lift the administrative stay, contending that, in light of Mullin, the Court had "more than sufficient direction to promptly rule on and deny Plaintiffs' motion." [ECF No. 77 at 1]. The Court partially granted and partially denied the government's motion. See [ECF No. 78]. The Court lifted the stay that was in place pending the decision in Mullin, and, consistent with the order that imposed that stay, see [ECF No. 73], directed the

---

[4] Case law and statute empower district courts to order administrative stays when reviewing agency action. In 1942, the Supreme Court held that the same "traditional equipment for the administration of justice" that empowers federal courts to "stay the enforcement of a judgment pending the outcome of an appeal" provided courts reviewing agency actions with a "customary power to stay orders under review." Scripps-Howard Radio v. F.C.C., 316 U.S. 4, 9–11 (1942). That understanding was later incorporated into 5 U.S.C. § 705, which was "primarily intended to reflect existing law under the Scripps-Howard doctrine." Sampson v. Murray, 415 U.S. 61, 68 n.15 (1974). Therefore, "courts charged by statute with judicial review of agency decisions" possess the same "authority . . . to issue appropriate writs in aid of that jurisdiction" as do appellate courts. See id. at 73; United States v. Texas, 599 U.S. 670, 700 (2023) (Gorsuch, J., concurring) (citing Sampson and affirming that, at a minimum, § 705 "confirm[s] courts' authority to issue traditional equitable relief pending judicial review"). This includes the authority to issue administrative stays. See Rachel Bayefsky, Administrative Stays: Power and Procedure, 97 Notre Dame L. Rev. 1941, 1951 (2022); United States v. Texas, 144 S. Ct. 797, 799 (2024) (Barrett, J., concurring).

[5] While briefing was underway, amicus briefs were filed by the Commonwealth of Massachusetts, [ECF No. 49], and Oxfam America, Inc., [ECF No. 57].

parties to submit a joint status report stating their respective positions about which claims, if any, remained viable after Mullin. See [ECF No. 78]. The administrative stay was left in place. On July 9, 2026, the parties submitted their joint status report, [ECF No. 79], in which Plaintiffs indicated that (1) they believed their constitutional equal protection claim remained viable and (2) they would be amending their complaint to add additional claims that were not resolved by the Supreme Court, [id. at 3]. The parties proposed briefing schedules, [id. at 4], and the Court ultimately adopted Plaintiffs' proposed schedule, see [ECF No. 82]. While the parties briefed the issues remaining after Mullin and any new issues raised by that decision, the case remained administratively stayed.[6] [ECF No. 78].

On July 20, 2026, the government appealed the Court's decision to leave the administrative stay in place. [ECF No. 84]. While that appeal was pending, on July 30, 2026, Plaintiffs filed an amended complaint, [ECF No. 90], and a renewed emergency motion, [ECF No. 91], this time seeking both a stay pursuant to 5 U.S.C. § 705 and a preliminary injunction. The Court issued an indicative ruling on July 31, 2026, which provided that if the case were remanded from the appeals court, it would dissolve its initial administrative stay and enter a new administrative stay only for as long as was necessary to resolve Plaintiffs' new emergency motion. [ECF No. 94]. On August 3, 2026, in light of the Court's indicative ruling, the First

---

[6] Courts regularly leave administrative stays in place until a motion is fully briefed. See Texas, 144 S. Ct. at 800 (Barrett, J., concurring); id. at 798 (citing June Med. Servs., L.L.C. v. Gee, 139 S. Ct. 661 (2019)); In re Abbott, 800 F. App'x 296, 298 (5th Cir. 2020). While the briefing schedule the Court adopted may have been longer than is typical of expedited briefing in the appellate context, the Court submits that this schedule—two weeks for Plaintiffs' opening brief, two weeks for the government's responsive brief, and one week for Plaintiffs' reply—was warranted given the importance of the issue to both parties and the fact that they were not revisiting arguments previously developed before a lower court, but rather articulating their positions on meaningful constitutional issues for the first time shortly after Mullin.

Circuit dismissed the appeal, but noted that "the district court must rule promptly on the motion before it" and declined to "approve the briefing deadlines set by that court." [ECF No. 95 at 2]. Shortly after the First Circuit dismissed the appeal, the government filed a renewed motion to lift the administrative stay, [ECF No. 97]. The following day, on August 4, 2026, the Court modified its briefing schedule and ordered the parties to complete briefing on Plaintiffs' emergency motion by August 6, 2026. [ECF No. 98]. The parties complied with the amended schedule, see [ECF No. 101], [ECF No. 102], [ECF No. 103], and the motions were fully briefed by the evening of August 6, 2026. On August 13, 2026, the government filed another motion to lift the administrative stay, [ECF No. 108].[7]

## II. LEGAL STANDARD

A motion for a stay pending final resolution of a challenge to agency action under § 705 is resolved according to "[t]he same standard [that] governs" a motion for preliminary injunction.

---

[7] Given the government's impatience, see [ECF No. 108], the Court notes that this order is issuing just over seven weeks after Mullin was decided, just over a week after the pending motions were fully briefed, and within a week of comparable rulings in other TPS cases. See Doe v. Noem, No. 25-cv-15483, Dkt. No. 115 (N.D. Ill. Aug. 7, 2026); Afr. Cmtys. Together v. Noem, No. 25-cv-13939, Dkt. No. 122 (D. Mass. Aug. 7, 2026); Nat'l TPS All. v. Noem, No. 25-cv-05687, Dkt. No. 233 (N.D. Cal. Aug. 6, 2026) (electronic order). During this time, the Court has not ignored Mullin, acted in contravention of its holding, or afforded Plaintiffs any relief. It has merely taken enough time to allow the parties to meaningfully respond to Mullin and then to engage in the thoughtful and deliberative process that is at the heart of the job of a judge.

There has been significant vitriol directed at this Court during the pendency of this case, including many letters and personal attacks. These attacks misapprehend the nature of the judicial function under our Constitution. It is the job of the courts in this country to resolve complex disputes fairly, carefully, and in accordance with the law regardless of whether we agree with that law or not. The parties must have time to present their cases and then the judge must be afforded a reasonable amount of time to come to a considered decision, understanding that many of these decisions have grave consequences for the parties involved. Here, the Court took the time that it felt was necessary to review the briefing, do research, come to a reasoned decision, and prepare an order, given the significant issues not resolved by Mullin and the life-altering consequences of this decision for the affected Somali TPS beneficiaries.

Ass'n of Am. Univs. v. Dep't of Def., 792 F. Supp. 3d 143, 164 (D. Mass. 2025) (first citing Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev., 496 F. Supp. 3d 600, 609 (D. Mass. 2020); and then citing Colorado v. Env't Prot. Agency, 989 F.3d 874, 883 (10th Cir. 2021)). The granting of a preliminary injunction is "an 'extraordinary and drastic remedy' that 'is never awarded as of right.'" Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (quoting Munaf v. Geren, 553 U.S. 674, 689–90 (2008)). In deciding whether to grant a motion for a preliminary injunction, courts must consider four factors: "(i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest."[8] Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013). These four factors "are not entitled to equal weight in the decisional calculus," id.; rather, the movant's likelihood of success on the merits "is the main bearing wall of the four-factor framework," id. at 10 (quoting Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996)). "[P]roving likelihood of success on the merits is the 'sine qua non' of a preliminary injunction." Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc., 794 F.3d 168, 173 (1st Cir. 2015) (quoting New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002)). Unless the movants can "demonstrate that [they are] likely to succeed in [their] quest, the remaining factors become matters of idle curiosity." Id. (quoting New Comm Wireless Servs., 287 F.3d at 9). As the moving party, Plaintiffs here bear the burden of establishing each of the four elements. See Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003).

---

[8] The balance of hardships and public interest factors "merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009).

## III. DISCUSSION

Plaintiffs' amended complaint asserts five causes of action: constitutional challenges pursuant to the Fifth Amendment's Due Process Clause, [ECF No. 90 ("Am. Compl.") ¶¶ 262–267], and equal-protection guarantee, [id. ¶¶ 286–294], two APA challenges pursuant to 5 U.S.C. § 706(2)(B), [id. ¶¶ 268–285, 295–301], and one APA challenge pursuant to 5 U.S.C. § 706(2)(C), [id. ¶¶ 302–311].

### A. Constitutional Claims

#### 1. Reviewability

The TPS statute bars "judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." 8 U.S.C. § 1254a(b)(5)(A). Mullin established that this judicial-review bar prevents this Court from considering nonconstitutional claims, see 146 S. Ct. at 2133, but left open whether the Court may consider any remaining constitutional challenges, see id. at 2137 (plurality opinion) (deciding "substance of . . . respondents' equal protection claim" without concluding that district courts have jurisdiction over such claims). The Court concludes that it may exercise jurisdiction over Plaintiffs' constitutional claims.

"[E]very right, when withheld, must have a remedy, and every injury its proper redress . . . ." Aguilar v. U.S. Immigr. & Customs Enf't, 510 F.3d 1, 17 (1st Cir. 2007) (quoting Marbury v. Madison, 5 U.S. (1 Cranch) 137, 147 (1803)), so while "the Supreme Court has not found constitutional difficulties in congressional abrogation of certain remedies as long as others are left intact," id. at 17 (first citing Lauf v. E.G. Shinner & Co., 303 U.S. 323, 330 (1938); then citing Cary v. Curtis, 44 U.S. (3 How.) 236, 250 (1845); and then citing Swain v. Pressley, 430 U.S. 372, 381 (1977)), "Congress probably cannot nullify rights guaranteed in the Constitution by prohibiting all remedies for the violation of those rights," id. at 18 (citing Webster v. Doe,

486 U.S. 592, 603 (1988)). At a minimum, if "Congress intends to preclude judicial review of constitutional claims[,] its intent to do so must be clear." Mullin, 146 S. Ct. at 2137 (quoting Webster v. Doe, 486 U.S. 592, 603 (1988)).

The Court is unaware of any case, outside of the habeas corpus context,[9] in which a statute was held to clearly preclude all judicial review of constitutional challenges, and no case in which such a withdrawal of jurisdiction was sustained as constitutional. See generally Richard H. Fallon, Jr., Jurisdiction-Stripping Reconsidered, 96 Va. L. Rev. 1043 (2010). Yet the judicial-review bar in the TPS statute, if found to reach constitutional claims, would prohibit all "judicial review," 8 U.S.C. § 1254a(b)(5)(A), without reserving or specifying any alternative remedial pathways. The Court does not read the statute to go so far.

Congress legislates against the backdrop of the Constitution, see Bond v. United States, 572 U.S. 844, 857–58 (2014), which presumes that there will be a forum for resolution of constitutional disputes, see Aguilar, 510 F.3d at 18. Viewing the phrase "judicial review" against that background, the Court cannot discern a clear statement evidencing an intent to preclude the adjudication of constitutional claims in the context of the TPS statute. Cf. Johnson v. Robison, 415 U.S. 361, 367, 373–74 (1974). As other courts have noted, where Congress intended to limit judicial review of constitutional claims in the INA, "it said so explicitly." Ramos v. Nielsen, 321 F. Supp. 3d 1083, 1105 (N.D. Cal. 2018) (citing 8 U.S.C. § 1252(b)(9)). In the absence of compelling evidence to the contrary, the Court will not conclude that Congress departed from over two hundred years of history by denying all remedies for constitutional

---

[9] Boumediene v. Bush, 553 U.S. 723 (2008), reached the closely related conclusion that the Military Commissions Act of 2006 "denie[d] the federal courts jurisdiction to hear [certain] habeas corpus actions," id. at 736, then invalidated that denial of jurisdiction on the basis that it "effect[ed] an unconstitutional suspension of the writ [of habeas corpus]," id. at 792.

claims when it passed 8 U.S.C. § 1254a. Accordingly, although § 1254a(b)(5)(A) may bar review of statutory claims, the Court does not find that to be true of constitutional claims.

### 2. Due Process

Plaintiffs' first constitutional argument is that the Secretary's termination of Somalia's TPS designation violated the Fifth Amendment's Due Process Clause,[10] see [ECF No. 92 at 15], which protects all people from being deprived of "life, liberty, or property, without due process of law," U.S. Const. amend. V, and applies equally to noncitizens who have entered the United States, see Zadvydas v. Davis, 533 U.S. 678, 693 (2001).

Plaintiffs challenge the termination under the procedural branch of due process doctrine. See [ECF No. 92 at 16]. As the First Circuit has explained:

> Due process has both procedural and substantive components. The right to procedural due process "guarantee[s] . . . that, before a significant deprivation of liberty or property takes place at the state's hands, the affected individual must be forewarned and afforded an opportunity to be heard at a meaningful time and in a meaningful manner." González-Droz v. González-Colón, 660 F.3d 1, 13 (1st Cir. 2011) (internal quotation marks omitted) (quoting Amsden v. Moran, 904 F.2d 748, 753 (1st Cir. 1990)). The right to substantive due process "safeguards individuals against certain offensive government actions, notwithstanding that facially fair procedures are used to implement them." DePoutot v. Raffaelly, 424 F.3d 112, 118 (1st Cir. 2005) (citing Daniels v. Williams, 474 U.S. 327, 331, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986)).

Maldonado-González v. P.R. Aqueduct & Sewer Auth., 158 F.4th 27, 34 (1st Cir. 2025) (alterations in original). To make out a procedural due process claim, "the plaintiffs must identify a protected property or liberty interest," Redondo-Borges v. U.S. Dep't of Hous. & Urb.

---

[10] The government directs the Court to Mullin's admonition that "challengers cannot avoid a judicial-review bar by creative pleading or clever lawyering." 146 S. Ct. at 2136; see [ECF No. 102 at 9]. The quoted portion of Mullin, however, concerns attempts to apply the APA to subsidiary or antecedent agency decisions to circumvent a bar on APA review of a final agency decision. Here, rather than applying the same law to prior decisions, Plaintiffs identify a distinct source of law that they contend furnishes an independent basis for setting aside the challenged final action.

Dev., 421 F.3d 1, 7 (1st Cir. 2005) (quoting Centro Medico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 5 (1st Cir. 2005)), to which they "must 'have a legitimate claim of entitlement'" that is "more than a unilateral expectation," id. at 8 (quoting Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972)).

i. Property Interests

"Property interests . . . are created and their dimensions are defined by . . . independent source[s]," such as statutory law, and courts look to the specific contours of the source of an asserted property right to ascertain whether one has been created. Roth, 408 U.S. at 577–78. "Discretionary forms of relief do 'not rise to the level of such a protected interest,'" Kandamar v. Gonzales, 464 F.3d 65, 69 (1st Cir. 2006) (quoting DaCosta v. Gonzales, 449 F.3d 45, 50 (1st Cir. 2006)); accord Doyle v. City of Medford, 606 F.3d 667, 672 (9th Cir. 2010) ("A regulation granting broad discretion to a decision-maker does not create a property interest."), but where a "statute [sufficiently] narrows the government's discretion," a person may have a legitimate claim of entitlement, Laborde-Garcia v. P.R. Tel. Co., 993 F.2d 265, 267 (1st Cir. 1993). The government does not, however, "create a property right merely by ordaining beneficial procedure unconnected to some articulable substantive guarantee." Town of Castle Rock v. Gonzales, 545 U.S. 748, 771 (2005) (Souter, J., concurring). Further, a property interest must be "distinguishable from the procedural obligations imposed on state officials to protect it." Id. at 772.

Thus, to prevail on this issue, Plaintiffs must establish that the TPS statute creates a property interest in Somalia's ongoing TPS designation such that they are entitled to constitutionally sufficient process before the designation is terminated. To do so, they rely on a number of benefits that the government is required to provide to TPS beneficiaries once the program is in effect. Specifically, they cite to "employment authorization, protection from

detention, and protection from removal," [ECF No. 92 at 16 (citing 8 U.S.C. § 1254a(a)(1)(A)–(B), (a)(4)(B), (d)(4))], as entitlements that rise to the level of protected property interests.

Though the Court recognizes how important these benefits are to recipients of TPS, they do not establish property interests in Somalia's TPS designation, due to the two-step structure of the TPS program. As explained above, TPS beneficiaries receive the benefits of TPS only for the period that their country of origin has been designated (hence the name "temporary protected status"), and when a country's TPS designation is set to expire, the Secretary must make the discretionary decision whether to terminate the designation or extend it for six to eighteen months. See generally 8 U.S.C § 1254a. Because TPS beneficiaries will receive future benefits if—but only if—the Secretary decides to extend the designation of their country of origin (or to redesignate it), they have nothing "more than a unilateral expectation," Roth, 408 U.S. at 577, in their future TPS eligibility.[11] Thus, while benefits are "mandate[d]," [ECF No. 92 at 17], during the term for which a country has been designated, the periodic decision to extend that designation is discretionary and does not give rise to a cognizable property interest. Cf. Nat'l TPS All. v. Noem, 150 F.4th 1000, 1022 n.9 (9th Cir. 2025) ("TPS holders can rely on the security of their status but only for a limited period of time.").

The cases cited by Plaintiffs, see [ECF No. 92 at 16–17], do not alter this determination. Mansor v. United States Citizenship and Immigration Services, 685 F. Supp. 3d 1000 (W.D. Wash. 2023), concerned nationals of a country that had already been designated, who alleged that they had applied and met the eligibility criteria for TPS, but had not received the temporary

---

[11] These facts are analogous to Roth, in which the Supreme Court concluded that an assistant professor appointed to a one-year term had no due process interest in his reappointment, 408 U.S. at 578.

employment authorization to which they were entitled. See id. at 1006. Framing the inquiry in terms of "whether the statutory and regulatory provisions at issue here are sufficiently mandatory to confer an entitlement," id. at 1013, that court concluded that because employment authorization is mandatory once TPS applicants have established that they qualify for the program (including establishing that their nation of origin has been designated by the Secretary), it amounts to a constitutionally protected property interest. See id. at 1014–15. That holding, however, concerned individuals' entitlements to mandatory benefits after the Secretary designated their country of origin, not their prospective entitlements to discretionary extension or the redesignation of their country of origin for future terms.

Plaintiffs also direct the Court to Ramos, 321 F. Supp. 3d 1083. In that case, TPS beneficiaries from several countries challenged decisions to terminate their countries' designations, see id. at 1083, on procedural due process grounds, among others, see id. at 1121. In denying the defendants' motion to dismiss, that court concluded that because TPS beneficiaries are "entitled to continue receiving benefits until the Secretary makes the determination to terminate [their country's designation] pursuant to the process and criteria set forth in the statute," id., they had "at least a plausible claim," id. at 1122, to a property interest in the "statutorily-mandated 'review' and 'determination'" procedures, id. Notably, the court did not pursue that formulation as the case progressed beyond the motion-to-dismiss stage.[12]

---

[12] It appears that procedural due process was not discussed in subsequent developments in that litigation. See Saget v. Trump, 375 F. Supp. 3d 280, 366 n.24 (E.D.N.Y. 2019) (noting that "the Ramos Court similarly declined to address the plaintiffs' procedural due process claim in granting injunctive relief, even though the court raised concerns at the motion-to-dismiss stage"). See generally Ramos v. Nielsen, 336 F. Supp. 3d 1075 (N.D. Cal. 2018), vacated and remanded sub nom. Ramos v. Wolf, 975 F.3d 872 (9th Cir. 2020), reh'g en banc granted, 59 F.4th 1010 (2023), appeal dismissed sub nom. Ramos v. Mayorkas, No. 18-16981, 2023 WL 4363667 (9th Cir. June 29, 2023).

Further, it appears that such an interest would not amount to "property" as defined by the Fifth Amendment, because it would be "[in]distinguishable from the procedural obligations imposed on state officials to protect it," Castle Rock, 545 U.S. at 772 (Souter, J., concurring). See Caesars Mass. Mgmt. Co. v. Crosby, 778 F.3d 327, 332 n.2 (1st Cir. 2015) (noting that "there is no freestanding right to due process that is itself a form of property"); Johnson v. Ryan, 55 F.4th 1167, 1193–94 (9th Cir. 2022) (collecting cases); Olim v. Wakinekona, 461 U.S. 238, 250 (1983) ("Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement."); cf. Teigen v. Renfrow, 511 F.3d 1072, 1082 (10th Cir. 2007) ("Because the right to be considered for promotion and other employment benefits is not a substantive right but a procedural one, a statutory entitlement to such consideration cannot form the basis for a federal due process claim.").

In conclusion, as Plaintiffs concede, "[t]he government has discretion whether to designate a foreign state for TPS," [ECF No. 92 at 17], as well as whether to terminate a "country's continued designat[ion] for TPS," [id. at 18]. Accordingly, Plaintiffs' only cognizable interest is in the Secretary following the review and termination procedures prescribed by statute while making a decision that is ultimately discretionary. See Clukey v. Town of Camden, 717 F.3d 52, 56 (1st Cir. 2013) ("In considering whether state [or federal] law creates an entitlement, we look primarily to the discretion [the at-issue] law accords [government] actors to withhold the entitlement from individuals."). Interests in procedure are not "property" within the meaning of the Due Process Clause, so Plaintiffs have not shown a likelihood of success on the merits of this claim.

ii. Liberty Interests

Plaintiffs assert liberty interests in the rights "to remain in the United States[,] to work[,] and [to] live with their family members." [ECF No. 92 at 17 (first citing Saget v. Trump, 375 F.

Supp. 3d 280, 333 (E.D.N.Y. 2019); then citing Destino v. FCI Berlin, Warden, No. 25-cv-00374, 2025 WL 4010424, at *11 (D.N.H. Dec. 24, 2025); and then citing Ching v. Mayorkas, 725 F.3d 1149, 1157 (9th Cir. 2013))]. The Court agrees that immigration detention and removal from the country implicate core due process liberty interests, e.g., Zadvydas v. Davis, 533 U.S. 678, 693–94 (2001), and as such, when the government seeks to deprive a person of those rights—that is, to detain or remove them—it must do so in a manner that comports with the Constitution, e.g., id.; A.A.R.P. v. Trump, 605 U.S. 91, 94 (2025) (per curiam) (citing Trump v. J.G.G., 604 U.S. 670, 673 (2025) (per curiam)). Here, however, terminating Somalia's TPS designation does not deprive anyone of these interests; it merely makes them susceptible to future deprivations. If the government wishes to remove or detain Somali people who previously held TPS, those enforcement actions will be subject to the protections of the Due Process Clause. The Court is aware of no precedent that would allow it to find a protected liberty interest in being free from the prospect of immigration enforcement.

**3. Equal Protection**

Plaintiffs next raise two claims under the Fifth Amendment's guarantee that the federal government will not deny any person the equal protection of the laws, see Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 213, 217–18 (1995)—namely, that the termination of Somalia's TPS designation unconstitutionally discriminated based on both race and national origin. See [ECF No. 92 at 20–34]; [ECF No. 103 at 14–15 (highlighting that national-origin claim is distinct)].

"Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S 252 . . . (1977), supplies the standard for assessing th[ese] claim[s]." Mullin, 146 S. Ct. at 2148 (Kagan, J., dissenting); cf. id. at 2137–38 (majority opinion) (assuming without deciding that Arlington Heights supplies the proper framework). Under that standard, "[p]roof of . . . discriminatory intent or purpose is required to show a violation of [the Fifth Amendment's equal protection

guarantee],” but the impermissible intent need not be “‘dominant’ or ‘primary.’” Arlington Heights, 429 U.S. at 265. Rather, Plaintiffs only need to show that “a discriminatory purpose has been a motivating factor in the decision.” Id. at 265–66. Because “direct evidence of discriminatory purpose is rarely available,” “impermissible discriminatory animus can be inferred from the totality of the circumstances, including both direct and circumstantial evidence.” Calvary Chapel Belfast v. Univ. of Me. System, 180 F.4th 13, 26 (1st Cir. 2026) (citing, inter alia, Arlington Heights, 429 U.S. at 266–68).

To begin, the Court must determine what statements should be considered in evaluating these equal protection claims. Plaintiffs present a timeline of statements that they contend reflect the requisite discriminatory intent, the vast majority of which were made by President Trump, see generally [ECF No. 93-14]; [ECF No. 90 ¶¶ 95–114], though Plaintiffs also identify two posts from DHS’s X account, one from the White House’s X account, and one statement each by Stephen Miller and Scott Bessent, Secretary of the United States Department of the Treasury, [ECF No. 93-14 at 5–6]. Plaintiffs contend that the Court should consider the President’s statements “because the President had authority and influence over Defendants’ decision.” [ECF No. 92 at 22 (first citing Centro Presente v. U.S. Dep’t of Homeland Sec., 332 F. Supp. 3d 393, 414–15 (D. Mass. 2018); and then citing Washington v. Seattle Sch. Dist. No. 1, 458 U.S. 457, 471 (1982))]. The Court agrees that the statements by the President are relevant and defers consideration of the remaining statements because they repeat themes already present in the President’s comments and thus would not alter Plaintiffs’ likelihood of success on the merits.

Executive officers, such as the Secretary of Homeland Security, “remain accountable to the President, whose authority they wield,” Seila Law LLC v. Consumer Fin. Prot. Bureau, 591 U.S. 197, 213 (2020), and not only are they “subject to his superintendence,” Trump v.

Slaughter, 146 S. Ct. 2283, 2293 (2026) (quoting The Federalist No. 72, at 436 (Alexander Hamilton)), but he also may "remove those who fail to live up to" expectations, id. at 2295. Given his control over the executive branch, the Court finds that evidence of the President's motivation in declaring that he was terminating TPS is probative of whether impermissible bias entered the deliberative process. See Centro Presente, 332 F. Supp. 3d at 414–15; Dep't of Homeland Sec. v. Regents of the Univ. of Calif., 591 U.S. 1, 38 (2020) (Sotomayor, J., dissenting) ("Taken together, 'the words of the president' help to 'create the strong perception' that the rescission decision was 'contaminated by impermissible discriminatory animus.'" (quoting Trump v. Hawaii, 585 U.S. 667, 739–40 (2018) (Sotomayor, J., dissenting))).[13] The Mullin majority, too, appeared to assume, though it did not explicitly state, that the President's statements could factor into the equal-protection analysis. See Mullin, 146 S. Ct. at 2138–39.

i. Discrimination on the Basis of Race

Plaintiffs argue that they are likely to succeed on their race-discrimination claims because President Trump and others in his administration made countless statements that were "racially overt[,] . . . directly targeted at Somali people," [ECF No. 103 at 12], and "explicitly tie[d] racialized notions about Somalis' alleged criminality to demands for their expulsion," [ECF No. 92 at 21–22]. Though Plaintiffs lay out a strong case for why the at-issue statements were racist, see [ECF No. 92 at 23–27], after Mullin, which included a constitutional race-discrimination claim, the Court cannot discern a path to concluding that Plaintiffs will succeed on the merits of this claim.

---

[13] Given the timeline of President Trump's statements in this case relative to the termination decision, see generally [ECF No. 93-14], the Court concludes that Regents, in which the Supreme Court declined to consider statements by the President with greater temporal distance from the challenged agency action, see 591 U.S. at 35, is inapposite.

In Mullin, the plaintiffs "offered . . . statements by the President so repellent and racially inflected that the majority decline[d] to put them in print." Mullin, 146 S. Ct. at 2149 (Kagan, J., dissenting). Among them were that Haitians were eating the dogs, cats, and other pets of the people of Springfield, Ohio; that Haitians in the United States "probably have AIDS"; that Haiti is a "filthy, dirty, [and] disgusting" "shithole"; that Haitian immigration is "like a death wish for our country"; and that Haitians, among other groups, "are 'poisoning the blood' of our country." Id. (alteration in original). Despite the undisguised racial animus reflected in these statements, the majority of the Supreme Court somehow concluded that the words showed nothing more than "the present administration's general stance on immigration and its obvious antipathy toward past administrations' TPS policies," id. at 2139 (majority opinion), and held that the plaintiffs were "unlikely to prove that race was a motivating factor in the decision to terminate Haiti's TPS designation," id. at 2140.

Bound as it is to view things through the Mullin prism, the Court cannot identify any statement or combination of statements offered by Plaintiffs here that is more illustrative of racial antipathy than were those in Mullin, and as such, it cannot find evidence of racial animus that would distinguish this case from that one.

Plaintiffs also argue that there is additional circumstantial evidence present here that was not present in Mullin. That includes "the Administration's singular focus" on Somalia, its "abrupt[] depart[ure] from decades of past practice," its immigration enforcement operations in Minnesota, the alleged fast-tracking of and interference with asylum hearings, the "considerable evidence in the record suggest[ing] that conditions in Somalia are unsafe," and President Trump's ongoing targeting of Somalia through other immigration policies. [ECF No. 92 at 28–32]. Plaintiffs also point to President Trump's concern for and comments about white South

Africans, and to his administration's favoring of white Ukrainian immigrants, as evidence of white nationalism. [Id. at 32–34]. This circumstantial evidence clearly shows that Somalia and its people are being targeted, but after Mullin, that is not sufficient to sustain a race-based equal protection claim.

ii. Discrimination on the Basis of National Origin

Plaintiffs also allege national-origin discrimination, which is a legal theory not addressed by Mullin. Although "the concept of national origin stands in uneasy relation to other prohibited grounds in ways that render its independent force uncertain," Aziz Z. Huq, The Double Movement of National Origin Discrimination, 87 U. Chi. L. Rev. 2397, 2401 (2020), "[j]ustices of both the right and the left on the Supreme Court have repeatedly enumerated national origin among the criteria triggering strict scrutiny pursuant to the Equal Protection Clause without a hint of protest or controversy," id. at 2400; see, e.g., Peña-Rodriguez v. Colorado, 580 U.S. 206, 252 (2017) (Alito, J., dissenting). Decisions of lower courts have fleshed out the concept somewhat, but the body of law is not comprehensive or particularly cohesive. See United States v. Gomez, 797 F.2d 417, 419 (7th Cir. 1986) (noting that it "obviously would be unconstitutional" to sentence a defendant more harshly on the basis of his nationality); cf. United States v. Kaba, 480 F.3d 152, 156 (2d Cir. 2007) (stating that "[a] defendant's race or nationality may play no adverse role in the administration of justice, including at sentencing." (quoting United States v. Leung, 40 F.3d 577, 586 (2d Cir. 1994)) and vacating a sentence that focused on defendant's Guinean nationality and sought to send a message "across the Atlantic"); United States v. Figueroa, 622 F.3d 739, 743–44 (7th Cir. 2010) (declining to decide whether "references to national origin, standing alone, would require reversal" because sentence could be vacated on other grounds); Sinai v. New Eng. Tel. & Tel. Co., 3 F.3d 471, 474 (1st Cir. 1993)

(upholding jury verdict on statutory race-discrimination claim because of close relationship between race and national origin).

That said, it seems evident that national origin remains subject to strict scrutiny based on the Supreme Court's recent, forceful repudiation of Korematsu v. United States, 323 U.S. 214 (1944), which it called "morally repugnant" because it approved the "forcible relocation of U.S. citizens to concentration camps, solely and explicitly on the basis of race." Trump v. Hawaii, 585 U.S. 667, 710 (2018). Although it refers in some instances to race, however, the actual logic of Korematsu's now-repudiated holding turned on national origin. See Huq, supra, at 2409 (noting the "obvious centrality of national origin to a government policy of interning Japanese Americans (but not other Asian Americans)" and observing that Korematsu expressly justified the internment policy on the basis that it only targeted "those of Japanese origin," 323 U.S. at 218–19); Korematsu, 323 U.S. at 223 ("Korematsu was not excluded from the Military Area because of hostility to him or his race. He was excluded because . . . the military urgency of the situation demanded that all citizens of Japanese ancestry be segregated . . . ." (emphasis added)). Indeed, Korematsu recognized that "cast[ing] this case into outlines of racial prejudice . . . [would] confuse[] the issue" because the classification concerned national origin, not race. Id. at 223. Accordingly, the Supreme Court's repudiation of Korematsu reaffirms that national origin is a characteristic that merits the greatest degree of protection under our constitutional equal protection jurisprudence.

Nonetheless, at least at this stage of the litigation, in the absence of more settled law on national-origin discrimination and without any examples of successful challenges to federal

agency action based on national origin, the Court cannot conclude that Plaintiffs have sufficiently demonstrated the likelihood of success required for injunctive relief.[14]

### B. APA Claims

Plaintiffs bring three APA claims. Two allege that the termination violated constitutional due process and equal protection guarantees, along the lines of the arguments discussed above, and thus should be vacated pursuant to 5 U.S.C. § 706(2)(B). See [Am. Compl. ¶¶ 268–285, 295–301]. The Court concludes that because those claims rely on a statutory cause of action, albeit one that incorporates the Constitution as a source of law, the Court's jurisdiction over them is foreclosed by the Supreme Court's decision in Mullin. Plaintiffs are thus unlikely to succeed on those claims (and would also be unlikely to succeed if the Court did have jurisdiction, for the reasons discussed above).

Plaintiffs' third APA claim is that the Secretary lacked authority to terminate Somalia's TPS status because the Secretary was never assigned the Attorney General's power to terminate TPS, either by the HSA, the creation of DHS, or the reorganization of DOJ. [Am. Compl. ¶¶ 302–311]. The Court has jurisdiction over this final claim because the judicial-review bar only applies to decisions by the statutorily authorized decision-maker. See 8 U.S.C. § 1254a(b)(5)(A)

---

[14] The government correctly observes that "[d]istinctions drawn among nationalities by the Executive are a permissible feature of immigration law," [ECF No. 102 at 17], but the fact that some classifications survive constitutional scrutiny does not imply that all will. The government directs the Court to the observation of one court, which commented that "[s]o long as such distinctions are not wholly irrational they must be sustained," Narenji v. Civiletti, 617 F.2d 745, 747 (D.C. Cir. 1979); see also Rajah v. Mukasey, 544 F.3d 427, 438 (2d Cir. 2008) (citing Narenji); [ECF No. 102 at 17 (citing Rajah)], but it appears that the court that originally stated that proposition relied on cases concerning more general distinctions, rather than the targeting of particular national groups, see Narenji, 617 F.2d at 747. Furthermore, the government must provide an explanation for the distinctions it draws, and regardless of what standard of review applies, government action cannot rest on "a bare . . . desire to harm a politically unpopular group." Romer v. Evans, 517 U.S. 620, 634–35 (1996) (quoting Dep't of Agric. v. Moreno, 413 U.S. 528, 534 (1973)).

(barring "judicial review of any determination of the Attorney General"). Here, the issue is not the decision itself, but rather whether, after the reorganization of DHS, the authorized decision-maker is the Attorney General or the Secretary. Compare [ECF No. 92 at 35–39], with [ECF No. 102 at 20–22]. If Defendants are correct that the decision-maker can be the Secretary, the judicial-review bar applies, but if Plaintiffs are correct that the decision-maker must be the Attorney General, it does not. Under such circumstances, where the question of jurisdiction "entirely overlap[s]" with the merits, the Court may decide the jurisdictional issue, even if its conclusion could "in effect deprive [it] of jurisdiction." Brownback v. King, 592 U.S. 209, 218 (2021); see also Doe v. Noem, No. 25-cv-15483, Dkt. No. 115, at 13–14 (N.D. Ill. Aug. 7, 2026).

Briefly put, for the reasons recently articulated by another session of this Court, see Afr. Cmtys. Together v. Noem, No. 25-cv-13939, Dkt. No. 122, at 5–11 (D. Mass. Aug. 7, 2026);[15] see also Doe v. Noem, No. 25-cv-15483, Dkt. No. 115, at 14–19 (N.D. Ill. Aug. 7, 2026), the Court concludes that the Secretary was assigned the Attorney General's power to terminate TPS by the HSA and subsequent reorganization. Accordingly, the challenged decision to terminate Somalia's TPS designation was within the Secretary's authority, and Plaintiffs are unlikely to succeed on this claim.

### C. Remaining Factors

In the interest of a complete record of its decision, the Court reaches the remaining factors despite its conclusion that Plaintiffs have not demonstrated a likelihood of success on the merits, thus precluding injunctive relief. Plaintiffs have made a convincing showing that they will suffer irreparable harm if the injunction is withheld, see [ECF No. 92 at 41–43], and the

---

[15] Because Plaintiff African Communities Together is a party to that case, the Court assumes familiarity with that order.

balance of hardships and the public interest also favor Plaintiffs, given that the government has made no showing that maintaining TPS status for the duration of this litigation would impose an undue burden apart from any injury inherent in delayed enforcement of the executive's priorities, see [ECF No. 102 at 23–24 (first citing Trump v. CASA, Inc., 606 U.S. 831, 861 (2025); and then citing Nken v. Holder, 556 U.S. 418, 435–36 (2009))].

## IV. CONCLUSION

For the foregoing reasons, the government's motions to lift the administrative stay, [ECF No. 97]; [ECF No. 108], are **GRANTED**, and Plaintiffs' emergency motion, [ECF No. 91], is **DENIED**.[16]

**SO ORDERED.**

August 14, 2026

*/s/ Allison D. Burroughs*
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE

[16] As noted previously, Plaintiffs' first emergency motion, [ECF No. 3], is **DENIED AS MOOT**.

**8 USC 1254a: Temporary protected status**
Text contains those laws in effect on September 29, 2026

**From Title 8-ALIENS AND NATIONALITY**
CHAPTER 12-IMMIGRATION AND NATIONALITY
SUBCHAPTER II-IMMIGRATION
Part V-Adjustment and Change of Status

**Jump To:**
**Source Credit**
**Miscellaneous**
**References In Text**
**Amendments**
**Effective Date**

# §1254a. Temporary protected status

## (a) Granting of status

### (1) In general

In the case of an alien who is a national of a foreign state designated under subsection (b) (or in the case of an alien having no nationality, is a person who last habitually resided in such designated state) and who meets the requirements of subsection (c), the Attorney General, in accordance with this section-

(A) may grant the alien temporary protected status in the United States and shall not remove the alien from the United States during the period in which such status is in effect, and

(B) shall authorize the alien to engage in employment in the United States and provide the alien with an "employment authorized" endorsement or other appropriate work permit.

### (2) Duration of work authorization

Work authorization provided under this section shall be effective throughout the period the alien is in temporary protected status under this section.

### (3) Notice

(A) Upon the granting of temporary protected status under this section, the Attorney General shall provide the alien with information concerning such status under this section.

(B) If, at the time of initiation of a removal proceeding against an alien, the foreign state (of which the alien is a national) is designated under subsection (b), the Attorney General shall promptly notify the alien of the temporary protected status that may be available under this section.

(C) If, at the time of designation of a foreign state under subsection (b), an alien (who is a national of such state) is in a removal proceeding under this subchapter, the Attorney General shall promptly notify the alien of the temporary protected status that may be available under this section.

(D) Notices under this paragraph shall be provided in a form and language that the alien can understand.

### (4) Temporary treatment for eligible aliens

(A) In the case of an alien who can establish a prima facie case of eligibility for benefits under paragraph (1), but for the fact that the period of registration under subsection (c)(1)(A)(iv) has not begun, until the alien has had a reasonable opportunity to register during the first 30 days of such period, the Attorney General shall provide for the benefits of paragraph (1).

(B) In the case of an alien who establishes a prima facie case of eligibility for benefits under paragraph (1), until a final determination with respect to the alien's eligibility for such benefits under paragraph (1) has been made, the alien shall be provided such benefits.

### (5) Clarification

Nothing in this section shall be construed as authorizing the Attorney General to deny temporary protected status to an alien based on the alien's immigration status or to require any alien, as a condition of being granted such status, either to relinquish nonimmigrant or other status the alien may have or to execute any waiver of other rights under this chapter. The granting of temporary protected status under this section shall not be considered to be inconsistent with the granting of nonimmigrant status under this chapter.

## (b) Designations

### (1) In general

The Attorney General, after consultation with appropriate agencies of the Government, may designate any foreign state (or any part of such foreign state) under this subsection only if-

(A) the Attorney General finds that there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;

(B) the Attorney General finds that-

(i) there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected,

(ii) the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state, and

(iii) the foreign state officially has requested designation under this subparagraph; or

(C) the Attorney General finds that there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the Attorney General finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

A designation of a foreign state (or part of such foreign state) under this paragraph shall not become effective unless notice of the designation (including a statement of the findings under this paragraph and the effective date of the designation) is published in the Federal Register. In such notice, the Attorney General shall also state an estimate of the number of nationals of the foreign state designated who are (or within the effective period of the designation are likely to become) eligible for temporary protected status under this section and their immigration status in the United States.

**(2) Effective period of designation for foreign states**

The designation of a foreign state (or part of such foreign state) under paragraph (1) shall-

(A) take effect upon the date of publication of the designation under such paragraph, or such later date as the Attorney General may specify in the notice published under such paragraph, and

(B) shall remain in effect until the effective date of the termination of the designation under paragraph (3)(B).

For purposes of this section, the initial period of designation of a foreign state (or part thereof) under paragraph (1) is the period, specified by the Attorney General, of not less than 6 months and not more than 18 months.

**(3) Periodic review, terminations, and extensions of designations**

**(A) Periodic review**

At least 60 days before end of the initial period of designation, and any extended period of designation, of a foreign state (or part thereof) under this section the Attorney General, after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state (or part of such foreign state) for which a designation is in effect under this subsection and shall determine whether the conditions for such designation under this subsection continue to be met. The Attorney General shall provide on a timely basis for the publication of notice of each such determination (including the basis for the determination, and, in the case of an affirmative determination, the period of extension of designation under subparagraph (C)) in the Federal Register.

**(B) Termination of designation**

If the Attorney General determines under subparagraph (A) that a foreign state (or part of such foreign state) no longer continues to meet the conditions for designation under paragraph (1), the Attorney General shall terminate the designation by publishing notice in the Federal Register of the determination under this subparagraph (including the basis for the determination). Such termination is effective in accordance with subsection (d)(3), but shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension under subparagraph (C).

**(C) Extension of designation**

If the Attorney General does not determine under subparagraph (A) that a foreign state (or part of such foreign state) no longer meets the conditions for designation under paragraph (1), the period of designation of the foreign state is extended for an additional period of 6 months (or, in the discretion of the Attorney General, a period of 12 or 18 months).

**(4) Information concerning protected status at time of designations**

At the time of a designation of a foreign state under this subsection, the Attorney General shall make available information respecting the temporary protected status made available to aliens who are nationals of such designated foreign state.

**(5) Review**

**(A) Designations**

There is no judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection.

**(B) Application to individuals**

The Attorney General shall establish an administrative procedure for the review of the denial of benefits to aliens under this subsection. Such procedure shall not prevent an alien from asserting protection under this section in removal proceedings if the alien demonstrates that the alien is a national of a state designated under paragraph (1).

**(c) Aliens eligible for temporary protected status**

**(1) In general**

**(A) Nationals of designated foreign states**

Subject to paragraph (3), an alien, who is a national of a state designated under subsection (b)(1) (or in the case of an alien having no nationality, is a person who last habitually resided in such designated state), meets the requirements of this paragraph only if-

(i) the alien has been continuously physically present in the United States since the effective date of the most recent designation of that state;

(ii) the alien has continuously resided in the United States since such date as the Attorney General may designate;

(iii) the alien is admissible as an immigrant, except as otherwise provided under paragraph (2)(A), and is not ineligible for temporary protected status under paragraph (2)(B); and

(iv) to the extent and in a manner which the Attorney General establishes, the alien registers for the temporary protected status under this section during a registration period of not less than 180 days.

**(B) Registration fee**

**(i) In general**

The Attorney General may require payment of a reasonable fee as a condition of registering an alien under subparagraph (A)(iv) (including providing an alien with an "employment authorized" endorsement or other appropriate work permit under this section). The amount of any such fee shall not exceed $500, subject to the adjustments required under clause (ii). In the case of aliens registered pursuant to a designation under this section made after July 17, 1991, the Attorney General may impose a separate, additional fee for providing an alien with documentation of work authorization. Notwithstanding section 3302 of title 31, all fees collected under this subparagraph shall be credited to the appropriation to be used in carrying out this section.

**(ii) Annual adjustments for inflation**

During fiscal year 2026, and during each subsequent fiscal year, the maximum amount of the fee authorized under clause (i) shall be equal to the sum of-

(I) the maximum amount of the fee authorized under this subparagraph for the most recently concluded fiscal year; and

(II) the product resulting from the multiplication of the amount referred to in subclause (I) by the percentage (if any) by which the Consumer Price Index for All Urban Consumers for the month of July preceding the date on which such adjustment takes effect exceeds the Consumer Price Index for All Urban Consumers for the same month of the preceding calendar year, rounded to the next lowest multiple of $10.

**(iii) Disposition of temporary protected status fees**

All of the fees collected pursuant to this subparagraph shall be deposited into the general fund of the Treasury.

**(iv) No fee waiver**

Fees required to be paid under this subparagraph shall not be waived or reduced.

**(2) Eligibility standards**

**(A) Waiver of certain grounds for inadmissibility**

In the determination of an alien's admissibility for purposes of subparagraph (A)(iii) of paragraph (1)-

(i) the provisions of paragraphs (5) and (7)(A) of section 1182(a) of this title shall not apply;

(ii) except as provided in clause (iii), the Attorney General may waive any other provision of section 1182(a) of this title in the case of individual aliens for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest; but

(iii) the Attorney General may not waive-

(I) paragraphs (2)(A) and (2)(B) (relating to criminals) of such section,

(II) paragraph (2)(C) of such section (relating to drug offenses), except for so much of such paragraph as relates to a single offense of simple possession of 30 grams or less of marijuana, or

(III) paragraphs (3)(A), (3)(B), (3)(C), and (3)(E) of such section (relating to national security and participation in the Nazi persecutions or those who have engaged in genocide).

**(B) Aliens ineligible**

An alien shall not be eligible for temporary protected status under this section if the Attorney General finds that-

(i) the alien has been convicted of any felony or 2 or more misdemeanors committed in the United States, or

(ii) the alien is described in section 1158(b)(2)(A) of this title.

**(3) Withdrawal of temporary protected status**

The Attorney General shall withdraw temporary protected status granted to an alien under this section if-

(A) the Attorney General finds that the alien was not in fact eligible for such status under this section,

(B) except as provided in paragraph (4) and permitted in subsection (f)(3), the alien has not remained continuously physically present in the United States from the date the alien first was granted temporary protected status under this section, or

(C) the alien fails, without good cause, to register with the Attorney General annually, at the end of each 12-month period after the granting of such status, in a form and manner specified by the Attorney General.

**(4) Treatment of brief, casual, and innocent departures and certain other absences**

(A) For purposes of paragraphs (1)(A)(i) and (3)(B), an alien shall not be considered to have failed to maintain continuous physical presence in the United States by virtue of brief, casual, and innocent absences from the United States, without regard to whether such absences were authorized by the Attorney General.

(B) For purposes of paragraph (1)(A)(ii), an alien shall not be considered to have failed to maintain continuous residence in the United States by reason of a brief, casual, and innocent absence described in subparagraph (A) or due merely to a brief temporary trip abroad required by emergency or extenuating circumstances outside the control of the alien.

**(5) Construction**

Nothing in this section shall be construed as authorizing an alien to apply for admission to, or to be admitted to, the United States in order to apply for temporary protected status under this section.

**(6) Confidentiality of information**

The Attorney General shall establish procedures to protect the confidentiality of information provided by aliens under this section.

**(d) Documentation**

**(1) Initial issuance**

Upon the granting of temporary protected status to an alien under this section, the Attorney General shall provide for the issuance of such temporary documentation and authorization as may be necessary to carry out the purposes of this section.

**(2) Period of validity**

Subject to paragraph (3), such documentation shall be valid during the initial period of designation of the foreign state (or part thereof) involved and any extension of such period. The Attorney General may stagger the periods of validity of the documentation and authorization in order to provide for an orderly renewal of such documentation and authorization and for an orderly transition (under paragraph (3)) upon the termination of a designation of a foreign state (or any part of such foreign state).

**(3) Effective date of terminations**

If the Attorney General terminates the designation of a foreign state (or part of such foreign state) under subsection (b)(3)(B), such termination shall only apply to documentation and authorization issued or renewed after the effective date of the publication of notice of the determination under that subsection (or, at the Attorney General's option, after such period after the effective date of the determination as the Attorney General determines to be appropriate in order to provide for an orderly transition).

**(4) Detention of alien**

An alien provided temporary protected status under this section shall not be detained by the Attorney General on the basis of the alien's immigration status in the United States.

**(e) Relation of period of temporary protected status to cancellation of removal**

With respect to an alien granted temporary protected status under this section, the period of such status shall not be counted as a period of physical presence in the United States for purposes of section 1229b(a) of this title, unless the Attorney General determines that extreme hardship exists. Such period shall not cause a break in the continuity of residence of the period before and after such period for purposes of such section.

**(f) Benefits and status during period of temporary protected status**

During a period in which an alien is granted temporary protected status under this section-

(1) the alien shall not be considered to be permanently residing in the United States under color of law;

(2) the alien may be deemed ineligible for public assistance by a State (as defined in section 1101(a)(36) of this title) or any political subdivision thereof which furnishes such assistance;

(3) the alien may travel abroad with the prior consent of the Attorney General; and

(4) for purposes of adjustment of status under section 1255 of this title and change of status under section 1258 of this title, the alien shall be considered as being in, and maintaining, lawful status as a nonimmigrant.

**(g) Exclusive remedy**

Except as otherwise specifically provided, this section shall constitute the exclusive authority of the Attorney General under law to permit aliens who are or may become otherwise deportable or have been paroled into the United States to

remain in the United States temporarily because of their particular nationality or region of foreign state of nationality.

**(h) Limitation on consideration in Senate of legislation adjusting status**

**(1) In general**

Except as provided in paragraph (2), it shall not be in order in the Senate to consider any bill, resolution, or amendment that-

(A) provides for adjustment to lawful temporary or permanent resident alien status for any alien receiving temporary protected status under this section, or

(B) has the effect of amending this subsection or limiting the application of this subsection.

**(2) Supermajority required**

Paragraph (1) may be waived or suspended in the Senate only by the affirmative vote of three-fifths of the Members duly chosen and sworn. An affirmative vote of three-fifths of the Members of the Senate duly chosen and sworn shall be required in the Senate to sustain an appeal of the ruling of the Chair on a point of order raised under paragraph (1).

**(3) Rules**

Paragraphs (1) and (2) are enacted-

(A) as an exercise of the rulemaking power of the Senate and as such they are deemed a part of the rules of the Senate, but applicable only with respect to the matters described in paragraph (1) and supersede other rules of the Senate only to the extent that such paragraphs are inconsistent therewith; and

(B) with full recognition of the constitutional right of the Senate to change such rules at any time, in the same manner as in the case of any other rule of the Senate.

**(i) Annual report and review**

**(1) Annual report**

Not later than March 1 of each year (beginning with 1992), the Attorney General, after consultation with the appropriate agencies of the Government, shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate on the operation of this section during the previous year. Each report shall include-

(A) a listing of the foreign states or parts thereof designated under this section,

(B) the number of nationals of each such state who have been granted temporary protected status under this section and their immigration status before being granted such status, and

(C) an explanation of the reasons why foreign states or parts thereof were designated under subsection (b)(1) and, with respect to foreign states or parts thereof previously designated, why the designation was terminated or extended under subsection (b)(3).

**(2) Committee report**

No later than 180 days after the date of receipt of such a report, the Committee on the Judiciary of each House of Congress shall report to its respective House such oversight findings and legislation as it deems appropriate.

(June 27, 1952, ch. 477, title II, ch. 5, §244, formerly §244A, as added and amended Pub. L. 101–649, title III, §302(a), title VI, §603(a)(24), Nov. 29, 1990, 104 Stat. 5030 , 5084; Pub. L. 102–232, title III, §§304(b), 307(l)(5), Dec. 12, 1991, 105 Stat. 1749 , 1756; Pub. L. 103–416, title II, §219(j), (z)(2), Oct. 25, 1994, 108 Stat. 4317 , 4318; renumbered §244 and amended Pub. L. 104–208, div. C, title III, §308(b)(7), (e)(1)(G), (11), (g)(7)(E)(i), (8)(A)(i), Sept. 30, 1996, 110 Stat. 3009–615 , 3009-619, 3009-620, 3009-624; Pub. L. 119–21, title X, §100006, July 4, 2025, 139 Stat. 369 .)

## Editorial Notes

## References in Text

This chapter, referred to in subsec. (a)(5), was in the original, "this Act", meaning act June 27, 1952, ch. 477, 66 Stat. 163 , known as the Immigration and Nationality Act, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 1101 of this title and Tables.

## Amendments

**2025**-Subsec. (c)(1)(B). Pub. L. 119–21 designated existing provisions as cl. (i), inserted cl. (i) heading, substituted "$500, subject to the adjustments required under clause (ii)" for "$50", and added cls. (ii) to (iv).

**1996**-Subsec. (a)(1)(A). Pub. L. 104–208, §308(e)(11), substituted "remove" for "deport".

Subsec. (a)(3)(B), (C). Pub. L. 104–208, §308(e)(1)(G), substituted "removal" for "deportation".

Subsec. (b)(5)(B). Pub. L. 104–208, §308(e)(1)(G), substituted "removal" for "deportation".

Subsec. (c)(2)(B)(ii). Pub. L. 104–208, §308(g)(7)(E)(i), substituted "section 1158(b)(2)(A)" for "section 1253(h)(2)".

**8 USC 1103: Powers and duties of the Secretary, the Under Secretary, and the Attorney General**
Text contains those laws in effect on September 29, 2026

**From Title 8-ALIENS AND NATIONALITY**
CHAPTER 12-IMMIGRATION AND NATIONALITY
SUBCHAPTER I-GENERAL PROVISIONS

**Jump To:**
Source Credit
Miscellaneous
References In Text
Codification
Amendments
Effective Date
Executive Documents

## §1103. Powers and duties of the Secretary, the Under Secretary, and the Attorney General

**(a) Secretary of Homeland Security**

(1) The Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: *Provided, however*, That determination and ruling by the Attorney General with respect to all questions of law shall be controlling.

(2) He shall have control, direction, and supervision of all employees and of all the files and records of the Service.

(3) He shall establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter.

(4) He may require or authorize any employee of the Service or the Department of Justice to perform or exercise any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon any other employee of the Service.

(5) He shall have the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens and shall, in his discretion, appoint for that purpose such number of employees of the Service as to him shall appear necessary and proper.

(6) He is authorized to confer or impose upon any employee of the United States, with the consent of the head of the Department or other independent establishment under whose jurisdiction the employee is serving, any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon officers or employees of the Service.

(7) He may, with the concurrence of the Secretary of State, establish offices of the Service in foreign countries; and, after consultation with the Secretary of State, he may, whenever in his judgment such action may be necessary to accomplish the purposes of this chapter, detail employees of the Service for duty in foreign countries.

(8) After consultation with the Secretary of State, the Attorney General may authorize officers of a foreign country to be stationed at preclearance facilities in the United States for the purpose of ensuring that persons traveling from or through the United States to that foreign country comply with that country's immigration and related laws.

(9) Those officers may exercise such authority and perform such duties as United States immigration officers are authorized to exercise and perform in that foreign country under reciprocal agreement, and they shall enjoy such reasonable privileges and immunities necessary for the performance of their duties as the government of their country extends to United States immigration officers.

(10) In the event the Attorney General determines that an actual or imminent mass influx of aliens arriving off the coast of the United States, or near a land border, presents urgent circumstances requiring an immediate Federal response, the Attorney General may authorize any State or local law enforcement officer, with the consent of the head of the department, agency, or establishment under whose jurisdiction the individual is serving, to perform or exercise any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon officers or employees of the Service.

(11) The Attorney General, in support of persons in administrative detention in non-Federal institutions, is authorized-

(A) to make payments from funds appropriated for the administration and enforcement of the laws relating to immigration, naturalization, and alien registration for necessary clothing, medical care, necessary guard hire, and the housing, care, and security of persons detained by the Service pursuant to Federal law under an agreement with a State or political subdivision of a State; and

(B) to enter into a cooperative agreement with any State, territory, or political subdivision thereof, for the necessary construction, physical renovation, acquisition of equipment, supplies or materials required to establish acceptable

conditions of confinement and detention services in any State or unit of local government which agrees to provide guaranteed bed space for persons detained by the Service.

**(b) Land acquisition authority**

(1) The Attorney General may contract for or buy any interest in land, including temporary use rights, adjacent to or in the vicinity of an international land border when the Attorney General deems the land essential to control and guard the boundaries and borders of the United States against any violation of this chapter.

(2) The Attorney General may contract for or buy any interest in land identified pursuant to paragraph (1) as soon as the lawful owner of that interest fixes a price for it and the Attorney General considers that price to be reasonable.

(3) When the Attorney General and the lawful owner of an interest identified pursuant to paragraph (1) are unable to agree upon a reasonable price, the Attorney General may commence condemnation proceedings pursuant to section 3113 of title 40.

(4) The Attorney General may accept for the United States a gift of any interest in land identified pursuant to paragraph (1).

**(c) Commissioner; appointment**

The Commissioner shall be a citizen of the United States and shall be appointed by the President, by and with the advice and consent of the Senate. He shall be charged with any and all responsibilities and authority in the administration of the Service and of this chapter which are conferred upon the Attorney General as may be delegated to him by the Attorney General or which may be prescribed by the Attorney General. The Commissioner may enter into cooperative agreements with State and local law enforcement agencies for the purpose of assisting in the enforcement of the immigration laws.

**(d) Statistical information system**

(1) The Commissioner, in consultation with interested academicians, government agencies, and other parties, shall provide for a system for collection and dissemination, to Congress and the public, of information (not in individually identifiable form) useful in evaluating the social, economic, environmental, and demographic impact of immigration laws.

(2) Such information shall include information on the alien population in the United States, on the rates of naturalization and emigration of resident aliens, on aliens who have been admitted, paroled, or granted asylum, on nonimmigrants in the United States (by occupation, basis for admission, and duration of stay), on aliens who have not been admitted or have been removed from the United States, on the number of applications filed and granted for cancellation of removal, and on the number of aliens estimated to be present unlawfully in the United States in each fiscal year.

(3) Such system shall provide for the collection and dissemination of such information not less often than annually.

**(e) Annual report**

(1) The Commissioner shall submit to Congress annually a report which contains a summary of the information collected under subsection (d) and an analysis of trends in immigration and naturalization.

(2) Each annual report shall include information on the number, and rate of denial administratively, of applications for naturalization, for each district office of the Service and by national origin group.

**(f) Minimum number of agents in States**

The Attorney General shall allocate to each State not fewer than 10 full-time active duty agents of the Immigration and Naturalization Service to carry out the functions of the Service, in order to ensure the effective enforcement of this chapter.

**(g) Attorney General**

**(1) In general**

The Attorney General shall have such authorities and functions under this chapter and all other laws relating to the immigration and naturalization of aliens as were exercised by the Executive Office for Immigration Review, or by the Attorney General with respect to the Executive Office for Immigration Review, on the day before the effective date of the Immigration Reform, Accountability and Security Enhancement Act of 2002.

**(2) Powers**

The Attorney General shall establish such regulations, prescribe such forms of bond, reports, entries, and other papers, issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out this section.

(June 27, 1952, ch. 477, title I, §103, 66 Stat. 173 ; Pub. L. 100–525, §9(c), Oct. 24, 1988, 102 Stat. 2619 ; Pub. L. 101–649, title I, §142, Nov. 29, 1990, 104 Stat. 5004 ; Pub. L. 104–208, div. C, title I, §§102(d), 125, 134(a), title III, §§308(d)(4)(C), (e)(4), 372, 373, Sept. 30, 1996, 110 Stat. 3009–555 , 3009-562, 3009-564, 3009-618, 3009-620, 3009-646, 3009-647; Pub. L. 107–296, title XI, §1102, Nov. 25, 2002, 116 Stat. 2273 ; Pub. L. 108–7, div. L, §105(a)(1), (2), Feb. 20, 2003, 117 Stat. 531 ; Pub. L. 108–458, title V, §5505(a), Dec. 17, 2004, 118 Stat. 3741 ; Pub. L. 111–122, §2(a), Dec. 22, 2009, 123 Stat. 3480 .)

**Federal Register** / Vol. 91, No. 9 / Wednesday, January 14, 2026 / Notices **1547**

## DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

**[CIS No. 2848–26; DHS Docket No. USCIS–2013–0006]**

**RIN 1615–ZB77**

## Termination of the Designation of Somalia for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is terminating the designation of Somalia for Temporary Protected Status. The designation of Somalia is set to expire on March 17, 2026. After reviewing country conditions and consulting with appropriate U.S. Government agencies, the Secretary determined that Somalia no longer continues to meet the conditions for designation for Temporary Protected Status. The Secretary, therefore, is terminating the Temporary Protected Status designation of Somalia as required by statute. This termination is effective March 17, 2026. After March 17, 2026, nationals of Somalia (and aliens having no nationality who last habitually resided in Somalia) who have been granted Temporary Protected Status under Somalia's designation will no longer have Temporary Protected Status.

**DATES:** The designation of Somalia for Temporary Protected Status is terminated, effective at 11:59 p.m., local time, on March 17, 2026.

**FOR FURTHER INFORMATION CONTACT:** Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, (240) 721–3000.

**SUPPLEMENTARY INFORMATION:**

### List of Abbreviations

CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
EAD—Employment Authorization Document
FR—Federal Register
FRN—Federal Register Notice
Government—U.S. Government
INA—Immigration and Nationality Act
Secretary—Secretary of Homeland Security
State—Department of State
TPS—Temporary Protected Status
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

### What Is Temporary Protected Status?

The Immigration and Nationality Act (INA) authorizes the Secretary of Homeland Security, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for Temporary Protected Status (TPS) if the Secretary determines that certain country conditions exist. *See* INA sec. 244(b)(1), 8 U.S.C. 1254a(b)(1). The Secretary, in her discretion, may grant Temporary Protected Status to eligible nationals of that foreign state (or aliens having no nationality who last habitually resided in the designated foreign state). *See* INA sec. 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a foreign state's Temporary Protected Status designation or extension, the Secretary—after consultation with appropriate U.S. Government agencies—must review the conditions in the foreign state designated for Temporary Protected Status and determine whether the conditions for the Temporary Protected Status designation continue to be met. *See* INA sec. 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the conditions in the foreign state continue to meet the specific statutory criteria for the Temporary Protected Status designation, Temporary Protected Status will be extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA sec. 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for the Temporary Protected Status designation, the Secretary must terminate the designation. *See* INA sec. 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). There is no judicial review of ''any determination of the [Secretary] with respect to the designation, or termination or extension of a designation of a foreign state'' for Temporary Protected Status. *See* INA sec. 244(b)(5)(A), 8 U.S.C. 1254a(b)(5)(A).

Temporary Protected Status is a temporary immigration benefit granted to eligible nationals of a country designated for Temporary Protected Status under the Immigration and Nationality Act, or to eligible aliens without nationality who last habitually resided in the designated country. During the designation period, Temporary Protected Status beneficiaries are eligible to remain in the United States and may not be removed so long as they continue to meet the requirements of Temporary Protected Status. In addition, Temporary Protected Status beneficiaries are authorized to work and obtain an Employment Authorization Document (EAD), if requested. Temporary Protected Status beneficiaries may also apply for and be granted travel authorization as a matter of discretion. The granting of Temporary Protected Status does not result in or lead to lawful permanent resident status or any other immigration status.

To qualify for Temporary Protected Status, beneficiaries must meet the eligibility standards at INA section 244(c)(2), 8 U.S.C. 1254a(c)(2) in accordance with the implementing regulations at 8 CFR parts 244 and 1244. When the Secretary terminates a country's designation, beneficiaries return to the same immigration status or category that they maintained before Temporary Protected Status, if any (unless that status or category has since expired or been terminated), or any other lawfully obtained immigration status or category they received while registered for Temporary Protected Status, as long as it is still valid on the date Temporary Protected Status terminates.

### Designation of Somalia for Temporary Protected Status

Somalia was initially designated for Temporary Protected Status on September 16, 1991, based on a determination that there were ''extraordinary and temporary conditions'' in Somalia that prevented Somali nationals from returning in safety and that permitting nationals of Somalia to remain temporarily in the United States is not contrary to the national interest of the United States.[1] The initial Temporary Protected Status designation for Somalia was extended nine times, from September 17, 1992–September 17, 1993,[2] September 18, 1993–September 17, 1994,[3] September 18, 1994–September 17, 1995,[4] September 18, 1995–September 17, 1996,[5] September 18, 1996–September

[1] Designation of Nationals of Somalia for Temporary Protected Status, 56 FR 46804 (Sept. 16, 1991); *see* INA 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

[2] Extension of Designation of Somalia Under Temporary Protected Status Program, 57 FR 32232 (July 21, 1992).

[3] Extension of Designation of Somalia Under Temporary Protected Status Program, 58 FR 48898 (Sept. 20, 1993).

[4] Extension of Designation of Somalia Under Temporary Protected Status Program, 59 FR 43359 (Aug. 23, 1994).

[5] Extension of Designation of Somalia; Under Temporary Protected Status Program, 60 FR 39005 (July 31, 1995).

17, 1997,[6] September 18, 1997–September 17, 1998,[7] September 18, 1998–September 17, 1999,[8] September 18, 1999–September 17, 2000,[9] and September 18, 2000–September 17, 2001.[10]

In September 2001, the Temporary Protected Status designation for Somalia was extended, and Somalia was newly designated (referred to as a redesignation).[11] Thereafter, the Temporary Protected Status designation for Somalia was extended eight times, from September 17, 2002–September 17, 2003,[12] September 17, 2003–September 17, 2004,[13] September 17, 2004–September 17, 2005,[14] September 17, 2005–September 17, 2006,[15] September 17, 2006–March 17, 2008,[16] March 18, 2008–September 17, 2009,[17] September 18, 2009–March 17, 2011,[18] and March 18, 2011–September 17, 2012.[19] Although Somalia was initially designated for Temporary Protected Status on the sole basis of extraordinary and temporary conditions, the July 2002 extension designated Somalia for Temporary Protected Status on the dual bases of ongoing armed conflict and extraordinary and temporary conditions.[20] Subsequent designations included these dual bases as justification for continuing designation.

In May 2012, the Temporary Protected Status designation for Somalia was extended, and Somalia again was newly designated.[21] Temporary Protected Status for Somalia was subsequently extended an additional five times, from March 18, 2014–September 17, 2015,[22] September 18, 2015–March 17, 2017,[23] March 18, 2017–September 17, 2018,[24] September 18, 2018–March 17, 2020,[25] and March 18, 2020–September 17, 2021.[26]

After these extensions, the Temporary Protected Status designation for Somalia was extended and Somalia was newly designated three times, from September 18, 2021–March 17, 2023,[27] March 18, 2023–September 17, 2024,[28] and September 18, 2024–March 17, 2026.[29]

## Secretary's Authority To Terminate the Designation of Somalia for Temporary Protected Status

At least 60 days before the expiration of a foreign state's Temporary Protected Status designation or extension, the Secretary—after consultation with appropriate U.S. Government agencies—must review the conditions in the foreign state designated for Temporary Protected Status to determine whether the country continues to meet the conditions for the designation. *See* INA sec. 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the foreign state no longer meets the conditions for the Temporary Protected Status designation, the Secretary must terminate the designation. *See* INA sec. 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). The termination may not take effect earlier than 60 days after the date the **Federal Register** notice of termination is published, or if later, the expiration of the most recent previous extension of the country designation. *See id.* The Secretary may determine the appropriate effective date of the termination and expiration of any Temporary Protected Status-related documentation, such as EADs, issued or renewed after the effective date of termination. *See id.; see also* INA sec. 244(d)(3), 8 U.S.C. 1254a(d)(3) (providing the Secretary the discretionary ''option'' to allow for a certain ''orderly transition'' period if she determines it to be appropriate).

## Reasons for the Secretary's Termination of the Temporary Protected Status Designation for Somalia

Consistent with INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A), after consulting with appropriate U.S. Government agencies, the Secretary reviewed country conditions in Somalia and considered whether Somalia continues to meet the conditions for the designation under INA sections 244(b)(1)(A), 8 U.S.C. 1254a(b)(1)(A) and 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C). This review included examining under INA section 244(b)(1)(A), 8 U.S.C. 1254a(b)(1)(A), whether there is ongoing armed conflict within the state, and whether, due to such conflict, requiring aliens who are nationals of that state to return would pose a serious threat to their personal safety. The Secretary also examined under INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C), whether extraordinary and temporary conditions in Somalia that prevent Somali nationals from returning in safety continue to exist, and if permitting Somali nationals to remain temporarily in the United States is contrary to the national interest of the United States.

Pursuant to INA section 244(b)(1)(A), 8 U.S.C. 1254a(b)(1)(A), the Secretary first examined whether there is ongoing armed conflict within Somalia and whether due to such conflict, requiring aliens who are nationals of that state to return would pose a serious threat to their personal safety. After independence in 1960, Somalia experienced Siad Barre's 1969 military coup and the increasingly authoritarian, clan-based governance that followed, creating widespread unrest that eventually led to the regime's collapse and the country's descent into turmoil

---

[6] Extension of Designation of Somalia Under Temporary Protected Status Program, 61 FR 39472 (July 29, 1996).

[7] Extension of Designation of Somalia Under Temporary Protected Status Program, 62 FR 41421 (Aug. 1, 1997).

[8] Extension of Designation of Somalia Under Temporary Protected Status Program, 63 FR 50156 (Sept. 18, 1998).

[9] Extension of Designation of Somalia Under Temporary Protected Status Program, 64 FR 49511 (Sept. 13, 1999).

[10] Extension of Designation of Somalia Under Temporary Protected Status Program, 65 FR 69789 (Nov. 11, 2000).

[11] Extension and Redesignation of Somalia under Temporary Protected Status Program, 66 FR 46288 (Sept. 4, 2001).

[12] Extension of the Designation of Somalia Under the Temporary Protected Status Program, 67 FR 48950 (July 26, 2002).

[13] Extension of the Designation of Somalia Under Temporary Protected Status Program, 68 FR 43147 (July 21, 2003).

[14] Extension of the Designation of Temporary Protected Status for Somalia, 69 FR 47937 (Aug. 6, 2004).

[15] Extension of the Designation of Somalia for Temporary Protected Status, 70 FR 43895 (July 29, 2005).

[16] Extension of the designation of Temporary Protected Status for Somalia; Automatic Extension of Employment Authorization Documentation for Somalia TPS Beneficiaries, 71 FR 42658 (July 27, 2006).

[17] Extension of the Designation of Somalia for Temporary Protected Status; Automatic Extension of Employment Authorization Documentation for Somali Temporary Protected Status Beneficiaries, 73 FR 13245 (Mar. 12, 2008).

[18] Extension of the Designation of Somalia for Temporary Protected Status and Automatic Extension of Employment Authorization Documentation for Somalian TPS Beneficiaries, 74 FR 37043 (July 27, 2009).

[19] Extension of the Designation of Somalia for Temporary Protected Status, 75 FR 67383 (Nov. 2, 2010).

[20] *See* Extension of the Designation of Somalia Under the Temporary Protected Status Program, 67 FR 48950 (July 26, 2002).

[21] Extension and Redesignation of Somalia for Temporary Protected Status, 77 FR 25723 (May 1, 2012).

[22] Extension of the designation of Somalia for Temporary Protected Status, 78 FR 65690 (Nov. 1, 2013).

[23] Extension of the Designation of Somalia for Temporary Protected Status, 80 FR 31056 (June 1, 2015).

[24] Extension of the Designation of Somalia for Temporary Protected Status, 82 FR 4905 (Jan. 17, 2017).

[25] Extension of the Designation of Somalia for Temporary Protected Status, 83 FR 43695 (Aug. 27, 2018).

[26] Extension of the Designation of Somalia for Temporary Protected Status, 85 FR 14229 (Mar. 11, 2020).

[27] Extension and Redesignation of Somalia for Temporary Protected Status, 86 FR 38744 (July 22, 2021).

[28] Extension and Redesignation of Somalia for Temporary Protected Status, 88 FR 15434 (Mar. 13, 2023).

[29] Extension and Redesignation of Somalia for Temporary Protected Status, 89 FR 59135 (July 22, 2024).

in 1991.[30] Following Barre's ouster in January 1991, ''no central government reemerged to take the place of the overthrown government . . . the country descended into chaos, and a humanitarian crisis of staggering proportions began to unfold.'' [31] In the context of these events, the former U.S. Attorney General designated Somalia for Temporary Protected Status on the basis of extraordinary and temporary conditions in September 1991.[32] Following the withdrawal of international forces and years of clan-related conflict, Somalia lacked a functioning central government for more than two decades, until political institutions gradually re-emerged and were formally recognized by the United States in 2013:

''In 2013, the United States officially recognized Somalia's government for the first time in 22 years, underscoring tenuous political improvements and advances against Al Shabaab. The International Monetary Fund (IMF) followed, enabling IMF technical assistance. In 2016, the United States sent its first ambassador to Somalia since 1991 and, in 2008 (*sic* 2018),[33] reestablished a permanent diplomatic presence. With support from donors, [African Union] forces, and other security and development partners, the country has transitioned from a ''failed state'' to a ''fragile state.'' '' [34]

In September 2025, the President of Somalia, Hassan Sheikh Mohamud, addressed the United Nations (UN) General Assembly, describing the country's progress as the result of ''real national effort supported by truly committed international partners'' and highlighted Somalia's transition away from the all-out civil conflict that began anew in 2012.[35] He emphasized that Somalia is now confronting only ''the last remaining pockets of international terrorism while building a strong and sustainable national security architecture,'' a characterization that underscores that the country is no longer experiencing an ongoing armed conflict.[36] Thus, while conditions at the time of previous designations reflected an ongoing armed conflict, Somalia today shows improved national governance and security structures and now experiences localized pockets of violence rather than nationwide, generalized conflict.

Moreover, requiring Somali nationals to return to Somalia would not pose a serious threat to their personal safety as there are areas within Somalia where Somali nationals may live in safety. For example, Somaliland, a territory in the north of Somalia, ''has widely been seen as an ''oasis'' for stability in a turbulent region.'' [37] Additionally, Puntland, an autonomous state, was described in early 2024 as ''a destination for many Somalis displaced by violence in the south.'' [38] U.S. Somalia policy historically has recognized the sovereignty and territorial integrity of Somalia within its 1960 borders which includes Somaliland, Puntland, and Jubaland as part of its ''One Somalia'' policy.[39] Additionally, clan ties play a significant role in life and society in Somalia and Somaliland and Puntland are no exception. Somaliland is home to several clans and minority groups. While people belonging to different clans or ethnic groups can generally reside across Hargeisa, the largest city, certain districts are dominated by certain groups. There are no formal requirements or restrictions to access and settle in Hargeisa, despite Somaliland's claim of independence. In Puntland, society is also clan-based and there are members of various clans, including those that came from southern Somalia and minority groups that have a significant presence in the largest city, Garowe.[40] Furthermore, the data surrounding internal displacement does indicate parts of the country are suitable for Somali nationals to safely return.[41]

Pursuant to INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C), the Secretary examined whether extraordinary and temporary conditions in Somalia that prevent Somali nationals from returning in safety continue to exist, and if permitting Somali nationals to remain temporarily in the United States is contrary to the national interest of the United States.

For decades, Somalia has endured prolonged conflicts and climatic shocks impacting food security. In a recent press briefing, the United Nations Secretary-General spokesperson stated: ''severe drought in the country is putting millions of people's lives at risk'' and ''approximately 3.4 million people in Somalia are currently experiencing high levels of acute food insecurity.'' [42] Al Shabaab, a designated Foreign Terrorist Organization, ''continues to exploit the Somalian government's limited state capacity and the country's dire humanitarian crises to launch indiscriminate attacks against government forces, foreign peacekeepers, and civilians.'' [43]

Despite these ongoing challenges in Somalia, the World Bank has stated that ''Somalia has made significant progress in recent years, consolidating its federal system of governance, strengthening capacity of government institutions and supporting inclusive private sector-led growth, while leveraging the momentum created by the Heavily Indebted Poor Countries (HIPC) Initiative.'' [44] Moreover, ''despite multiple climatic shocks and a complicated security situation, Somalia continued advancing structural reforms and maintained a track record of sound macroeconomic management, as evidenced by the satisfactory implementation of the International Monetary Fund (IMF) Extended Credit Facility (ECF) program.'' [45] Mogadishu, Somalia's capital, is experiencing a transformative ''building boom'': ''. . . for the first time in decades, the three million inhabitants of the capital Mogadishu . . . are

[30] U.S. Department of State, Office of the Historian, ''Somalia, 1992—1993'' (last visited Nov. 21, 2025), *https://history.state.gov/milestones/1993-2000/somalia.*

[31] *Id.*

[32] Designation of Nationals of Somalia for Temporary Protected Status, 56 FR 46804 (Sept. 16, 1991).

[33] U.S. Department of State, Reestablishment of a Permanent Diplomatic Presence in Somalia (Dec. 4, 2018), *https://2017-2021.state.gov/reestablishment-of-a-permanent-diplomatic-presence-in-somalia/.*

[34] Congressional Research Service, ''Somalia'' (June 30, 2025), *https://www.congress.gov/crs-product/IF10155.*

[35] UN News, ''Post-war Somalia proves multilateralism can make the world a better place, says President'' (Sept. 25, 2025) *https://news.un.org/en/story/2025/09/1165952.*

[36] *Id.*

[37] Council on Foreign Relations, ''Somaliland: The Horn of Africa's Breakaway State'' (Jan. 21, 2025), *https://www.cfr.org/backgrounder/somaliland-horn-africas-breakaway-state* (discussing Somalilanders as part of an ethnically and de facto politically separate entity from Somalia).

[38] British Broadcasting Corporation (BBC), ''Puntland profile'' (Apr. 3, 2024), *https://www.bbc.com/news/world-africa-14114727* (Puntland in 2024 declared its functional separation from the federal country of Somalia).

[39] Congressional Research Service, ''Somalia'' (Jun. 30, 2025), *https://www.congress.gov/crs-product/IF10155.*

[40] *See* European Union Agency for Asylum, ''Country of Origin Information Report—Somalia: Country Focus'' (May 2025), *https://www.euaa.europa.eu/sites/default/files/publications/2025-05/2025_05_EUAA_COI_Report_Somalia_Country_Focus.pdf.*

[41] United Nations High Commissioner for Refugees (UNHCR), ''Internal Displacement'' (last accessed Nov. 21, 2025), *https://data.unhcr.org/en/dataviz/1?sv=1&geo=192.*

[42] United Nations, ''Daily Press Briefing by the Office of the Spokesperson for the Secretary-General'' (Nov. 13, 2025), *https://press.un.org/en/2025/db251113.doc.htm.*

[43] Council on Foreign Relations, ''Conflict With Al-Shabaab in Somalia'' (Sept. 15, 2025), *https://www.cfr.org/global-conflict-tracker/conflict/al-shabab-somalia.*

[44] World Bank, ''Federal Republic of Somalia: Overview'' (last updated Sept. 26, 2025), *https://www.worldbank.org/en/country/somalia/overview.*

[45] *Id.*

Case: 26-1930 Document: 00118525118 Page: 123 Date Filed: 10/19/2026 Entry ID: 6853142



witnessing a building boom.''[46] The BBC reported: ''[a]ccording to the office of the mayor of Mogadishu, over the last years, more than 6,000 buildings have been constructed, marking a significant change in the city's landscape. Further, ''[s]ecurity in Mogadishu has improved, leading to an increase in high-rise and commercial buildings,'' says Salah Hassan Omar, the mayor's spokesperson.''[47] These recent developments in Somalia underscore the progress made across multiple sectors and demonstrates the country's commitment to addressing challenges and fostering growth.

Based on the review, the Secretary has determined that while some extraordinary and temporary conditions may exist in Somalia, they do not prevent Somali nationals (or aliens having no nationality who last habitually resided in Somalia) from returning in safety.

By statute, the Secretary is prohibited from designating a country for Temporary Protected Status or extending a Temporary Protected Status designation on the basis of extraordinary and temporary conditions if she finds that ''permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.''[48] The Secretary has concluded that permitting Somali nationals to remain temporarily in the United States would be contrary to the national interest of the United States.

''National interest'' is an expansive standard that may encompass an array of broad considerations, including foreign policy, public safety (*e.g.,* potential nexus to criminal gang membership), national security, migration factors (*e.g.,* pull factors), immigration policy (*e.g.,* enforcement prerogatives), and economic considerations (*e.g.,* adverse effects on U.S. workers, impact on U.S. communities).[49] Determining whether permitting a class of aliens to remain temporarily in the United States is contrary to the U.S. national interest therefore calls upon the Secretary's expertise and discretionary judgment, informed by consultations with appropriate U.S. Government agencies.

There are significant public safety and national security risks associated with the continued designation of Temporary Protected Status for Somalia. The United States named Al Shabaab a Foreign Terrorist Organization (FTO) on March 18, 2008.[50] In Executive Order 13536, former President Obama found ''that the deterioration of the security situation and the persistence of violence in Somalia, and acts of piracy and armed robbery at sea off the coast of Somalia, which have repeatedly been the subject of United Nations Security Council resolutions . . . constitute an unusual and extraordinary threat to the national security and foreign policy of the United States'' and, declared ''a national emergency to deal with that threat.''[51] Although the United States never formally severed diplomatic relations with Somalia, the U.S. Embassy in Somalia was closed in 1991. The United States formally recognized the new Federal Government of Somalia on January 17, 2013, following the adoption of a provisional constitution.[52] This lack of diplomatic engagement severely limits the U.S. government's ability to access reliable Somali records. Furthermore, the caliber of the civil and criminal history records is not comprehensive, accurate, or reliable, making meaningful vetting virtually impossible. In a January 20, 2025 Executive Order, President Trump instructed the Secretary of State, Attorney General, Secretary of Homeland Security, and the Director of National Intelligence to ''vet and screen to the maximum degree possible all aliens who intend to be admitted, enter, or are already inside the United States, particularly those aliens coming from regions or nations with identified security risks.''[53] Due to this lengthy gap in U.S. diplomatic engagement, the United States cannot adequately vet Somali nationals, particularly aliens who were approved for TPS during this period of 1991–2013, for identity, criminal history, or potential terrorist affiliations, posing an ongoing threat to public safety and national security of the United States.

These national security and public safety vulnerabilities have already been proven in the United States. In 2009, the U.S. Senate Committee on Homeland Security and Governmental Affairs held hearings titled ''Violent Islamist Extremist: Al-Shabaab Recruitment in America'' (Mar. 11, 2009) and ''Eight Years After 9/11: Confronting the Terrorist Threat to the Homeland'' (Sept. 30, 2009).[54] During a hearing, Chairman Lieberman had the following opening statement:

''Today we are going to focus on what appears to be the most significant case of homegrown American terrorism recruiting based on violent Islamist ideology. The facts, as we know them, tell us that over the last 2 years, individuals from the Somali-American community in the United States, including American citizens, have left for Somalia to support and in some cases fight on behalf of al-Shabaab, which, incidentally was designated as a foreign terrorist organization by our government in February 2008.

There are ideological, tactical, financial, and also personnel links between al-Shabaab and al-Qaeda.

Al-Shabaab, meanwhile, continues to release recruiting videos targeting Westerners, and those videos are surely being watched by some potential followers here in the United States. In the most graphic and deadly example of a direct connection between the Somali-American community and international terrorism, Shirwa Ahmed, a naturalized U.S. citizen living in the Minneapolis area, returned to Somalia within the last 2 years and killed himself and many others in a suicide bombing last October. According to Federal Bureau of Investigations (FBI) Director Robert Mueller, Shirwa Ahmed, who was radicalized in Minnesota, is probably

[46] Barron's, ''Rising From The Ashes: Mogadishu's Building Boom'' (Nov. 23, 2025), *https://www.barrons.com/news/rising-from-the-ashes-mogadishu-s-building-boom-53c34085?reflink=desktopwebshare_permalink.*

[47] BBC, ''The women at the centre of Somalia's construction boom'' (June 14, 2025), *https://www.bbc.com/news/articles/cj427dy11j0o.*

[48] *See* INA sec. 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

[49] *See, e.g., Poursina* v. *USCIS,* 936 F.3d 868, 874 (9th Cir. 2019) (observing, in an analogous INA context, ''that the 'national interest' standard invokes broader economic and national-security considerations, and such determinations are firmly committed to the discretion of the Executive Branch—not to federal courts'' (citing *Trump* v. *Hawaii,* 585 U.S. 667, 684–86 (2018)); *Flores* v. *Garland,* 72 F.4th 85, 89–90 (5th Cir. 2023) (same); *Brasil* v. *Sec'y, Dep't of Homeland Sec.,* 28 F.4th 1189, 1193 (11th Cir. 2022) (same); *cf. Matter of D–J-,* 23 I&N Dec. 572, 579–81 (A.G. 2003) (recognizing that taking measures to stem and eliminate possible incentives for potential large-scale migration from a given country is ''sound immigration policy'' and an ''important national security interest''); *Matter of Dhanasar,* 26 I&N Dec. 884, 890–91 (AAO 2016) (taking into account impact on U.S. workers in ''national interest'' assessments).

[50] U.S. Department of State, ''Foreign Terrorist Organizations'' (last updated Nov. 24, 2025), *https://www.state.gov/foreign-terrorist-organizations.*

[51] Blocking Property of Certain Persons Contributing to the Conflict in Somalia, 75 FR 19869 (Apr. 15, 2010).

[52] U.S. Department of State, ''U.S.-Somalia Relations'' (last visited Nov 24, 2025), *https://2021-2025.state.gov/countries-areas/somalia/#:~:text=Although%20the%20U.S.%20never%20formally,Somalia%20on%20January%2017%2C%202013.*

[53] Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats, 90 FR 8451 (Jan. 30, 2025).

[54] U.S. Senate, Committee on Homeland Security and governmental Affairs, March 11, 2009 and September 30, 2009, *https://www.govinfo.gov/content/pkg/CHRG-111shrg49640/html/CHRG-111shrg49640.htm.*

the first U.S. citizen to carry out a terrorist suicide bombing.'' [55]

In a separate congressional hearing by the Committee on Homeland Security in the House of Representatives, the Committee found: ''Al-Shabaab has conducted recruitment and fundraising within the Somali diaspora community in the United States, drawing considerable attention from U.S. law enforcement officials. Several Somali-Americans have been prosecuted for terrorist financing, and U.S. citizens (many, but not all, of Somali origin) have been indicted on suspicion of traveling to train and fight with al-Shabaab. Others have been prosecuted for efforts to recruit or provide financial support to the group.'' [56]

These threats and concerns remain ongoing. In October 2025, Abdisatar Ahmed Hasan, 23, pled guilty to attempting to provide material support and resources to a designated foreign terrorist organization. Hasan publicly supported Al Shabaab and later ISIS in multiple social media posts and praised terrorist attacks globally and in the United States. In December 2024, he twice attempted to travel one-way from Minnesota to Somalia with the intent to join and fight on behalf of ISIS.[57] It is deeply troubling that a young Somali man [58] with so many opportunities in the United States would choose to support Al Shabaab, a terrorist organization in Somalia. This case also raises serious concerns about inadequate vetting processes, reflecting potential gaps in how aliens were screened before being granted access to such opportunities. On December 1, 2025, Treasury Secretary Scott Bessent announced that the U.S. Treasury is ''investigating allegations that . . . Minnesotans' tax dollars may have been diverted to the terrorist organization Al-Shabaab.'' [59] DHS records indicate there are Somali nationals (or aliens who last habitually resided in Somalia) who are Temporary Protected Status beneficiaries or applicants who are or have been the subject of administrative investigations for fraud, public safety, and national security. The Secretary accordingly took account of those cases in making her determination, as fraud and egregious public safety violations are contrary to the national interest.

In Presidential Proclamation ''Restricting the Entry of Foreign Nationals to Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats'' President Trump imposed a full suspension on the admission of Somali nationals along with nationals from 11 other countries, upon country identification by the Secretary of State and after accounting for the United States' foreign policy, national security, and counterterrorism objectives.[60] For Somalia, reasons included: ''Somalia lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures'' and ''[a] persistent terrorist threat also emanates from Somalia's territory.'' [61] This was in direct response to the January 20, 2025 Executive Order, in which President Trump instructed the Secretary of State, Attorney General, Secretary of Homeland Security, and the Director of National Intelligence to ''vet and screen to the maximum degree possible all aliens who intend to be admitted, enter, or are already inside the United States, particularly those aliens coming from regions or nations with identified security risks.'' [62] On December 16, 2025, President Trump issued a new Presidential Proclamation ''Restricting and Limiting the Entry of Foreign Nationals to Protect the Security of the United States,'' in which he determined to continue to fully restrict and limit the entry of nationals from Somalia.[63]

According to the Fiscal Year (FY) 2024 DHS Entry/Exit Overstay Report, Somalia had a non-visa waiver program countries business or pleasure visitors (B–1/B–2) visa overstay rate of 21.3% and a student and exchange visitors (F, M, J) visa overstay rate of 25%.[64] These rates exceed by a large margin the global average overstay rates of 2.3% for B–1/B–2 visas and 3.2% for F, M, J visas—over nine times higher for business or pleasure visitors and seven times higher for student and exchange visitors.[65] Somalia's visa overstay rates have remained high compared to the global average from FY 2018 to FY 2024.[66] Overstaying the authorized period of admission in nonimmigrant status is a violation of U.S. immigration laws and presents challenges for immigration enforcement and resource allocation. Visa overstaying diverts resources from other critical enforcement priorities such as addressing illegal border crossings. The high-volume border environment under the previous administration, which facilitated unauthorized entries, coupled with gaps in access to verifiable information for Somali nationals, has left the United States unable to adequately vet nationals from Somalia.

There are well-documented concerns related to benefit fraud with this population. Recently, the Department of Justice charged a defendant with engaging in wire fraud as part of a $14 million autism fraud scheme. Per the charges filed against the defendant, Asha Farhan Hassan, she and her partners approached parents in the Somali community to recruit their children into Smart Therapy and worked to get children qualified for autism treatment regardless of need. Then, ''as a recruitment tactic to drive up enrollment, Hassan and her partners paid monthly cash kickback payments to the parents of children who enrolled their children in Smart Therapy to receive autism services.'' [67] In 2023, a couple pleaded guilty to their roles in a $250 million fraud scheme that exploited a federally funded child nutrition program during the COVID–19 pandemic. Per the Department of Justice, ''Ali and Hussein enrolled their companies, Lido Restaurant and Somali American Faribault Education (SAFE) respectively, in the Federal Child

---

[55] *Id.*

[56] U.S. House of Representatives, Committee on Homeland Security, ''From Al-Shabaab to Al-Nusra: How Westerners Joining Terror Groups Overseas Affect the Homeland'' (Oct. 9, 2013), *https://www.congress.gov/event/113th-congress/house-event/LC1003/text.*

[57] U.S. Department of Justice, ''Press Release: ISIS Supporter Pleads Guilty to Material Support of Terrorism'' (Oct. 1, 2025), *https://www.justice.gov/usao-mn/pr/isis-supporter-pleads-guilty-material-support-terrorism.*

[58] U.S. Department of Justice, ''United States District Court for the District of Minnesota, United States of America v. Abdisatar Ahmed Hassan'' Case No. 25–mj–104 (DLM) (Feb. 27, 2025), *https://www.justice.gov/d9/2025-02/25-mj-104_complaint_packet.pdf* (''HASSAN is a twenty-two-year-old ethnic-Somali male resident of Minneapolis, Minnesota . . . [a] review of records provided by [USCIS] indicate HASSAN was born in Garissa, Kenya, in 2002. HASSAN's parents were both listed as having been born in Badade (variant Badhadhe), Somalia, which is located in the Lower Juba Region in southern Somalia.'')

[59] X (formerly known as Twitter), Treasury Secretary Scott Bessent @SecScottBessent (Dec. 1, 2025), *https://x.com/secscottbessent/status/1995615377284628908?s=46&t=qR3vODA0Fo4X5Pm3n4psEw.*

[60] Restricting the Entry of Foreign Nationals To Protect The United States From Foreign Terrorists and Other National Security and Public Safety Threats, 90 FR 24497 (June 10, 2025).

[61] *Id.*

[62] Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats, 90 FR 8451 (Jan. 30, 2025).

[63] Restricting and Limiting the Entry of Foreign Nationals to Protect the Security of the United States, 90 FR 59717 (Dec. 19, 2025) (originally published Dec. 16, 2025).

[64] U.S. Customs and Border Protection, Entry/Exit Overstay Report, Department of Homeland Security (Jul. 16, 2025), *https://www.dhs.gov/sites/default/files/2025-08/25_0826_cbp_entry-exit-overstay-report-fiscal-year-2024.pdf.*

[65] *Id.*

[66] *Id.*

[67] U.S. Department of Justice, ''Press Release: First Defendant Charged in Autism Fraud Scheme'' (Sept. 24, 2025), *https://www.justice.gov/usao-mn/pr/first-defendant-charged-autism-fraud-scheme-0.*

Nutrition Program under the sponsorship of Feeding Our Future. After enrolling, Hussein and Ali began submitting fraudulently inflated invoices for reimbursement in which they claimed to be serving meals to thousands of children a day.'' [68] In 2024, three others, Haji Osman Salad, Sharmarke Issa and Khadra Abdi, pleaded guilty to their roles in the same $250 million fraud scheme that exploited a federally funded child nutrition program during the COVID–19 pandemic. According to the Department of Justice, ''between June 2020 through 2022, Salad falsely claimed that Haji's Kitchen was a food vendor for more than 15 million meals to various Federal Child Nutrition Program sites in Minnesota . . . [a]ccording to court documents, Issa, the principal of Minnesota's Somali Community and Wacan Restaurant LLC, fraudulently received Federal Child Nutrition Program funds under the sponsorship of Sponsor A and Feeding Our Future, respectively.'' [69]

Fraud and misrepresentation with U.S. immigration petitions have also been a concern. In 2017, DHS announced that it was seeking denaturalization against four Somali nationals who engaged in fraud and misrepresentation. In that case, Fosia Abdi Adan, a native of Somalia, applied for and received a diversity visa and used her visa to unlawfully obtain beneficiary visas for three aliens who she purported to be her husband and children despite having no relationship to them, and their using completely false identities.[70] In July 2025, a Somali national with familial ties to ISIS-Somalia was sentenced in federal court for committing asylum fraud.[71]

There are compelling foreign policy reasons for ending the Temporary Protected Status designation for Somalia. In Executive Order ''America First Policy Directive to the Secretary of State,'' President Trump declared ''from this day forward, the foreign policy of the United States shall champion core American interests and always put America and American citizens first.'' Moreover, it instructed ''as soon as practicable, the Secretary of State shall issue guidance bringing the Department of State's policies, programs, personnel, and operations in line with an America First foreign policy, which puts America and its interests first.'' [72] In recent remarks, John Kelley, a Political Counselor at the U.S. Mission to the United Nations stated ''[t]he United States remains committed to the fight against terrorism in Somalia, but it is ultimately time for other partners with vested interests in Somalia's security, stability, and future to increase their financial contributions.'' [73] In light of these directives and statements, it is clear that ending Temporary Protected Status for Somalia aligns with U.S. foreign policy by prioritizing American interests and encouraging greater international responsibility.

In sum, the Secretary's decision to terminate the Temporary Protected Status designation for Somalia is grounded in a comprehensive assessment of national interest factors including public safety, national security, immigration integrity, foreign policy, as well as an analysis of the nature of the violence in the country today. The significant change in armed conflict from the initial designation of Temporary Protected Status for Somalia in September 1991 to the present shows that violence no longer constitutes an ongoing armed conflict nor does it fully prohibit Somali nationals from returning in safety. Moreover, in light of the continued national security and public safety risks combined with the fraud and foreign policy considerations, these factors considered individually and cumulatively establish that Somalia no longer meets the statutory basis for Temporary Protected Status.

DHS estimates that there are 1,082 [74] current approved beneficiaries under the designation of Somalia for Temporary Protected Status. As of December 8, 2025, there are 1,383 total pending applications for the designation of Somalia for Temporary Protected Status.

**Effective Date of Termination of the Designation**

The Temporary Protected Status statute provides that the termination of a country's Temporary Protected Status designation may not be effective earlier than 60 days after the notice is published in the **Federal Register** or, if later, the expiration of the most-recent previous extension. *See* INA sec. 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

The Temporary Protected Status statute authorizes the Secretary, at her discretion, to allow for an extended ''orderly transition'' period with respect to the termination and the expiration of any Temporary Protected Status-related documentation, such as EADs. The Secretary has determined, in her discretion, that a 60-day transition period is sufficient and warranted here given the Secretary's finding that continuing to permit Somali nationals to remain temporarily in the United States is contrary to the U.S. national interest. *See* INA sec. 244(d)(3), 8 U.S.C. 1254a(d)(3). Accordingly, the termination of the Somalia Temporary Protected Status designation will be effective 60 days from this notice's publication date.[75]

DHS recognizes that Somalia Temporary Protected Status beneficiaries under the designation continue to be employment authorized during the 60-day transition period.[76] Accordingly, through this **Federal Register** notice, DHS automatically extends the validity of certain EADs previously issued under the Temporary Protected Status designation of Somalia through March 17, 2026. Therefore, as proof of continued employment authorization through March 17, 2026, Temporary Protected Status beneficiaries can show their EADs that have the notation A–12 or C–19 under Category and a ''Card Expires'' date of March 17, 2023, September 17, 2024, and March 17, 2026.

The Secretary has considered putative reliance interests in the Somalia Temporary Protected Status designation,

[68] U.S. Department of Justice, ''Press Release: Faibault Couple Plead Guilty to Their Roles in $250 Million Feeding Our Future Fraud Scheme'' (Jun. 6, 2023), *https://www.justice.gov/usao-mn/pr/faribault-couple-plead-guilty-their-roles-250-million-feeding-our-future-fraud-scheme.*

[69] U.S. Department of Justice, ''Press Release: Three Plead Guilty to Wire Fraud in $250 Million Feeding Our Future Fraud Scheme'' (Sept. 20, 2024), *https://www.justice.gov/usao-mn/pr/three-plead-guilty-wire-fraud-250-million-feeding-our-future-fraud-scheme.*

[70] DHS, ''Denaturalization Sought Against Four Somalia-born Individuals Who Falsely Claimed to be a Family and Were Admitted to the United States on Diversity Immigrant Visas'' (Nov. 6, 2017), *https://www.dhs.gov/archive/news/2017/11/06/denaturalization-sought-against-four-somalia-born-individuals-who-falsely-claimed.*

[71] U.S. Department of Justice, ''Press Release: Somali National with Familial Ties to ISIS-Somalia Sentenced for Committing Asylum Fraud'' (Jul. 28, 2025), *https://www.justice.gov/usao-sdca/pr/somali-national-familial-ties-isis-somalia-sentenced-committing-asylum-fraud-0.*

[72] America First Policy Directive to the Secretary of State, 90 FR 8337 (Jan. 29, 2025).

[73] U.S. Mission to the UN, ''Remarks at a UN Security Council Briefing on Cooperation Between the UN and the African Union (AU),'' Oct. 7, 2025, *https://usun.usmission.gov/remarks-at-a-un-security-council-briefing-on-cooperation-between-the-un-and-the-african-union-au/.*

[74] DHS, Office of Performance and Quality, estimate as of Dec. 8, 2025.

[75] *See* 8 CFR 244.19 (''Upon the termination of designation of a foreign state, those nationals afforded temporary Protected Status shall, upon the sixtieth (60th) day after the date notice of termination is published in the **Federal Register**, or on the last day of the most recent extension of designation by the [Secretary of Homeland Security], automatically and without further notice or right of appeal, lose Temporary Protected Status in the United States. Such termination of a foreign state's designation is not subject to appeal.'').

[76] *See* INA 244(a)(1)(B), 8 U.S.C. 1254a(a)(1)(B); *see also* 8 CFR 244.13(b).

especially when considering whether to allow for an additional transition period akin to that allowed under certain previous Temporary Protected Status terminations. Temporary Protected Status, as the name itself makes clear, is an inherently temporary status. Temporary Protected Status designations are time-limited and must be periodically reviewed, as frequently as every six months in some cases, and Temporary Protected Status notices clearly notify aliens of the designations' expiration dates. Further, whether to allow for an orderly transition period is left to the Secretary's unfettered discretion. *See* INA sec. 244(b)(3), (d)(3); 8 U.S.C. 1254a(b)(3), (d)(3). The statute inherently contemplates advance notice of a termination by requiring timely publication of the Secretary's determination and delaying the effective date of the termination by at least 60 days after publication of a **Federal Register** notice of the termination or, if later, the existing expiration date. *See* INA sec. 244(b)(3)(A)–(B), (d)(3); 8 U.S.C. 1254a(b)(3)(A)–(B), (d)(3).

**Notice of the Termination of the Temporary Protected Status Designation of Somalia**

By the authority vested in me as Secretary under INA section 244(b)(3), 8 U.S.C. 1254a(b)(3), I have reviewed, in consultation with the appropriate U.S. Government agencies, (a) conditions in Somalia; (b) whether permitting nationals of Somalia (and aliens having no nationality who last habitually resided in Somalia) to remain temporarily in the United States is contrary to the national interest of the United States; and (c) whether Somalia is experiencing ongoing armed conflict that poses a serious threat to the personal safety of Somali nationals. Based on my review, I have determined that Somalia no longer continues to meet the conditions for Temporary Protected Status under INA sections 244(b)(1)(A), 8 U.S.C. 1254a(b)(1)(A) and 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

Accordingly, I order as follows:

(1) Pursuant to INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B), and considering INA section 244(d)(3), 8 U.S.C. 1254a(d)(3), the designation of Somalia for Temporary Protected Status is terminated effective at 11:59 p.m., local time, on March 17, 2026.

(2) Information concerning the termination of Temporary Protected Status for nationals of Somalia (and aliens having no nationality who last habitually resided in Somalia) under the designation will be available at local USCIS offices upon publication of this notice and through the USCIS Contact Center at 1–800–375–5283. This information will also be published on the USCIS website at *www.uscis.gov.*

**Kristi Noem,**

*Secretary of Homeland Security.*

[FR Doc. 2026–00596 Filed 1–13–26; 11:15 am]

BILLING CODE 9111–97–P

## DEPARTMENT OF THE INTERIOR

### Bureau of Land Management

**[A2407–014–004–065516; #O2509–014–004–125222]**

### Notice of Realty Action: Noncompetitive (Direct) Sale of Public Land in Moffat County, CO

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Notice of realty action.

**SUMMARY:** The Bureau of Land Management (BLM) is proposing a non-competitive (direct) sale of 2.13 acres of public land in the Little Snake Field Office to Moffat County. The sale would resolve an inadvertent unauthorized use of public land. The sale would be subject to the applicable provisions of the Federal Land Policy and Management Act of 1976 (FLPMA), as amended, and the BLM land sale regulations. The surface estate would be sold for no less than the appraised fair market value of $17,000.00.

**DATES:** Interested parties must submit written comments no later than March 2, 2026.

**ADDRESSES:** Mail written comments to Robert Swithers, District Manager, Northwest District Office, 455 Emerson Street, Craig, CO 81625, or submit them online via the BLM National NEPA Register at *https://eplanning.blm.gov/eplanning-ui/project/2038945/510.*

**FOR FURTHER INFORMATION CONTACT:** Kymm Hampton at the above address, or by telephone at 970–826–5089, or by email at *kgresset@blm.gov.* Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States.

**SUPPLEMENTARY INFORMATION:** The Browns Park School is in far northwestern Colorado, closer to the Utah and Wyoming borders than to any major Colorado city. For many years, the Browns Park School property was assumed to be owned by Moffat County. It was discovered in 1994 that the buildings were inadvertently placed on Federal public land in the 1940s and Moffat County only holds ownership over the buildings and associated improvements. After many years of negotiation, the BLM proposes to offer the land for direct sale to resolve the issue.

The following described public land in Moffat County has been examined and found suitable for sale under the authority of sections 203 and 209 of FLPMA, as amended.

**Sixth Principal Meridian, Colorado**

T. 9 N., R. 102 W.,
Sec. 2, lot 36;
Sec. 3, lot 24.

The area described contains 2.13 acres, according to the official plat of survey of the said land, on file with the BLM.

The above-described land was segregated on September 14, 2020, from all forms of appropriation under the public land laws, including the mining laws, except for the sale provision of the FLPMA (85 FR 56627). Upon publication of this notice and until completion of the sale, the BLM will not accept land use applications affecting the identified public land except applications for the amendment of previously filed right-of-way applications or existing authorizations to increase the term of the grants in accordance with 43 CFR 2807.15. Pursuant to 43 CFR 2711.1–2, the land will not be sold until after March 16, 2026.

The proposed sale is in conformance with the BLM Little Snake Resource Management Plan, approved in October 2011, as addressed on page RMP–52 under Management Actions: Allowable Uses and Actions. The mineral potential is unknown and the mineral estate would not be conveyed, in accordance with section 209 of FLPMA. A parcel-specific environmental assessment (EA), document number DOI–BLM–CO–N010–2025–0032–EA, was prepared in connection with this realty action and may be viewed at *https://eplanning.blm.gov/eplanning-ui/project/2038945/510.* Existing historical structures make the subject parcel difficult for the BLM to manage. Under the FLPMA section 203, disposal of the subject parcel is allowable because existing characteristics are difficult and uneconomic to manage and disposal of the tract will serve important public objectives, including but not limited to, expansion of communities and economic development.